UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

                      REPORT & RECOMMENDATION

              Plaintiff,

                      03-CR-6033L

      v.

CHAD MARKS

              Defendant.

---

## PRELIMINARY STATEMENT

By Order of Hon. David G. Larimer, United States District Judge, dated April 14, 2003, all pre-trial matters in the above captioned case have been referred to this Court pursuant to 28 U.S.C. §§ 636(b)(1)(A)-(B).  (Docket # 27).

Defendant Chad Marks ("Marks") is charged in eleven counts of a sixteen-count superseding indictment.  The first count charges that between August 2002 and February 2003, Marks, along with co-defendants Nathan Brown and Tommy Hardy, conspired to possess with intent to distribute and to distribute fifty grams or more of cocaine base, in violation of 21 U.S.C. § 846.  Count Seven charges that on February 4, 2003, Marks possessed with intent to distribute fifty grams or more of cocaine base, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A), and 18 U.S.C. § 2.  The eighth count of the superseding indictment charges that on September 25, 2002, Marks and Hardy unlawfully possessed a firearm in furtherance of a drug trafficking crime, specifically, the narcotics conspiracy charged in Count One, in violation of 18 U.S.C. §§ 924(c)(1) and 2.  Count Nine charges that on November 15, 2002, Marks and Hardy possessed

with intent to distribute cocaine base, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C), and 18 U.S.C. § 2.  The tenth count charges that on November 15, 2002, Marks and Hardy possessed a firearm in furtherance of a drug trafficking crime, specifically, the narcotics offense charged in Count Nine, in violation of 18 U.S.C. §§ 924(c)(1) and 2.  The eleventh through sixteenth counts of the superseding indictment charge that on November 30, December 3, December 5, December 18, and December 26, 2002, respectively, Marks possessed cocaine base with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C), and 18 U.S.C. § 2.  (Docket # 96).

Currently pending before this Court are Marks's motions to suppress statements and tangible evidence.  Also before the Court is Marks's motion to suppress a photographic identification.  Finally, Marks moves to suppress communications intercepted pursuant to a wiretap of his cellular telephone.  (Docket # 94).[1]  The following constitutes this Court's Report and Recommendation regarding Marks's motions.

## FACTUAL BACKGROUND

On November 29, December 14, and December 15, 2004, this Court conducted evidentiary hearings on Marks's motions to suppress.  (Docket ## 115, 128, 130).  Officers Lisa Hayes, John DiMascio, Brian Kehrig and Scott Wehr, and Sergeants David Druzynski and Brett

---

[1] Marks's omnibus motions also sought, *inter alia*, *Brady* material, *Jencks* material, rulings on evidentiary matters under Rules 404 and 609 of the Federal Rules of Evidence, preclusion of expert witnesses, removal of surplusage from the Indictment, dismissal of the indictment, and discovery and inspection.  Each of these requests was either resolved by the parties or decided in open court by the undersigned on September 21, 2004, or December 15, 2004.  (Docket ## 103 128).

Sobieraski of the Rochester Police Department testified on behalf of the government.  No witnesses were called on behalf of the defense.

          **Testimony Relating to September 25, 2002 Encounter:**  Officer Bryan Kehrig testified concerning a report of a possible burglary on September 25, 2002 in the vicinity of 52 Murray Street.  Marks was one of the individuals present in the area, and he spoke to Kehrig when Kehrig responded to the scene.  Following the hearing, Marks withdrew his motion to suppress these statements, conceding that "any statements were non-custodial and therefore not subject to suppression."  (Docket # 163 at 5).

          **Testimony Relating to October 15, 2002 Traffic Stop:**  Officer Lisa Hayes testified that on October 15, 2002, she established surveillance of 622 Monroe Avenue in response to multiple reports of prostitution and drug activity in the area.  Hayes was in uniform and in a marked police vehicle.  (Tr. 6).[2]  During her surveillance, Hayes recognized certain individuals she knew to have a history of prostitution entering the residence.  At approximately 12:32,[3] Hayes observed Marks arrive at the location in a red pickup truck and enter the residence at 622 Monroe Avenue.  (Tr. 6-7).  Approximately ten minutes later, Marks returned to his vehicle and drove away.  Hayes testified that a female passenger was in the truck with Marks. (Tr. 7).

---

[2]  The transcript of the suppression hearing conducted before this Court on November 29, December 14, and December 15, 2004, shall hereinafter be referenced as "Tr. __."  (Docket # 136).

[3]  Officer Hayes did not specify whether her observations occurred at 12:32 in the afternoon or early morning.  (Tr. 6).

Hayes followed Marks's vehicle and conducted a traffic stop because she "knew he was coming from a drug location, and also[] knew [from other officers, that] he didn't have a driver's license." (Tr. 9). Hayes testified that she approached the vehicle and asked Marks whether he knew why she had stopped him. Marks immediately replied that he knew he was leaving a "drug house," but stated that he was not involved with that "stuff." (Tr. 9). Marks also indicated that his brother lived at the location he "just left from" and that his brother sold narcotics from that location. (Tr. 12). Marks also stated that he had gone to 622 Monroe Avenue to place a sign at the property for his business, Infinity Home Improvements, and presented Hayes with checks bearing the name of Infinity Home Improvements. (Tr. 15).

While Marks was still in his vehicle, Hayes asked him whether he had a driver's license, and he responded that he did not. (Tr. 9). After some additional conversation, Hayes asked Marks to get out of his vehicle and to accompany her to her police vehicle, which Marks did. (Tr. 10). Once in the patrol car, Hayes conducted a records check and confirmed that Marks did not have a valid driver's license.[4] (Tr. 10). Hayes also testified that, for reasons of officer safety, she questioned Marks regarding threats he allegedly had made to other officers. First, Hayes asked Marks whether he had any guns, to which Marks replied that he did not. (Tr. 10). Hayes then told Marks that she "had heard of him before" and that he was "well-known on the west side." (Tr. 10). Hayes further asked Marks whether he had threatened to shoot certain officers during a shift change. Marks admitted having made such threat, but stated that he was angry at the time and would not really do it. (Tr. 10-11).

---

[4] On cross-examination, Hayes admitted that she was not certain that Marks did not have a license until she conducted the records check. (Tr. 17).

4

According to Hayes, throughout the conversation, Marks acted in a cooperative, light-hearted manner.  The encounter lasted for approximately fifteen minutes, after which Hayes issued Marks a traffic infraction ticket for operating a motor vehicle without a license and released him.  An acquaintance of Marks arrived to drive the pickup truck, and Marks left the scene as a passenger in that vehicle.  (Tr. 11-12).

**Testimony Relating to November 17, 2002 Encounter:**  Officer Scott Wehr testified that on November 17, 2002, he and Officer Carl Dickerson responded to 445 Lyell Avenue for the purpose of investigating a possible burglary.  (Tr. 45-48).  When they arrived at the location, the officers observed a ladder on the east side of the building leading to the roof.  (Tr. 54).  Near the base of the ladder, they were met by a white female standing on the ground.  A white male was also getting onto the ladder from the roof.  Wehr asked the male to come down, which he did.  (Tr. 54).  While speaking with the two individuals, another male, later identified as Marks, came out of the second floor window onto the roof.  (Tr. 55).  Marks came down the ladder, and Officer Dickerson asked the three individuals what they were doing.  The woman identified herself as Kathleen Doherty and informed the officers that they were there to retrieve her belongings.  (Tr. 56-57).  Once Dickerson obtained the identities of the three individuals, he initiated a records check to determine whether any of them had any warrants outstanding against them.  (Tr. 57).

Marks then used his cellular telephone to place a call to an individual whom he identified as the landlord of the building.  Marks handed the telephone to Wehr, and Wehr spoke to the individual.  Wehr explained that he and Dickerson were at the location investigating a

5

report of a possible burglary.  The individual advised Wehr that he would come to the property

the next day to allow the residents into the apartment.  (Tr. 58).  Following the conversation,

Wehr returned the cellular telephone to Marks.  Shortly thereafter, the officers received the

results of the records check revealing no outstanding warrants for any of the three individuals.

At this point, Officers Wehr and Dickerson left the scene.  (Tr. 59).

       Wehr testified that at no time during the encounter were any of the individuals

arrested or placed in the police car.  Neither Marks nor his companions were charged with any

crime.  (Tr. 59).

       **<u>Testimony Relating to a Photographic Identification</u>:** Sergeant Druzynski

testified concerning a photographic identification procedure conducted on November 29, 2002.

(Tr. 87).  On that date, Druzynski and Officer Simpson met with an individual who had allegedly

been assaulted by Marks.  (Tr. 87-88).  During this meeting, which took place at the witness's

home, Druzynski informed the witness that he was going to show him some photographs and

instructed him to indicate whether he recognized any of the individuals depicted.  (Tr. 88, G.Ex.

3A).  Druzynski then presented the witness with a photographic array containing six

photographs.  Within one-minute, the witness pointed to the sixth photograph and stated that it

was Chad Marks, the person who had assaulted him.  (Tr. 88).  Druzynski provided the witness

with a pen and asked him to write the name of the suspect he had identified.  The victim then

wrote "Chad" across the photograph depicting Marks.  (Tr. 89, G.Ex. 3A).

       According to Druzynski, neither he nor Simpson in any way suggested to the

witness which of the photographs he should select.  The witness was also shown a second array

that did not contain a photograph of Marks, and he did not identify any of the individuals

depicted. (Tr. 90). Following the photographic identification procedures, Druzynski presented

the witness with a written deposition that Druzynski had prepared based upon a prior interview

with the witness. Druzynski instructed the witness to read the deposition and, if it was accurate,

to sign it. (Tr. 94-96). Druzynski testified that he did not make any reference to the deposition

until after the witness had identified Marks in the photographic array. (Tr. 95).


**Testimony Relating to December 2, 2002 Traffic Stop:** Officer John Anthony

DiMascio testified concerning a second traffic stop of Marks that occurred on December 2, 2002.

(Tr. 25). DiMascio testified that on that date, he observed a vehicle driving northbound on

Seneca Avenue that did not have working taillights. (Tr. 26). DiMascio initiated a traffic of the

vehicle without knowing at the time that Marks was the driver. Once he approached the car,

however, he recognized Marks.

Marks provided DiMascio with a New York State driver's license or identification

card[5] and informed him that his driving privileges had been suspended. (Tr. 26-27). As a result,

DiMascio removed Marks from the vehicle and placed him in the back seat of the police car.

(Tr. 27). DiMascio testified that he removed Marks to his patrol car in order to perform a records

check for outstanding warrants and to ensure officer safety. According to DiMascio, he had

previously been advised by other officers that Marks was a dangerous person and that there were

"weapons issues." (Tr. 27). Once in the patrol car, DiMascio questioned Marks about his

---

[5] DiMascio did not have a clear recollection whether Marks provided him with a license or a photographic
identification card. (Tr. 27, 33).

driver's license, asking him when it had been suspended and for what reason. (Tr. 28-29, 33). Marks responded to the question[6] and then asked, "Why are the cops always bothering me?" (Tr. 28-29, 35). DiMascio replied that it was because of his reputation. Marks then stated, "It's probably because I deal drugs . . . I can't help it, you don't understand – the money is good and it keeps pulling me in." (Tr. 30).

According to DiMascio, the entire encounter in the police car lasted for less than fifteen minutes, during which Marks was neither handcuffed, nor threatened with arrest. (Tr. 30-31). DiMascio confirmed on the terminal in his patrol car that Marks's driver's license had been suspended for failure to pay fines. He therefore issued Marks two traffic tickets, one for having deficient taillights and one for the unlicensed operation of a motor vehicle. (Tr. 31). Marks then exited the police car and walked to a nearby apartment complex. Before leaving, he handed DiMascio a business card, encouraging DiMascio to call him if he ever needed any remodeling work done. (Tr. 32).

**Testimony Relating to Controlled Purchase of Narcotics:** Druzynski also testified concerning a controlled purchase of narcotics by a confidential informant from Chad Marks. On December 3, 2002, Druzynski and Officer Terri Dearcop met with a confidential informant as part of an effort to obtain evidence against Marks. (Tr. 78). The officers initially searched the informant for money and drugs. Finding none, Druzynski equipped the informant with a transmitting device, which would enable the officers to overhear any conversations between the informant and other persons. (Tr. 70). The conversations were not recorded.

---

[6] DiMascio did not testify as to the substance of Marks's response.

Once the informant was equipped and searched, he was driven in an unmarked car to the area of 168 Masseth Street.  Upon arrival at the location, Druzynski observed a Mitsubishi Eclipse – a car known to be driven by Marks – parked in front of the residence.  (Tr. 72, 79).  Druzynski let the informant out of the car and drove to an area from which he and Dearcop could listen to the monitor.  (Tr. 70-71).

Druzynski testified that he then overheard a conversation between the informant and another male.  According to Druzynski, the voice of the male sounded "similar" to one he had heard during a previously monitored conversation that had been identified as Marks's voice.  (Tr. 71-71, 80-81).  During the conversation, the male, who Druzynski believed to be Marks, explained to the informant that the quantity of cocaine could be made to appear larger if it were cut into diagonal slices instead of square pieces.  (Tr. 71-72).  Druzynski testified that "[i]t appeared that the CI made the buy of the cocaine."  (Tr. 72).

Following the conversation, the officers returned to the area of 168 Masseth Street and observed the Mitsubishi Eclipse driving away.  (Tr. 72, 79).  The informant returned to the car and handed Dearcop a plastic bag containing a rocky substance later determined to be cocaine base.  The informant related that Marks had sold him the narcotics and stated that Marks had instructed him how to cut the cocaine so that it would appear more substantial than it actually was.  (Tr. 72).

**Testimony Relating to Marks's Arrest on February 4, 2003:**  Sergeant Brett Sobieraski testified concerning Marks's arrest on February 4, 2003.  On that day, pursuant to a court-authorized wiretap order, Sobieraski was supervising the interception of telephone calls

over Marks's cellular phone, and three telephone conversations were intercepted between Marks

and a male who was subsequently identified as co-defendant Nathan Brown.  (Tr. 97).

Sobieraski believed, based upon his training and experience and knowledge of Marks's activities

as a result of the wiretap investigation, that the purpose of the calls was for Marks to arrange a

meeting with "Nate" "to reup his cocaine supply."  (Tr. 97, G.Ex. 4).  "Reup," Sobieraski

testified, referred to purchasing cocaine.  (Tr. 97).

> Specifically, Sobieraski explained that at the time these calls occurred, Sobieraski

had been advised by the lead investigating agents that they believed that Nate was Marks's

supplier of cocaine (Tr. 121); at that time, the investigating agents also believed that Nate and

Marks's narcotics transactions occurred in the vicinity of 189 Pierpont Street.  (Tr. 100-101,

121-26).  The basis for the belief that Nate was Marks's supplier derived in part from prior

intercepted communications between Marks and "Nate," as well as a prior incident involving an

individual named Richard Ross near 189 Pierpont Street.  On that prior occasion, Marks

apparently had a conversation with Ross in which he directed Ross to pick up narcotics.  Shortly

thereafter, Ross called a cab to the area near 189 Pierpont Street, and a utilities check identified

Nathan Brown as the subscriber of utilities for one of the apartments at that address.  (Tr.

124-25).  Sobieraski also disclosed that the investigating agents had reviewed a police report in

which Marks's supplier was identified as "Nate"; Sobieraski was unable to provide any details

about the source of the information in the report.  (Tr. 125).

> The government submitted a transcript of the three telephone calls intercepted on

the day of Marks's arrest.  (G.Ex. 4).  The transcript provides as follows:

      First Call - 6:26 p.m.

| | |
|---|---|
| Brown: | Hello |
| Marks: | Yo, what up |
| Brown: | What's going on |
| Marks: | What's it look in like |
| Brown: | Wa, It's cool, where you at? |
| Marks: | Um, I'm right over there on Emerson |
| Brown: | Ohhh |
| Marks: | Where are you? |
| Brown: | I'm here at th the, – inaudible – right across from um, right across from Moe Joe's. |
| Marks: | Alright, how long? |
| Brown: | I'll be there like, I'll be there like, ah, bout ten minutes. |
| Marks: | Alright, One |

      Second Call - 6:38 p.m.

| | |
|---|---|
| Marks: | What up |
| Brown: | Yo |
| Marks: | Where you at? |
| Brown: | Yo, meet me on Lakeview! |
| Marks: | Alright, I'm comin now |

      Third Call - 6:44 p.m.

| | |
|---|---|
| Brown: | Hello |
| Marks: | Yo, that you behind |
| Brown: | Yea, I'm on a |
| Marks: | Yea, you see that niger [*sic*] right there look up the road a bit |
| Brown: | I'm about to pull let me wait for a sec before you pull up |
| Marks: | All right |
| Brown: | I'm about to go upstairs |
| Marks: | All right |

(G.Ex. 4).

      Sobieraski testified that after intercepting the first call, he deployed surveillance

teams to look for Marks and Nate.  Because he was not sure where this suspected transaction was

to take place, Sobieraski directed his surveillance team towards the northern part of the city of

Rochester near Emerson Street, which had been mentioned in the first call.  (Tr. 101).  Once the

second call was intercepted, referring to Lakeview Avenue, Sobieraski redirected the team.  (Tr.

102).  As Sobieraski explained, Lakeview Avenue intersects with Pierpont Street one block south

of 189 Pierpont.  (Tr. 101).  Sobieraski also responded to the area of Lakeview Avenue.  While

on his way, Sobieraski heard police dispatches by other officers indicating that Marks had been

seen in a black Jeep Cherokee, that he had been observed leaving his vehicle and meeting with an

individual in a red Ford Explorer on Lakeview, that he had returned to his car, and that both

vehicles had driven off.  (Tr. 102, 131-32, 140-41).

      After receiving this information, Sobieraski observed Marks drive up directly

behind his vehicle while he was stopped at the intersection of Lakeview Avenue and Dewey

Avenue, and he decided to stop Marks's car.  (Tr. 103, 126).  To effectuate such a stop,

Sobieraski backed his car towards Marks's vehicle and instructed the officer behind him to pull

behind the rear of Marks's car so that he would be "boxed in."  Once Marks's Jeep was secured,

the officers exited their cars.  As Sobieraski approached the Jeep, the passenger, later identified

as Richard Ross, fled on foot.  (Tr. 103).  After Ross was apprehended, a search was conducted

of the area through which he ran.  (Tr. 105, 107, G.Exs. 6, 7).  According to Sobieraski, the

search was difficult because there was snow on the ground.  After approximately four hours of

searching, which included the use of a canine detection unit, fifty-one grams of cocaine base

were recovered from the area.  (Tr.109).

      While the search was ongoing, Marks was taken to the Public Safety Building,

and while he was being detained, Sobieraski learned that Marks's driving privileges had been

suspended.  (Tr. 104-05, 107).  During this time, he also learned that the driver of the red Ford

Explorer in fact had been Nathan Brown.  (Tr. 132).

Finally, Sobieraski testified that at the time he approached Marks's vehicle, he

believed he had probable cause to arrest Marks.  His belief, he testified, was based upon his

knowledge of the wiretap investigation, the calls immediately preceding the arrest, the meeting

between Marks and the male in the red Explorer, and prior narcotics sales by Marks.  (Tr. 137-

38).


## REPORT AND RECOMMENDATION

Marks moves this Court to suppress statements and tangible evidence.  Marks also

moves to suppress the photographic identification procedure conducted on November 29, 2002.

Finally, Marks challenges the admissibility of communications intercepted pursuant to a wiretap

of his cellular telephone.  (Docket # 94).


## I.  Suppression of Statements

Marks moves to suppress statements made by him on three occasions.  The first

set consists of statements made by Marks to Officer Hayes on October 15, 2002.  The second

comprises statements made by Marks to Officer Wehr on November 17, 2002.  The final set of

statements challenged by Marks consist of those made by him to Officer DiMascio on December

2, 2002.  (Docket # 94).

**A.  Statements Made to Officer Hayes:**  With respect to the statements made

during the traffic stop by Officer Hayes on October 15, 2002, Marks argues that he was

13

unlawfully detained and that his statements were the product of custodial interrogation because he was not advised of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966). To analyze Marks's claim, this Court must first determine whether the initial traffic stop by Hayes was justified. If so, it must then determine whether the statements at issue were the product of custodial interrogation.

       **1. Traffic Stop:** As the Second Circuit has observed, an ordinary traffic stop constitutes a limited seizure within the meaning of the Fourth Amendment. *United States v. Scopo*, 19 F.3d 777, 781 (2d Cir.) (citing *Delaware v. Prouse*, 440 U.S. 648, 653 (1979)), *cert. denied*, 513 U.S. 877 (1994). A traffic stop must be justified by probable cause or "reasonable suspicion, based on specific and articulable facts, of unlawful conduct." *Id.* (quoting *United States v. Hassan El*, 5 F.3d 726, 729 (4th Cir. 1993), *cert. denied*, 511 U.S. 1006 (1994)); *see Terry v. Ohio*, 392 U.S. 1, 30 (1968) (police officer may lawfully conduct brief stop and frisk for weapons, without probable cause, if officer "observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot"); *see also Knowles v. Iowa*, 525 U.S. 113, 117 (1998) (routine traffic stop is more analogous to *Terry* stop than to formal arrest). Evidence obtained as the result of an unjustified traffic stop "is subject to the fruit of the poisonous tree doctrine" and may be suppressed. *Scopo*, 19 F.3d at 781 (citing *Hassan El*, 5 F.3d at 729); *see also Wong Sun v. United States*, 371 U.S. 471, 488 (1963).

       On a motion to suppress, a defendant bears the initial burden of establishing that a government official acting without a warrant subjected him to a search or seizure. *United States v. Arboleda*, 633 F.2d 985, 989 (2d Cir.1980) (citations omitted), *cert. denied*, 450 U.S. 917 (1981); *United States v. Chavis,* 48 F.3d 871, 872 (5th Cir.1995); *United States v. Bayless*, 921

F. Supp. 211, 213 (S.D.N.Y. 1996).  Once the defendant has met this burden, the burden then

shifts to the government to demonstrate by a preponderance of the evidence, *id.* at 213, that the

search or seizure did not violate the Fourth Amendment.  *Arboleda*, 633 F.2d at 989; *see also*

*United States v. Bonilla Romero*, 836 F.2d 39, 45 (1st Cir. 1987) ("[w]hen it has acted without a

warrant, the ultimate burden of persuasion is then upon the government to show that its evidence

is not tainted") (citing *Alderman v. United States*, 394 U.S. 165, 183 (1969)), *cert. denied*, 488

U.S. 817 (1988).

   Here, Officer Hayes testified that she conducted a traffic stop of Marks's vehicle.

(Tr. 9).  Thus, the government bears the burden of establishing that probable cause or reasonable

suspicion existed to stop Marks's vehicle.  I find that this burden has been satisfied.

   Officer Hayes testified that on October 15, 2002, she was conducing surveillance

of 622 Monroe Avenue due to reported prostitution and narcotics-related activity.  (Tr. 6).

During such surveillance, Hayes observed individuals known to have a history of prostitution

entering the premises at 622 Monroe Avenue.  Hayes also testified that she observed Marks drive

up to that location in a red truck and enter the premises.  Approximately ten minutes later, Marks

returned to his vehicle and drove away.  (Tr. 6-7).  Because Hayes had been informed previously

by other officers that Marks did not have a valid driver's license, and because she had observed

him entering and exiting a suspected drug location, Hayes conducted a traffic stop of Marks's

vehicle.  (Tr. 9).

   Judged on this record, I find that Hayes was justified in conducting the traffic stop

of Marks.  The mere fact that Hayes observed Marks driving a vehicle after having been advised

that he did not have a valid driver's license created an articulable suspicion that Marks was

committing the crime of operating a motor vehicle without a license.  *See Illinois v. Wardlow*, 528 U.S. 119, 123-26 (2000) (when officer has a reasonable, articulable suspicion that criminal activity is afoot involving a vehicle, a brief investigative detention is warranted); *Terry v. Ohio*, 392 U.S. 1, 30 (1968); *United States v. Owens*, 142 F. Supp. 2d 255, 164 (D. Conn. 2001) (traffic stop justified by officer's reasonable belief that defendant was driving with a suspended license); New York Vehicle and Traffic Law § 511 (McKinney 2005) (defining Aggravated Unlicensed Operation of a Motor Vehicle in the third degree as a misdemeanor punishable by a fine, or by a term of imprisonment of not more than thirty days, or both); *see also Whren v. United States*, 517 U.S. 806, 809-10 (1996) ("the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred"); *United States v. Harrell*, 268 F.3d 141, 148-49 (2d Cir. 2001) (officer's observations that car had defective brake light and impermissibly tinted windows justified traffic stop); *United States v. Scopo*, 19 F.3d 777, 782 (2d Cir.) ("[w]hen an officer observes a traffic offense – however minor– he has probable cause to stop the driver of the vehicle") (internal quotation omitted), *cert. denied*, 513 U.S. 877 (1994).

Although Officer Hayes did not testify as to the date on which she learned from other officers that Marks did not have a license, the reasonable inference is that her information was current.  First, her testimony was that she knew from other officers that he did not have a license (Tr. 9), not that at some point in the past he had driven without a license.  In addition, she testified that at the time of her surveillance, she had a photograph of Marks and was looking specifically for him in order to question him.  (Tr. 20-23).  Hayes apparently had prepared in advance for her encounter with Marks, and I find it reasonable to infer from her testimony as a whole that her discussions with other officers concerning the status of Marks's driving privileges

16

were part of that preparation.  On this record, and drawing the inferences noted, I conclude that the government has established reasonable suspicion to support the October 15, 2002 traffic stop.

**2. Statements Made by Marks:**  Having found that the traffic stop was justified, this Court must now determine whether the statements made by Marks during the subsequent encounter were obtained in violation of his constitutional rights.  As established by the Supreme Court, statements made during custodial interrogation are generally inadmissible unless a suspect first has been advised of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966).  In *Miranda*, the Supreme Court held that the prosecution may not use a defendant's statements that are the product of custodial interrogation unless it demonstrates that the defendant first was warned of his Fifth Amendment privilege against self-incrimination and then voluntarily waived that right.  *Id.* at 444.

In the case at bar, Hayes testified that upon conducting the traffic stop of Marks's vehicle, she approached the vehicle and asked Marks whether he knew why she had stopped him.  According to Hayes, Marks "immediately replied he knew he was leaving a drug house, but he wasn't involved with that stuff."  (Tr. 9).  Hayes then asked Marks whether he had a driver's license, and he indicated that he did not.  (Tr. 9).  Marks also stated that he had gone to 622 Monroe Avenue that day in order to place a sign at the property for his business, Infinity Home Improvements.  (Tr. 15).  Following this conversation, Hayes asked Marks to accompany her to her police vehicle, which Marks did.  (Tr. 10).

Once in the patrol car, Hayes performed a records check, which confirmed that Marks's driving privileges had been suspended.  More conversation occurred between Hayes and Marks during the course of that records check, most of which related to alleged threats that

17

Marks had made – presumably, the subject matter about which Hayes had planned to question

Marks.  Hayes then issued Marks a traffic infraction for driving without a license and released

him.  (Tr. 12).

In its post-hearing memorandum of law, the government argues only that the

statements made by Marks while in his own vehicle should be admissible, apparently choosing

not to press the admissibility of his statements in Hayes's patrol car.  Accordingly, this Court will

confine its analysis to the first set of statements.

As an initial matter, the government concedes that Marks was not advised of his

*Miranda* warnings.  Rather, the government contends that administration of the *Miranda*

warnings was unnecessary because Marks was not in custody at that time.  (Docket # 160).  As

framed by the Second Circuit,

> [c]ustodial interrogation exists when a law enforcement official
> questions an individual and that questioning was (1) conducted in
> custodial settings that have inherently coercive pressures that tend
> to undermine the individual's will to resist and to compel him to
> speak (the in custody requirement) and (2) when the inquiry is
> conducted by officers who are aware of the potentially
> incriminating nature of the disclosures sought (the investigative
> intent requirement).

*United States v. Rodriguez*, 356 F.3d 254, 258 (2d Cir. 2004) (citing *United States v. Morales*,

834 F.2d 35, 38 (2d Cir. 1987)) (internal citations omitted).

Although there is no rule exempting traffic stops from the reach of *Miranda*, *see*,

*e.g.*, *United States v. Newton*, 181 F. Supp. 2d 157, 170 (E.D.N.Y. 2002) ("Supreme Court did

not adopt a bright-line rule that *Miranda* warnings are never required during [traffic] stops")

(citing *Berkemer v. McCarty*, 468 U.S. 420, 440-42 (1984)), routine traffic stops generally do not

constitute custodial settings.  *See Berkemer v. McCarty*, 468 U.S. at 440-42 (the "noncoercive

aspect of ordinary traffic stops prompts us to hold that persons temporarily detained pursuant to

such stops are not 'in custody' for the purposes of *Miranda*"); *United States v. Newton*, 369 F.3d

659, 669 (2d Cir. 2004) (acknowledging *Berkemer* holding that routine traffic stops do not

constitute custodial detentions for purposes of *Miranda*); *United States v. Fernandez-Jimenez*,

2004 WL 1598653, *5 (S.D.N.Y. 2004) ("[a]lthough motorists do not feel free to leave, traffic

stops are not a form of custodial interrogation because they are brief and public") (citation

omitted); *United States v. Perez*, 2002 WL 1835601, *6 (S.D.N.Y. 2002) ("persons temporally

detained pursuant to [traffic] stops are not 'in custody' for the purposes of *Miranda*") (citation

omitted).

Here, Hayes posed her initial questions to Marks while he was still in his own

vehicle, and the circumstances of their encounter were typical of a routine, non-custodial traffic

stop.  Moreover, the particular questions asked by Hayes – "Do you know why I stopped you?"

and "Do you have a driver's license?" – are common questions asked during a traffic stop and do

not themselves convert the traffic stop into a custodial setting.  The questions do not in any way

convey the threat of arrest, and thus would not have led a reasonable person to conclude that he

was in custody.  Accordingly, I find that Marks was not in custody when he was in his vehicle,

and his statements to Officer Hayes were not the product of custodial interrogation.  I thus

recommend that Mark's motion to suppress the statements made by him while in his vehicle on

October 15, 2002 be denied.

B.  **Statements Made to Officer Wehr:**  Marks also moves to suppress all

statements made to Officer Wehr on November 17, 2002.  Marks argues that the government has

presented the Court with insufficient evidence to establish that his alleged statements to Wehr
were made freely and voluntarily.

     **1. Confusion Regarding Location of Encounter:** Wehr testified that on
November 17, 2002, he and Officer Dickerson responded to Lyell Avenue concerning a report of
a possible burglary. Wehr appeared to be confused as to the precise address to which he
responded. During the December 14, 2004 hearing, Wehr originally identified the address as 445
Lyell Avenue and described it as having two apartments on the upper level and a bar on the lower
level. (Tr. 54). On cross-examination, Wehr testified that he had mistakenly recorded the
address because the property at 445 Lyell Avenue is actually a house. (Tr. 60). Wehr stated that
he was confident that the location from which he observed Marks come out of a second-story
window contained a bar on the first floor. Wehr then identified the address of his encounter with
Marks as 541 Lyell Avenue. (Tr. 64-65).

     During the December 15, 2004 hearing, following the presentation of its final
witness, the government moved to recall Officer Wehr for the purpose of correcting his previous
day's testimony regarding the address at which the November 17, 2002 incident occurred. (Tr.
142). Defendant objected to the reopening of the hearing. This Court allowed the officer to
resume the stand, but reserved decision on whether such additional testimony would be
admissible for purposes of the hearing. (Tr. 145). I now grant the government's motion to recall
Officer Wehr. *See United States v. Tzakis*, 736 F.2d 867,872 (2d Cir. 1984) (decision whether to
reopen suppression hearing is within court's discretion).

     Upon reexamination, Wehr testified that during his initial testimony he mistakenly
identified the location of his encounter as 541 Lyell Avenue, a house with a bar on the ground

floor.  (Tr. 146-48).  On recall, Wehr testified that following his previous day's testimony, he returned to Lyell Avenue and identified the location of his encounter with Marks as 445 Lyell Avenue.  (Tr. 146).

      **2.  Encounter With Marks:**  Wehr testified that after arriving at the Lyell Avenue location, he and Officer Dickerson confronted Marks and two other individuals who were using a ladder to enter and exit a second story apartment.  (Tr. 45-48, 54).  One of the individuals explained to the officers that they were attempting to retrieve her belongings from the apartment.  (Tr. 56-57).  After speaking to an individual who claimed to be the landlord and performing a records check to confirm that none of the individuals had warrants outstanding against them, Wehr and Dickerson left the scene.  (Tr. 58, 59).  According to Wehr, at no time during the encounter were any of the individuals arrested or placed in the police car.  Neither Marks nor his companions were charged with any crimes.  (Tr. 59).

      Marks contends that suppression is warranted because Wehr's testimony was "insufficiently reliable to permit the Court to determine what occurred on [the] date [in question] [and] consequently, whether the statements that the government alleges defendant made should be admitted or suppressed."  (Docket # 163 at 5-6).  Marks does not assert, however, that he was either in custody at the time the statements were made, or that the statements were made in response to interrogation by the officers.  Thus, Marks has failed to raise a constitutional issue for the Court's consideration.  Instead, Marks appears to contend that Wehr is an unreliable witness and his testimony should be precluded.  Such an argument is one more appropriately reserved for the trial court.

This Court agrees that Wehr's testimony was confusing concerning the location of the encounter, but disagrees with Marks as to the significance of such confusion for purposes of his suppression motion.  Whether the encounter occurred at 445 Lyell Avenue or 541 Lyell Avenue, Marks was not in custody at the time the statements in question were made, nor were his statements made in response to interrogation by Wehr.

I reject Marks's contention that Wehr's confusion as to the location renders unreliable his identification of Marks.  Wehr was able to provide a thorough summary of the events occurring on November 17, 2002.  He specifically recalled Marks exiting a second story window and later using his cellular telephone to call the landlord of the premises.  Indeed, at the hearing, Wehr spontaneously identified the individual he encountered as the defendant Marks. (Tr. 55).  That Wehr could have recalled the unusual events of his interaction with Marks even if he could not remember the particular address where they occurred seems entirely plausible to this Court.  Accordingly, I recommend that Marks's motion to suppress statements made on November 17, 2002, be denied.

**C.  <u>Statements Made to Officer DiMascio</u>:**  Marks also challenges the statements made by him to Officer DiMascio during a subsequent traffic stop on December 2, 2002.  Because Marks again argues that the initial stop of his vehicle was unjustified and that any statements made during the stop should be suppressed, this Court will address separately the appropriateness of the traffic stop and the admissibility of the statements subsequently made.

**1.  Initial Traffic Stop:**  DiMascio testified that on December 2, 2002, while in his patrol car, he observed a vehicle driving without taillights on Seneca Avenue, which is a violation of New York's vehicle and traffic laws.  (Tr. 26, 31).  *See* N.Y. Veh. & Traf. Law

22

§ 375(40)(b) (McKinney 2004).  Based upon his observation, DiMascio conducted a traffic stop

of the vehicle.  (Tr. 26).  DiMascio further stated that he did not realize that Marks was the driver

of the vehicle at the time he initiated the stop.  (Tr. 26).

On this record, the traffic stop was plainly valid.  DiMascio observed a vehicle

with defective taillights and, on that basis alone, he was justified in conducting the stop.  *See*

*United States v. Harrell*, 268 F.3d at 148-49 (officer's observations that car had defective brake

light and impermissibly tinted windows justified traffic stop); *United States v. Garcia*, 279 F.

Supp. 2d 294, 298 (S.D.N.Y. 2003) (finding that defective brake light and excessively tinted

windows were independently sufficient to justify traffic stop); *see also Scopo*, 19 F.3d at 782

("[w]hen an officer observes a traffic offense – however minor– he has probable cause to stop the

driver of the vehicle") (internal quotation omitted).

**2.  Statements:**  DiMascio testified that after stopping Marks's car, Marks

provided him with a New York driver's license or identification card bearing his name and

photograph, but also indicated that his license had been suspended.  (Tr. 26-27).  As a result,

DiMascio testified that he removed Marks from the vehicle and directed him into the rear seat of

his police car, as he does with any driver who does not have a license.  (Tr. 27).  According to

DiMascio's testimony, he placed Marks in the rear of his patrol car to ensure officer safety as he

performed a records check relating to Marks's driver's license.  (Tr. 27).  He did not place him in

handcuffs.  (Tr. 30).

While conducting the records check, DiMascio questioned Marks regarding the

reason his license had been suspended.  (Tr. 28-29, 33).  Following an undisclosed response to

that question, Marks asked, "Why are the cops always bothering me?"  (Tr. 28-29).  DiMascio

23

responded that it was probably because of his reputation, to which Marks replied, "It's probably because I deal drugs . . . I can't help it, you don't understand – the money is good and it keeps pulling me in." According to DiMascio, these statements by Marks were not part of the conversation concerning his license, but occurred "separate and apart" from that conversation. (Tr. 35).

Following these statements, DiMascio confirmed that Marks's driver's license had been suspended for failure to pay fines, and he issued Marks traffic tickets for deficient taillights and the unlicensed operation of a motor vehicle.  (Tr. 28-33).  Marks then left the patrol car and walked to a nearby apartment complex to visit a friend.  (Tr. 32).  Before he did, he gave DiMascio a business card for his remodeling business.  (Tr. 32).

As discussed above, the government may not introduce in its direct case a defendant's statements that are the product of custodial interrogation unless it demonstrates that the defendant was first warned of his Fifth Amendment privilege against self-incrimination and then voluntarily waived that right.  *Miranda v. Arizona*, 384 U.S. at 444.  Unlike the previous traffic stop, Marks does not challenge the statements he made while in his own vehicle during the December 2, 2002 stop; rather, he challenges the statements made after he was removed from his vehicle and placed in the rear of DiMascio's police car.  At that time, Marks argues, he was in custody and interrogated by DiMascio.

As already noted, routine traffic stops do not generally constitute custodial settings mandating the administration of *Miranda* warnings.  *Berkemer v. McCarty*, 468 U.S. at 440-42.  Courts are nonetheless required to consider the totality of the circumstances of the traffic stop to determine whether the motorist was subjected to treatment that would render him

"in custody" for practical purposes.  *Berkemer*, 468 U.S. at 440; *United States v. Newton*, 181 F.

Supp. 2d at 170-71.  If so, *Miranda* warnings are required before interrogation may occur.

The test for determining whether a defendant was "in custody" involves a two-part

analysis.  First, the court must consider whether a reasonable person in defendant's position

would have felt free to leave.  *United States v. Newton*, 369 F.3d 659, 672 (2d Cir. 2004).  If so,

the court must then determine "whether a reasonable person in defendant's position would have

understood himself to be subjected to the restraints comparable to those associated with a formal

arrest."  *Id*. at 671 (quoting *United States v. Ali*, 68 F.3d 1468, 1472 (2d Cir. 1995)).  According

to the Second Circuit's recent decision in *Newton*:

>Because seizure is a necessary prerequisite to *Miranda*, *see, e.g.,*
>*Oregon v. Mathiason*, 429 U.S. [492, 495 (1977)] [], it makes
>sense for a court to begin any custody analysis by asking whether a
>reasonable person would have thought he was free to leave the
>police encounter at issue.  If the answer is yes, the *Miranda* inquiry
>is at an end; the challenged interrogation did not require advice of
>rights.  On the other hand, if a reasonable person would not have
>thought himself free to leave, additional analysis is required
>because, as *Berkemer v. McCarty*, 468 U.S. [420, 439-40 (1984)]
>[], instructs, not every seizure constitutes custody for purposes of
>*Miranda*.  *Cf. Posr v. Doherty*, 944 F.2d 91, 98 (2d Cir. 1991)
>("[I]t is not enough to say a person has been *arrested* simply
>because, due to police action, he reasonably believes he is not free
>to leave.")  In such cases, a court must ask whether, in addition to
>not feeling free to leave, a reasonable person would have
>understood his freedom of action to have been curtailed to a degree
>associated with formal arrest.  *See California v. Beheler*, 463 U.S.
>[1121, 1125 (1983)] []; *see also Stansbury v. California*, 511 U.S.
>[318, 322 (1994)] [].  Only if the answer to this second question is
>yes was the person "'in custody' for practical purposes," and
>"entitled to the full panoply of protections prescribed by *Miranda*."
>*Berkemer v. McCarty*, 468 U.S. at 440 [].

*United States v. Newton*, 369 F.3d at 672.

In determining whether a lawful investigatory stop involves restraints generally associated with a formal arrest, two factors are of principal relevance.  The first is "whether a reasonable person in the suspect's shoes would have understood that his detention was not likely to be 'temporary and brief.'"  *Id.* at 675 (quoting *Berkemer v. McCarty*, 468 U.S. at 437).  The second is "whether a person stopped under the circumstances at issue would feel that he was 'completely at the mercy of the police.'"  *Id.* (quoting *Berkemer*, 468 U.S. at 438).

I find that a reasonable person in Marks's position, while he likely would not have felt free to leave the encounter, would not have understood his freedom to have been curtailed to a degree associated with formal arrest.  Even though Marks was placed in the back seat of DiMascio's police vehicle as a records check was being performed, that alone does not transform the encounter into a custodial one.  "A reasonable investigation following a justifiable traffic stop may include asking for the driver's license and registration, asking the driver to sit in the patrol car, and asking about the driver's destination and purpose."  *United States v. Allegree*, 175 F.3d 648, 650 (8th Cir.) (citing *United States v. Ramos*, 42 F.3d 1160, 1163 (8th Cir. 1994)), *cert. denied*, 528 U.S. 958 (1999); *see United States v. Prince*, 157 F. Supp. 2d 316, 325 (D. Del. 2001) ("there is no *per se* rule that the use of handcuffs or placement in a police car during a traffic stop constitutes an arrest") (citations omitted); *United States v. Graham*, 119 F. Supp. 2d 116, 127-28 (D. Conn. 2000) (defendant not in custody for purposes of *Miranda* despite fact that she was placed in police car during traffic stop).

Here, DiMascio conducted a traffic stop of Marks's vehicle after observing that it did not have operating taillights.  When asked to produce his driver's license, Marks willingly volunteered that his license had been suspended.  As a result, Marks was placed in the backseat

of DiMascio's patrol car so that he could perform a records check.  During this check, DiMascio questioned Marks only about his driving privileges and the reasons they were suspended.  I find nothing in these circumstances to suggest that a reasonable person would have believed his detention to be other than temporary and brief.  Indeed, Marks's own experience supports that conclusion – as described *supra*, when Marks was previously detained for driving without a license, he was not arrested, but was issued a ticket and released.

Moreover, even if Marks were in custody, I find that his challenged statements were spontaneous and voluntary and not a product of interrogation.  *Miranda v. Arizona*, 384 U.S. at 478 ("[a]ny statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence").  DiMascio testified credibly that Marks's question to him – "Why are the cops always bothering me?" – was not part of the conversation about Marks's license, but occurred "separate and apart" from that conversation.  Moreover, the nature of Marks's question was substantively unrelated to DiMascio's questions about his license.  Where, as here, the defendant spontaneously initiates a conversation by asking a question unrelated to the subject matter of the officer's questions, no constitutional basis exists to suppress that question or his subsequent statement to the officer's response.  *See, e.g.*, *United States v. Castro*, 723 F.2d 1527, 1530 (11th Cir. 1984) (defendant's statement that "[w]e got money" was an attempted bribe and was completely unresponsive to officer's question, "What in the world is going on here?"; the statement thus was not obtained in violation of *Miranda*); *United States v. Thomas*, 961 F. Supp. 43, 45-46 (W.D.N.Y. 1997) (defendant's statement that he would have killed another officer was unresponsive to question relating to the genesis of the altercation and was therefore spontaneous and voluntary).

## II.  Suppression of Tangible Evidence

Also before the Court is Marks's motion to suppress tangible evidence seized following his arrest on February 4, 2003.  Marks contends that law enforcement did not have probable cause to arrest him, and thus any evidence subsequently seized should be suppressed as fruit of the unlawful arrest.  (Docket # 163).  This Court disagrees.  Marks's motion to suppress should be denied on two independent grounds.  First, probable cause to arrest Marks existed based solely upon the controlled purchase by a confidential informant two months prior to his arrest.  Second, the traffic stop of Marks's vehicle was justified by reasonable suspicion, which subsequently ripened into probable cause once narcotics were recovered.

Probable cause exists when "the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient in themselves to warrant a person of reasonable caution in the belief that (1) an offense has been or is being committed (2) by the person to be arrested."  *United States v. Fisher*, 702 F.2d 372, 375 (2d Cir. 1983); *see also United States v. Patrick*, 899 F.2d 169, 171 (2d Cir. 1990) (citing *Brinegar v. United States*, 338 U.S. 160, 175-76 (1949)).

Sergeant Druzynski testified that on December 3, 2002, he and Officer Dearcop supervised a controlled purchase of narcotics by a confidential informant from Marks.  Specifically, the officers drove the informant to the area of 168 Masseth Street, where they observed a car believed to be driven by Marks.  (Tr. 69-71).  The informant entered the residence wearing a transmitting device.  Thereafter, the officers overheard a conversation between the informant and a male believed to be Marks, during which the male explained to the informant how he could cut the cocaine to make it appear more substantial.  (TR. 71-72).  According to

28

Druzynski, he concluded that a narcotics transaction had occurred between the informant and

Marks.  Druzynski and Dearcop then returned to the area of 168 Masseth Street and observed

Marks's vehicle driving away.  The informant provided to the officers a small bag containing

cocaine base that he advised he had purchased from Marks.  The informant also provided a

description of his conversation with Marks, which was consistent with that overheard by the

officers.  (Tr. 72).

Based upon this controlled purchase alone, I find that law enforcement had

sufficient information to "warrant a person of reasonable caution in the belief" that a narcotics

trafficking crime had been committed by Marks.  *See United States v. Fisher*, 702 F.2d at 375.

Thus, probable cause to arrest Marks existed at the time of the controlled purchase on December

3, 2002.  That the arrest was not made contemporaneously and was made without a warrant does

not render the arrest unconstitutional.[7]  *See United States v. Watson*, 423 U.S. 411 (1976).

Sobieraski's testimony is unclear, however, as to whether, and to what extent, he

relied upon the alleged December sale when he stopped Marks's car in February.  Although

Sobieraski eventually testified that he believed probable cause existed to arrest Marks based upon

the controlled purchase, he did not mention the purchase specifically when he was initially

questioned about his basis for believing that probable cause existed for the arrest.  Rather, he first

cited the wiretap investigation and the events immediately preceding the stop.  (Tr. 137-38).

Whether his reference to the wiretap investigation was meant to include the alleged controlled

---

[7]  To the extent that Marks argues that the narcotics sale was "stale" and thus could not have provided
probable cause for his arrest (*see* Docket # 163 at 12), that argument should be rejected.  The concept of "staleness,"
plainly relevant in evaluating search warrants, is generally inapposite to arrests, so long as they are supported by
probable cause and are otherwise within the statute of limitations and the confines of due process.  *See generally
United States v. Marion*, 404 U.S. 307, 321-24 (1971).

purchase – a purchase which predated the wiretap order but was part of the investigation of Marks – is simply unclear.  Considering this lack of clarity, this Court will address the alternative argument that Marks's interactions with Nathan Brown on the date of his arrest also provided independent probable cause for the arrest.

Sobieraski testified that on February 4, 2003, he supervised the interception of a series of telephone communications pursuant to a wiretap investigation of Marks.  The communications were between Marks and another individual identified as Nate, who, for reasons described *supra*, the investigating officers believed to be Marks's supplier of narcotics.  During the first call, Marks and Nate arranged to meet at an undisclosed location in approximately ten minutes.  (Tr. 99, G.Ex. 4).  Approximately twelve minutes later, they spoke again and agreed to meet on Lakeview Avenue, which was near the location to which Ross allegedly had traveled previously to obtain narcotics for Marks.  (Tr. 99, G.Ex. 4).  During the final call, placed approximately six minutes later, Marks and Brown finalized the details of their imminent meeting.  (Tr. 100, G.Ex. 4).

Sobieraski testified that after intercepting the first two calls, he and other officers drove towards Lakeview Avenue.  (Tr. 102).  On his way there, he learned from other officers that Marks has been observed driving a black Jeep Cherokee, that he had exited the car on Lakeview and had met with an individual in a red Ford Explorer, that he had returned to his car and had driven away.  (Tr. 102).  A short while later, Marks pulled up behind Sobieraski at the intersection of Lakeview Avenue and Dewey Avenue, and Sobieraski and other officers stopped his car.  As they approached Marks's car, the passenger, later identified as Ross, fled from the car.

30

Following Ross's apprehension, a search for narcotics was conducted of the area through which he ran. (Tr. 105, 107). As a result of the snowy weather, the search took approximately four hours and required the use of a canine detection unit. During this period, Marks was detained at the Public Safety Building while Sobieraski and others considered the offenses with which he should be charged. Before the crack cocaine was discovered, Sobieraski learned that Marks's license had been revoked, and he and others considered charging Marks only with that offense. (Tr. 116). When Sobieraski was later advised that the search had uncovered 52 grams of crack cocaine, a determination was apparently made to charge Marks with narcotics conspiracy. (Tr. 107). For reasons explained below, I find that Sobieraski's traffic stop and subsequent detention of Marks while the search ensued was justified by reasonable suspicion and did not violate the Fourth Amendment.

As already noted, a traffic stop must be supported by probable cause or "reasonable suspicion, based on specific and articulable facts, of unlawful conduct." *United States v. Scopo*, 19 F.3d at 781; *see Terry v. Ohio*, 392 U.S. at 30 (police officer may lawfully conduct brief stop and frisk for weapons, without probable cause, if officer "observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot"); *see also Knowles v. Iowa*, 525 U.S. at 117 (routine traffic stop analogous to *Terry* stop). Evidence obtained as the result of an unjustified traffic stop "is subject to the fruit of the poisonous tree doctrine" and may be suppressed. *Scopo*, 19 F.3d at 781 (citing *Hassan El*, 5 F.3d at 729); *see also Wong Sun v. United States*, 371 U.S. at 488.

Here, adequate evidence existed to establish reasonable suspicion for the traffic stop. Sobieraski testified that he believed, based upon intercepted communications that day and

31

other evidence obtained during the course of the investigation, that Marks was making plans to

meet with his cocaine supplier, Nate.  That suspicion appears reasonable to me based upon the

explanation Sobieraski offered during his testimony.  After making these arrangements through a

series of short, cryptic conversations, Marks apparently did meet with another individual in his

car close to the area where law enforcement believed Ross had previously purchased drugs from

Brown.  They met for only a very brief time, after which they both drove away.  On these facts, I

find that reasonable suspicion existed to stop Marks's car.  *See United States v. Seijo*, 2003 WL

21035245, *3-4 (S.D.N.Y. 2003) (*Terry* stop was justified based upon series of intercepted

telephone communications apparently arranging a meeting between defendant and suspected

narcotics distributor, and subsequent surveillance of such meeting).

        I further find that after approaching the Jeep and observing Ross flee, Sobieraski

was justified in detaining Marks as the search for narcotics was conducted in the area through

which Ross ran.  *See Illinois v. Wardlow*, 528 U.S. 119, 124 (flight of suspect one factor

supporting reasonable suspicion).  While the four-hour detention of Marks may have been longer

than would be justified in the average traffic stop, the combination of Ross's flight from the

scene following a suspected narcotics purchase and the snowy weather warranted the prolonged

investigative detention.  *United States v. Sharpe*, 470 U.S. 675, 685 (1985) ("cases impose no

rigid time limitation on *Terry* stops"); *United States v. Montoya De Hernandez*, 473 U.S. 531,

542-44 (1985) (detention of defendant for almost sixteen hours deemed reasonable under the

circumstances of the case); *Michigan v. Summers*, 452 U.S. 692, 700, n.12 (1981) ("If the

purpose underlying a *Terry* stop – investigating possible criminal activity – is to be served, the

police must under certain circumstances be able to detain the individual for longer than the brief

time period involved in *Terry*").  Of course, once the narcotics were discovered, Sobieraski

would have had probable cause to believe that Marks was involved in a narcotics conspiracy.

*Maryland v. Pringle*, 540 U.S. 366, 372 (2003) (narcotics discovered in rear seat of car presumed

to be possessed by all three occupants of the car, thus establishing probable cause for arrest).

 In any event, before the four-hour search ended, law enforcement had learned that

Marks's driving privileges had been revoked.  This discovery provided independent probable

cause to arrest Marks.

 On this record, I conclude, in the alternative to my finding that the December 3rd

alleged controlled purchase provided probable cause to arrest Marks, that the initial traffic stop

on February 4, 2003 was supported by reasonable suspicion, which subsequently ripened into

probable cause for arrest upon the discovery both that Marks's license had been revoked and that

crack cocaine had been discovered during the search.  Thus, it is my recommendation that

Marks's motion to suppress tangible evidence based upon lack of probable cause be denied.


## III.  <u>Suppression of Photographic Identification</u>

 Marks also moves to suppress the photographic identification conducted on

November 29, 2002.  Marks argues that the identification procedure was unduly suggestive and

must therefore be suppressed.

 In *Manson v. Brathwaite*, 432 U.S. 98 (1977), the Supreme Court established that

a defendant has the right not to be subjected to an identification procedure that creates a "very

substantial likelihood of irreparable misidentification."  *Id.* at 116 (quoting *Simmons v. United

States*, 390 U.S. 377, 384 (1968)).  In determining whether to exclude a pre-trial identification,

the court must undertake a two-step analysis.  First, the court must consider whether the identification procedure was unduly suggestive.  If so, the court then must determine whether the identification nevertheless possessed "sufficient aspects of reliability."  *United States v. Bubar*, 567 F.2d 192, 197 (2d Cir.) (citing *Manson v. Brathwaite*, 432 U.S. at 109-17), *cert. denied*, 434 U.S. 872 (1977).  "Even if the procedure was unnecessarily (or impermissibly) suggestive, therefore, a district court may still admit the evidence 'if, when viewed in the totality of the circumstances, it possesses sufficient indicia of reliability.'"  *United States v. Bautista*, 23 F.3d 726, 729-30 (2d Cir.) (footnote omitted) (quoting *United States v. Simmons*, 923 F.2d 934, 950 (2d Cir.), *cert. denied*, 500 U.S. 919 (1991)), *cert. denied*, 513 U.S. 862 (1994).

   According to Druzynski's testimony, on November 29, 2002, he and Simpson met with an individual who had allegedly been assaulted by Marks.  (Tr. 87-88).  The officers went to the witness's home for the purpose of conducting a photographic identification.  Druzynski advised the witness that he was going to show him some photographs and instructed him to review them and indicate whether he recognized any of the individuals depicted.  (Tr. 88, G.Ex. 3A).  Druzynski then presented a six-photograph array to the witness.  Within a minute, the witness pointed to the sixth photograph and stated that it was Chad Marks, the person who had assaulted him.  (Tr. 88).  The witness was provided with a pen, which he used to write "Chad" across the photograph depicting Marks.  (Tr. 89, G.Ex. 3A).  Druzynski also presented the witness with a second photographic array that did not contain a photograph of Marks.  The witness did not identify any of the individuals depicted in the second array.  (Tr. 90).  Druzynski testified that neither he nor Officer Simpson suggested to the witness which photograph he should identify.

This Court has reviewed the photographic array presented to the witness. (G.Ex. 3A). The array contains six photographs. Each photograph depicts a frontal image of a male's face, neck and part of his shoulders. All of the men appear to be of similar age and coloring, have similarly short-cut hair and have similarly groomed facial hair. *See United States v. Maldonado-Rivera*, 922 F.2d 934, 974 (2d Cir. 1990) ("fairness of photograph array depends upon number of factors, including the size of the array, the manner of presentation by the officers, and the array's contents"), *cert. denied*, 501 U.S. 1233 (1991). *See also United States v. Thai*, 29 F.3d 785, 808 (2d Cir.) ("principal question is whether the picture of the accused, matching descriptions given by the witness, so stood out from all the other photographs as to 'suggest to an identifying witness that [that person] was more likely to be the culprit'") (quoting *Jarrett v. Headley*, 802 F.2d 34, 41 (2d Cir. 1986)), *cert. denied*, 513 U.S. 993 (1994); *United States v. Marrero*, 705 F.2d 652, 655 n.5 (2d Cir. 1983) (six photographs is an acceptable number for a photographic array); *United States v. Joseph*, 332 F. Supp. 2d 571, 582 (S.D.N.Y. 2004) (finding that photographic array was not unduly suggestive where array contained six photographs of individuals of similar ethnicity, age, hair style and facial hair). On this record, I find that the photographic identification procedure conducted by Druzynski on November 29, 2002 was not impermissibly suggestive. I thus recommend that Marks's's motion to suppress this identification should be denied.

## IV.  <u>Suppression of Intercepted Communications</u>

In his final motion, Marks challenges the admissibility of communications intercepted pursuant to a wiretap of his cellular telephone number (585) 576-5564, as well as any

evidence derived therefrom.  (Docket # 94).  Each of the various motions raised by Marks will be addressed in turn below.

A.  **Probable Cause for Wiretap:**  In his initial challenge to the intercepted telephone communications, Marks asserts that all conversations should be suppressed or that, in the alternative, a hearing is warranted pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978). Attached to Marks's motion papers is an affidavit by Officer Dearcop that was submitted to Monroe County Court Judge John Connell in support of the wiretap application at issue.  (Docket # 94, Ex. A, "Dearcop Aff.").  Marks contends that Dearcop's affidavit contained allegations that were knowingly and intentionally false, or were made in reckless disregard for the truth, and that in the absence of those allegations, probable cause for the wiretap was wanting.

1.  **Franks Hearing:**  Under the Supreme Court's holding in *Franks v. Delaware*, "a district court may not admit evidence seized pursuant to a warrant if the warrant was based on materially false and misleading information."  *United States v. Levasseur*, 816 F.2d 37, 43 (2d Cir. 1987) (citing *Franks v. Delaware*, 438 U.S. at 154), *cert. denied*, 507 U.S. 954 (1993).  To warrant a *Franks* hearing, a defendant challenging an affidavit must make "a substantial preliminary showing that (1) the affidavit contained false statements made knowingly or intentionally, or with reckless disregard for the truth; and (2) the challenged statements or omissions were necessary to the Magistrate's probable cause finding."  *Id.* (citing *Franks*, 438 U.S. at 171-72) (internal quotation omitted).  A hearing is required if the defendant provides the court with a sufficient basis upon which to doubt the truth of the affidavit at issue.  As the Supreme Court has explained:

> To mandate an evidentiary hearing, the challenger's attack must be
> more than conclusory and must be supported by more than a mere

desire to cross-examine.  There must be allegations of deliberate
falsehood or of reckless disregard for the truth, and those
allegations must be accompanied by an offer of proof.  They should
point out specifically the portion of the warrant affidavit that is
claimed to be false; and they should be accompanied by a
statement of supporting reasons.  Affidavits or sworn or otherwise
reliable statements of witnesses should be furnished, or their
absence satisfactorily explained.  Allegations of negligence or
innocent mistake are insufficient.

*Franks*, 438 U.S. at 171.

A *Franks* hearing is not required where it is sought merely on the basis of an

allegation that the information in the search warrant affidavit subsequently proved to be

inaccurate, especially where that information derives from a source independent of the affiant.

*See id.* ("[t]he deliberate falsity or reckless disregard whose impeachment is permitted . . . is only

that of the affiant, not of any nongovernmental informant"); *United States v. One Parcel of*

*Property Located at 15 Black Ledge Dr., Marlborough, Conn.*, 897 F.2d 97, 100-01 (2d Cir.

1990) (requirement that information in warrant application be truthful does not mean that every

fact must be correct, but rather that information must be appropriately accepted by affiant as

true); *United States v. Markey*, 131 F. Supp. 2d 316, 324 (D. Conn. 2001) ("*Franks* is implicated

only when the false statement is made by, or the reckless disregard is that of, the affiant.  There is

no right to a hearing when the challenge is to information provided by an informant or other

source.").

Marks identifies several alleged inaccuracies and omissions in Dearcop's affidavit

that he contends were made knowingly or with reckless disregard for the truth.  Marks argues that

such inaccuracies and omissions mandate suppression of all communications intercepted over the

wiretap, or, in the alternative, that a *Franks* hearing should be conducted.

The errors and omissions raised by Marks fit within one of three categories:

(1) factual assertions contained in the affidavit that Marks claims are simply inaccurate;

(2) information that Marks argues was unjustifiably and intentionally omitted from the affidavit;

and, (3) assertions that Marks contends are intentionally misleading because the surrounding

circumstances are not disclosed.  (Docket # 94).

   With respect to alleged falsities, Marks begins by challenging Dearcop's assertion

that CI-1, who was arrested at 445 Lyell on November 15, 2002, subsequently provided a written

statement admitting that he sold cocaine for Marks at several locations including 445 Lyell

Avenue.  Marks claims that the allegation that CI-1 sold cocaine for Marks from 445 Lyell

Avenue is untrue.  In support of his contention, Marks has submitted a copy of the informant's

signed statement for review by this Court.[8]  The statement, which was not attached to the

affidavit submitted to the reviewing judge, provides:

> I used to sell cocaine for Chad Marks to support my habit. . . . I
> have been at 445 Lyell Ave. for two days.  I have smoked cocaine
> several times.  I even answered the door so customers could go
> upstairs.  I would take off the barricade, but never got paid.  I never
> sold cocaine at 445 Lyell Ave.  Rick Ross Jr. was the seller and
> supervisor at 445 Lyell Ave.  Chad Marks would cut up a 1/4
> ounce of cocaine and make 29 or 30 $20 bags.  Rick wold give the
> cocaine to 'Wody' or John Moody to sell.  'Wody,' John and Rick
> would have to give Chad $500.00 back.  Chad usually buys a '62'.
> . . . Chad would double his investment.

(Docket # 94 at Ex. 8).

   While Marks is correct that CI-1 stated that he had not sold narcotics at 445 Lyell

Avenue, his admission that he answered the door for customers who arrived to purchase narcotics

---

[8] There appears to be no dispute that the individual who signed the statement was CI-1.

is sufficient to demonstrate that he assisted Marks in the sale of cocaine from that location.

Although the affidavit would have been more faithful to CI-1's signed statement had it described

his role in the cocaine sales from 445 Lyell, rather than characterizing his role in a manner that

was factually, if not legally, inconsistent with CI-1's statement, I find that this alleged inaccuracy

was not a material misrepresentation.

Marks also challenges as inaccurate Dearcop's assertion that Marks had assaulted

an individual named Abdul-Slame Elamri.  (Docket # 94 at ¶ 23).  Marks claims that the

assertion is false, emphasizing the Elamri made a statement to law enforcement following his

arrest at 445 Lyell Avenue and never mentioned the alleged earlier assault by Marks.  The

government counters that Marks's conclusory allegation that Elamri was not assaulted is

insufficient to warrant a *Franks* hearing, particularly considering the affidavit's assertion that the

assault is indeed described in an October 12, 2002 police report by Officer DeSain.  (*See* Dearcop

Aff. ¶ 18).  I agree with the government that, on this record, Marks has not made a sufficient

preliminary showing of falsity to justify a *Franks* hearing.

The final challenged inaccuracy is Dearcop's assertion that she had reviewed the

written statements provided by the individuals arrested at 445 Lyell Avenue and had "gathered

significant information relative to the cocaine business operated by Chad Marks at 445 Lyell

Avenue."  (Dearcop Aff. ¶ 27).  Marks claims that this statement is false because only one

written statement actually referred to him.  Thus, according to Marks, Dearcop could not have

gathered significant information about a narcotics business operated by Marks.

Marks's contention is based upon a strained interpretation of Dearcop's words and

should be rejected.  First, CI-1's statement does provide a basis for Dearcop's conclusion that

Marks was running a drug house at 445 Lyell.  In addition, as the affidavit discloses, even before

the arrests at 445 Lyell, Dearcop had been advised by another individual that she bought cocaine

from 445 Lyell and that Marks operated the business at that location.  (Dearcop Aff. ¶ 22).  The

remaining written statements of the others arrested at 445 Lyell, although they do not mention

Marks by name, provide detailed information about the drug activities at 445 Lyell.  Read in this

context, I do not find Dearcop's statement false, let alone intentionally misleading.

> With respect to omissions, Marks claims that Dearcop intentionally misled the

issuing court by not disclosing that CI-1 had been released from prison only two days before his

arrest at 445 Lyell and that his statement that Marks was operating a drug house there was based

solely upon hearsay.  (Docket # 94 at ¶ 20).  I find that neither omission is material.  First, with

respect to CI-1's credibility and reliability, the affidavit discloses that CI-1 has been involved in

the narcotics business and that he was arrested on November 15, 2002, at 445 Lyell.  These

disclosures, I believe, provided an accurate and adequate basis for the reviewing judge to assess

CI-1's reliability, including whether his post-arrest statement was motivated by a desire to

exculpate himself.  *See United States v. Wells*, 1989 WL 252841 at *4 (D. Vt. 1989) ("[e]ven

though the police are not constitutionally required to reveal information about the confidential

informant's criminal history or status, the affiant also may not intentionally or recklessly prepare

the search warrant affidavit to create a materially false impression of enhanced reliability").

With respect to the alleged failure to disclose that CI-1's knowledge of Marks's involvement in

drug activity at 445 Lyell was based on hearsay, I find that such information was not improperly

omitted.  According to CI-1's post-arrest statement, he learned through "word of mouth" upon his

release from prison two days earlier that Marks was running a drug house at 445 Lyell.  The

statement continues, however, to describe CI-1's personal involvement in those activities over the two-day period following his release from prison.  (Docket # 94 at Ex. B).

Marks also claims that Dearcop deliberately failed to disclose that CI-2 had been arrested for stealing from his employer at the time he was acting as a confidential informant. (Docket # 94 at ¶ 28).  This information, Marks argues, would have been relevant to the court in assessing the reliability of CI-2.  Had the affidavit contained no disclosures about CI-2's alleged criminal activity, I might agree that this omission was significant.  *But see United States v. Wells*, 1989 WL 252841 at *4.  Here, however, Dearcop disclosed that CI-2 was no longer an active informant "due to a recent arrest . . . on a burglary charge."  (Dearcop Aff. ¶ 54).  I find that Marks's challenged omission, when considered against the totality of the disclosures in the affidavit, is insufficient to warrant a *Franks* hearing.

The final challenged omission relates to the confidential informant identified as CI-3.  CI-3 is only mentioned in the affidavit in connection with one alleged transaction – the introduction of an undercover agent by CI-3 to Marks.  On this occasion, Marks allegedly threatened the informant, fearing that the informant might have been trying to "set [him] up."  Marks then directed the informant to an address from which the informant purchased a small quantity of cocaine.  (Dearcop Aff. ¶ 35).  CI-3 was no longer an active informant at the time of the wiretap application, according to Dearcop's affidavit.

Marks again alleges that Dearcop did not go far enough in disclosing information pertaining to the informant's reliability.  Specifically, Marks claims that CI-3 subsequently pled guilty to an indictment charging twenty-seven counts of robbery and burglary and that he had been engaged in criminal activity during the time he was acting as an informant in this case.

(Docket # 94 at ¶ 29).  First, Marks has not provided this Court with any information to suggest that Dearcop knew of CI-3's alleged criminal activities at the time of the wiretap application, or that he faced criminal charges at that time.  Even if he had, I find that ample probable cause existed for the wiretap even in the absence of the assertions concerning CI-3.  *See, e.g.*, *United States v. Ferguson*, 758 F.2d 843, 849 (2d Cir.) ("affidavit remains valid if probable cause is found based on an independent consideration of only the lawful information contained in the affidavit"), *cert. denied*, 474 U.S. 841 (1985); *United States v. Benjamin*, 72 F. Supp. 2d 161, 181 (W.D.N.Y. 1999) (denying *Franks* hearing because warrant application established probable cause even after court disregarded these portions challenged by defendant).

Finally, Marks challenges as deliberately misleading Dearcop's inclusion in the affidavit of an alleged threat to CI-2 that "if I want to kill you[,] I'll just do it."  (Docket # 94 at ¶¶ 24-27).  According to Marks, such statement was not intended as a threat, but as an assurance to CI-2, who had expressed fear about meeting with Marks.  In other words, Marks argues that he meant that if he had wanted to harm the informant, he would have done so; that he did not should be taken as assurance that the informant need not feel fearful.  I have listened to the recording and cannot determine without a greater familiarity with the rest of the evidence whether those words were meant as a threat, as an assurance, or as a combination of both.  I do not, however, find any basis to conclude that Dearcop's inclusion of Marks's alleged words in her affidavit or her summary of Marks's conversation with the informant was intentionally misleading.  What Marks may have meant during that conversation is an issue for trial, and I cannot conclude that Marks's alternative explanation justifies a *Franks* hearing.

In sum, I find that Marks has failed to make a substantial showing that Dearcop's affidavit contained material false statements or omissions made knowingly and intentionally or with reckless disregard for the truth.  *United States v. Levasseur*, 816 F.2d at 43 (citing *Franks*, 438 U.S. at 171-72) (internal quotation omitted).  Nor do I find, as Marks has argued in the alternative, that, taken together, all of the alleged inaccuracies and omissions demonstrate that Dearcop is an unreliable affiant, whose affidavit should not be credited.  (*See* Docket # 94 at ¶¶ 32-48).  Accordingly, I recommend that Marks's motion for a *Franks* hearing be denied.

**2.  Probable Cause:**  Having found a *Franks* hearing unnecessary, this Court will now address Marks's claim that the affidavit failed to establish probable cause.  Under Title 18 U.S.C. § 2518(3), prior to issuing an order for the interception of wire communications, a judge must determine that:

> [1] [t]here is probable cause to believe that a crime has been, is being, or is about to be committed; [2] probable cause to believe that communications about the crime will be obtained through the wiretap; [3] alternative means have been tried and failed or appear too dangerous or unlikely to succeed; and [4] probable cause that the premises to be wiretapped are being used for criminal purposes or are used or owned by the target of the wiretap.

*United States v. Wagner*, 989 F.2d 69, 71 (2d Cir. 1993).

The probable cause standard applicable to wiretaps is the same as that required for a traditional search warrant.  *Id.* (citing *United States v. Rowell*, 903 F.2d 899, 901-02 (2d Cir. 1990); *United States v. Fury*, 554 F.2d 533, 530 (2d Cir. 1977), *cert. denied*, 436 U.S. 931 (1978)).  As the Supreme Court held in *Illinois v. Gates*, probable cause must be determined by evaluating the "totality of the circumstances."  462 U.S. at 238.  Applying this standard, the issuing court must make a "practical common-sense decision whether, given all the

43

circumstances set forth in the [supporting] affidavit . . . , there is a fair probability that

contraband or evidence of a crime will be found in a particular place." *Id.* As a reviewing court,

however, this Court must accord "substantial deference" to the issuing court's finding of

probable cause. *United States v. Wagner*, 989 F.2d at 72 (citations omitted).

       In her affidavit, Dearcop affirmed that based upon her training and experience,

and her knowledge of the ongoing investigation of Marks, probable cause existed to believe that

Marks was involved in drug trafficking crimes and that such crimes were facilitated through the

use of cellular telephone number (585) 576-5564, which was subscribed by Chad Marks. After a

careful review of the affidavit, and for the following reasons, I find that the wiretap order was

adequately supported by probable cause to believe that evidence of the specified crimes would be

obtained through the use of the requested electronic surveillance.

       Dearcop's affidavit described multiple reports from numerous confidential

informants, as well as various police reports, regarding Marks's involvement in the sale of

narcotics, various assaults and the possession and use of firearms. (Dearcop Aff. ¶¶ 10-40). In

addition, the affidavit also provided a summary of toll and pen register analyses performed on

Marks's cellular telephone. That analysis revealed numerous incoming and outgoing calls to

various telephone numbers subscribed by individuals with a history of narcotics trafficking.

(Dearcop Aff. ¶¶ 41-51).

       More importantly, Dearcop summarized in her affidavit six occasions on which

Marks allegedly utilized his cellular telephone to facilitate trafficking narcotics. First, on

November 26, 2002, pursuant to Dearcop's direction, a confidential informant (referenced as

CI-2) called Marks's cellular telephone numerous times for the purpose of arranging a cocaine

44

purchase. During one such conversation, Marks directed CI-2 to his house on Lake Avenue. After arriving at that location, Marks further directed CI-2 to 168 Masseth Street, where Marks allegedly sold cocaine to CI-2 in exchange for $70. (Dearcop Aff. ¶ 30).

The second incident involving the use of Marks's cellular telephone for alleged drug activity occurred on December 3, 2002. On that date, Dearcop instructed CI-2 to place a telephone call to Marks's cellular telephone. The call was monitored by Dearcop and Druzynski. During the call, CI-2 asked Marks whether they could do "something." Marks responded by directing CI-2 to 168 Masseth Street.

Under Dearcop's supervision, CI-2 went to 168 Masseth Street and approached the side door. CI-2 was equipped with a transmitting device, and Dearcop listened as CI-2 engaged Marks in a conversation about cocaine. Marks subsequently sold a quantity of cocaine to CI-2, which was thereafter provided to Dearcop. (Dearcop Aff. ¶ 34).

The third incident involved an additional controlled purchase of cocaine by CI-2. On December 5, 2002, CI-2 placed a call to Marks's cellular telephone and discussed with Marks the possible purchase of cocaine. Marks directed CI-2 to his house at 3618 Lake Avenue. CI-2, equipped with a transmitter, was transported to the area of Lake Avenue. CI-2 entered 3618 Lake Avenue, spoke with Marks about cocaine and thereafter purchased a quantity of cocaine from Marks. CI-2 then exited 3618 Lake Avenue and provided the cocaine to Druzynski. (Dearcop Aff. ¶ 36).

Dearcop reported a fourth incident occurring on December 18, 2002. On that date, at approximately 7:53 p.m., CI-2 placed a call to Marks's cellular telephone and, pursuant to Dearcop's direction, CI-2 asked Marks about "doing that thing we talked about yesterday."

45

According to Dearcop, CI-2 was referring to a prior conversation that took place at 3618 Lake Avenue, during which CI-2 asked Marks about purchasing a quantity of cocaine at an agreed-upon price.  In response to CI-2's request, Marks instructed CI-2 to meet him twenty minutes later on Sherman Street.

At approximately 8:20 p.m., CI-2 was transported to 317 Sherman Street and entered the downstairs apartment.  A few minutes later, Richard Ross arrived and asked for CI-2. Ross provided CI-2 with a quantity of cocaine in exchange for money.  CI-2 then left 317 Sherman Street and provided the narcotics to Dearcop.  CI-2 also indicated that while in Ross's presence, CI-2 heard Ross yell to someone else in the premises, "Chad will be right back to pick you up, he just went up to the pizza place."  Dearcop then drove to the intersection of Emerson Street and Curlew Street and observed Marks inside a pizza shop.  (Dearcop Aff. ¶ 37).

Dearcop's affidavit also states that on December 21, 2002, CI-2 placed several telephone calls to Marks's cellular telephone.  During those calls, Marks informed CI-2 that he only had "garbage" left and that he would have something in one hour.  At Marks's direction, CI-2 went to 317 Sherman Street, where he met inside with Marks.  Marks informed CI-2 that he had not "made his move" yet and that CI-2 would have to wait a little longer.  CI-2 then purchased a small quantity of cocaine from Ross and left the location.  (Dearcop Aff. ¶ 38).

The final incident involving Marks's cellular telephone occurred on December 26, 2002.  On that date, CI-2 placed a call to Marks on his cellular telephone under the supervision of Dearcop.  After receiving Marks's voice-mail, CI-2 called Marks's home telephone number and spoke with Marks's girlfriend, Jennie Streber, who informed CI-2 that Marks was sleeping.  CI-2 stated to Streber that he or she was on the way over.  CI-2 was then transported to the area of

3618 Lake Avenue and was let into the residence by Streber.  Once inside, Marks yelled down

the stairs that CI-2 should go to Sherman Street and that "they will have it ready for you there."

CI-2 then went to 317 Sherman Street, where he observed Ross "cutting up" and bagging

quantities of cocaine on the kitchen table.  CI-2 requested a "couple bags," and a young white

male sold two bags of cocaine to CI-2.  (Dearcop Aff. ¶ 39).

       Considering this evidence, I find that Officer Dearcop's affidavit demonstrated

ample probable cause to believe that Marks's cellular telephone was being used to facilitate the

offenses specified in the government's application.  Accordingly, Marks's suppression motion

seeking suppression of the intercepted communications on the grounds that probable cause for

the January 22, 2003 wiretap order was lacking should be denied.

       In addition, no evidence has been adduced to suggest that the law enforcement

officers intercepting the calls did not rely in good faith on the validity of the wiretap warrants.

*See United States v. Leon*, 468 U.S. 897 (1984); *see also United States v. Bellomo*, 954 F. Supp.

630, 638 (S.D.N.Y. 1997) (collecting cases applying *Leon's* good faith exception to evidence

seized pursuant to an electronic wiretap warrant.)  Under *Leon*, a court will not suppress evidence

obtained pursuant to a warrant issued without probable cause unless (1) the issuing magistrate

has been knowingly misled; (2) the issuing magistrate wholly abandoned his or her judicial role;

(3) the application is so lacking in indicia of probable cause as to render reliance upon it

unreasonable; or (4) the warrant is so facially deficient that reliance upon it is unreasonable.

*Leon*, 468 U.S. at 923; *see also United States v. Moore*, 968 F.2d 216, 222 (2d Cir.), *cert. denied*,

506 U.S. 980 (1992).  No proof has been offered to suggest, nor do I find any basis in the record

to conclude, that any of these four exceptions apply here.

B. **Exhaustion of Normal Investigative Techniques**:  Marks also seeks

suppression of the intercepted communications on the grounds that Dearcop's affidavit failed to

show that before resorting to the wiretaps, traditional investigative procedures had been

attempted and had proved unsuccessful.

An application for wiretap authorization must contain "a full and complete

statement as to whether or not other investigative procedures have been tried and failed or why

they reasonably appear to be unlikely to succeed if tried or to be too dangerous."  18 U.S.C.

§ 518(1)(c).  A judge may approve a wiretap application only after determining that such a

showing has been made.  18 U.S.C. § 518(3)(c).  The intent of 18 U.S.C. § 518(1)(c), however,

> is not to preclude resort to electronic surveillance until after all
> other possible means of investigation have been exhausted by
> investigative agents; rather, [it] only require[s] that the agents
> inform the authorizing judicial officer of the nature and progress of
> the investigation and of the difficulties inherent in the use of
> normal law enforcement methods.

*United States v. Torres*, 901 F.2d 205, 231 (2d Cir.) (internal quotations omitted), *cert. denied*,

498 U.S. 906 (1990).  *See also United States v. Kahn*, 415 U.S. 143, 153 n.12 (1974) (18 U.S.C.

§ 518 "is simply designed to assure that wiretapping is not resorted to in situations where

traditional investigative techniques would suffice to expose the crime"); *United States v.*

*Pacheco*, 489 F.2d 554, 565 (5th Cir.1974), *cert. denied*, 421 U.S. 909 (1975) (intent of 18

U.S.C. § 518(1)(c) is "not to foreclose electronic surveillance until every other imaginable

method of investigation has been unsuccessfully attempted, but simply to inform the issuing

judge of the difficulties involved in the use of conventional techniques"); *United States v. Valdez*,

1991 WL 41590, at *2 (S.D.N.Y.) (the "other investigative procedures" requirement was not

intended to turn electronic surveillance "into a tool of last resort"), *aff'd*, 952 F.2d 394 (2d Cir.

1991).

   In narcotics conspiracy investigations, the requirement may be satisfied by

"describing how traditional investigative techniques had failed to provide more than a 'limited

picture' of . . . [the] narcotics organization." *Valdez*, 1991 WL 41590, at *2 (quoting *Torres*, 901

F.2d at 232).  Moreover, wiretaps are particularly appropriate when "the telephone is routinely

relied on to conduct the criminal enterprise under investigation."  *United States v. Young*, 822

F.2d 1234, 1237 (2d Cir. 1987).

   This Court's review of the issuing court's determination is not *de novo*; rather, it

is the reviewing court's role "'to decide if the facts set forth in the application were minimally

adequate to support the determination that was made.'" *Torres*, 901 F.2d at 231 (quoting *United

States v. Scibelli*, 549 F.2d 222, 226 (1st Cir.) (collecting cases), *cert. denied*, 431 U.S. 960

(1977)); *see also United States v. Miranda*, 1993 WL 410507, at *2-3 (S.D.N.Y. 1993) (issuing

court's determination concerning sufficiency of normal investigative techniques is entitled to

"substantial deference").  Applying this standard to the instant case, this Court finds that

Dearcop's affidavit adequately identified the traditional investigative techniques that had been

used and explained why the use of other traditional techniques reasonably appeared unlikely to

succeed if used.

   Dearcop's affidavit identified various traditional investigative techniques that

either had been utilized and proved unsuccessful in furthering the goals of the investigation or

had not been utilized because they were not likely to succeed.  For example, the affidavit alleged

that although the government had successfully utilized various informants and undercover agents,

the utility of informants and undercover agents as an investigative tool was limited because of

Marks's history of assaults against persons who posed a threat to his cocaine business.  In

addition, Dearcop affirmed that physical surveillance would be unlikely to reveal the source and

storage locations of Marks's narcotics.

Dearcop further affirmed that pen register and toll record analyses had been

utilized, but that these techniques were insufficient to achieve the goals of the investigation

because they could not differentiate between innocent and incriminating telephone conversations,

nor could they reveal the specifics of Marks's narcotics network.  The use of search warrants was

also unlikely to accomplish the investigative goals because not all co-conspirators would likely

be present at the time of the search, nor was it likely that Marks would retain all evidence of his

narcotics trafficking network at his residence.  (Dearcop Aff. ¶¶ 53-65).

In sum, this Court finds that Dearcop's affidavit sufficiently identified the

traditional investigative techniques that had been utilized and adequately informed the issuing

court of the reasons why other techniques were unlikely to achieve the aims of the investigation.

Accordingly, Marks's motion to suppress the wiretap communications based upon the failure to

demonstrate the futility of other investigative techniques should be denied.

C.  **Failure to Seal**:  Marks moves to suppress the wiretaps on the grounds that

the intercepted communications were not sealed in a timely fashion.  18 U.S.C. § 2518(8)

requires that "[i]mmediately upon the expiration of the period of the order, . . . [recordings

obtained pursuant to the wiretaps] shall be made available to the judge issuing such order and

sealed under his directions."

Marks has failed to offer any specific evidence supporting his contention of untimely sealing.  Rather, he made the motion because at the time his original motion papers were filed, he had not received a copy of the sealing order.  The government, however, has since submitted a sealing order signed by Judge Connell sealing the communications intercepted over Marks's cellular telephone.  The order was signed on February 6, 2003, one day after the authorized interceptions ceased.  (Docket # 95, Ex. 1).  Having reviewed that order, I recommend that Marks's motion to suppress for failure to seal be denied.

**D.  Communications Intercepted Prior to Wiretap Authorization**:  Marks moves to suppress an intercepted communication between his mother and him.  According to Marks, the transcript of the conversation indicated that it was intercepted on January 20, 2003, two days before Judge Connell issued the wiretap order on January 22, 2003.  The government has represented that the pertinent conversation was actually intercepted on January 30, 2003, and that the January 20th date was incorrectly recorded on the transcript.  (Docket # 95 at 10).  Based upon the government's representation, this Court recommends denial of Marks's motion without prejudice to renewal in the event that Marks comes forward with additional evidence to demonstrate that the conversation was intercepted prior to the wiretap authorization.

**E.  Failure to Minimize**:  Marks further argues that the government failed to satisfy its obligation to minimize pursuant to 18 U.S.C. § 2518(5).  That section requires that every wiretap order "shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception."  18 U.S.C. § 2518(5).  Moreover,

> During the early stages of surveillance the agents may be forced to intercept all calls to establish categories of nonpertinent calls which will not be intercepted thereafter.  Interception of those same type of calls might be unreasonable later on, however, once the

> nonpertinent categories have been established and it is clear that
> this particular conversation is of that type.

*Scott v. United States*, 436 U.S. 128, 141 (1978).

Here, despite Marks's assertion that there were "numerous" conversations that should have been minimized, he only identifies the above-described conversation between his mother and him.  During the call, Marks told his mother that he needed her help.  Marks did not detail the nature of the help requested, but merely asked his mother whether she could come to his house.  (Docket # 94 Ex. H).  This conversation was intercepted approximately one week after the wiretap warrant was authorized.  At that time, it was reasonable for the intercepting officers to monitor the conversation to determine the nature of the assistance Marks requested and whether it related to alleged narcotics activities.  Accordingly, Marks's motion to suppress that conversation should be denied.

To the extent that Marks raises a general motion to suppress all communications for failure to minimize, such motion should be denied on the record before this Court.

**F.  Fruits of the Wiretap**:  In his final motion with respect to the wiretap, Marks moves to suppress any "derivative" evidence seized pursuant to the allegedly illegal wiretaps. Because I find that the wiretap order was supported by probable cause and because I find that law enforcement did not violate the law in executing the order, I further recommend denial of this motion.

## CONCLUSION

For the foregoing reasons, it is my recommendation that defendant's motions to suppress statements and tangible evidence **(Docket # 94)** be **DENIED**.  It is my further

recommendation that defendant's motion to suppress the photographic identification **(Docket # 94)** be **DENIED**.  Finally, it is my recommendation that defendant's motion to suppress intercepted communications **(Docket # 94)** be **DENIED**.


s/Marian W. Payson
_____
MARIAN W. PAYSON
United States Magistrate Judge

Dated:  Rochester, New York
        May 16, 2005

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report and Recommendation in accordance with the above statute and Rule 58.2(a)(3) of the Local Rules of Criminal Procedure for the Western District of New York.[9]

The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. *See, e.g., Paterson-Leitch Co., Inc. v. Massachusetts Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988).

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn*, 474 U.S. 140 (1985); *Wesolek v. Canadair Ltd.*, 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 58.2(a)(3) of the Local Rules of Criminal Procedure for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 58.2(a)(3) may result in the District Court's refusal to consider the objection.**

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the parties.

**IT IS SO ORDERED.**

s/Marian W. Payson
_____
MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
        May 16, 2005

---

[9] Counsel is advised that a new period of excludable time pursuant to 18 U.S.C. § 3161(h)(1)(F) commences with the filing of this Report and Recommendation. Such period of excludable delay lasts only until objections to this Report and Recommendation are filed or until the ten days allowed for filing objections has elapsed. *United States v. Andress*, 943 F.2d 622 (6th Cir. 1991); *United States v. Long*, 900 F.2d 1270 (8th Cir. 1990).