IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

CHAD MARKS,

                     Defendant,                              03-CR-6033L

-vs-

UNITED STATES OF AMERICA,

Respondent.

_____

**GOVERNMENT'S MEMORANDUM IN OPPOSITION TO
DEFENDANT'S MOTION TO REDUCE SENTENCING
PURSUANT TO 18 U.S.C. § 3582(c)(1)(A)(i)**

        The United States of America, by and through its attorneys, James P. Kennedy, Jr., United

States Attorney for the Western District of New York, and Everardo A. Rodriguez, Assistant

United States Attorney, of counsel, hereby files its memorandum in opposition to Chad Marks'

motion for reduction of sentence pursuant to 18 U.S.C. § 3582(c)(1)(A)(i).  As more fully set forth

below, the motion should be denied because it ignores (and at times misrepresents) the facts of this

case and the applicable law, which expressly prohibits the relief which he now seeks.

**INTRODUCTION**

        Chad Marks was and remains a dangerous and violent man who ran a large-scale and

violent drug distribution operation in Rochester, New York, and who continues to this day to

engage in criminal activity while in prison.  Marks attempted to murder rival drug dealers, he

viciously beat up a worker who he perceived to be disloyal, he bragged about how he exercised

absolute control over his drug workers and how he could direct them to kill others and he

threatened to kill witnesses against him.  While incarcerated in this case, he repeatedly threatened in letters and statements that he would torture, rape and murder his ex-wife, he would torture and murder her young daughter, he would peel off the skin of her then boyfriend, now husband, cut off his penis and shove it down the throat of the boyfriend's daughter and watch the boyfriend bleed to death and his daughter choke to death, and he would murder his ex-wife's mother and stepfather.

Marks' violence and threats of violence continued while in custody against other inmates and even against corrections officers.  He beat up an inmate with whom he was sharing a cell (to force the jail to give him a cell of his own).  He threatened to beat up a jail guard and told another guard to suck his dick.

When he was incarcerated at the Coleman Federal Prison from September 2011 to January 2013 Marks joined the "Dirty White Boys," a prison gang that espouses racist views and opinions. Marks recently admitted to a Bureau of Prisons Special Investigations Section technician that as a member of the Dirty White Boys he beat up other inmates at the direction of gang leaders.

Chad Marks is a liar, perjurer and an obstructer of justice.  He repeatedly lied in his pleadings and his letters to the Court that he would have accepted a 20 year plea if it had been communicated to him.  He perjured himself, before this Court, when he testified under oath to that effect, and this Court correctly found his testimony "to lack credibility." (Sept. 12 2012 Decision and Order, Docket # 410, at 16).  His threats to kill witnesses fully justified the obstruction of justice enhancement that this Court imposed against him at sentencing.

Finally, despite his many claims of being rehabilitated and having "evolved," Chad Marks remains a criminal and continues to violate prison disciplinary rules.  Since his transfer to FMC Lexington in January of this year, the prison's Special Investigations Section (SIS) has obtained

information from other inmates that Marks is supplying and/or transporting Suboxone in the prison. Suboxone is used to treat opiate addiction, but is used by prison inmates to get high. SIS officers also learned that Marks was attempting to obtain a cell phone and that he already had a SIM card, all in violation of prison disciplinary rules. Based on that information, officers searched Marks' cell and located a plastic card that SIM cards come in, but with the SIM card removed. The plastic SIM card holder was concealed inside Marks' bible.

For the sake of the community and of the many people he has threatened over the years, and because he does not deserve a reduction of sentence, Chad Marks' motion should be denied.

## <u>MARKS' MOTION FOR EARLY RELEASE IS PRECLUDED BY THE CLEAR LANGUAGE OF FEDERAL LAW, INCLUDING THE FIRST STEP ACT, AND BY THE FACTS OF THIS CASE</u>

"The court may not modify a term of imprisonment once it has been imposed except" under certain circumstances. 18 U.S.C. 3582(c). None of those circumstances exist in this case.

Marks claims that "extraordinary and compelling reasons" warrant his early release. The reasons he cites are: (1) that the First Step Act has ended the imposition of consecutive 25 year mandatory minimum sentences for multiple 924(c) convictions in the same trial;[1] (2) Marks is not

---

[1] Before the First Step Act was enacted, 18 U.S.C. § 924(c)(1)(C) provided: "In the case of a second or subsequent conviction under this subsection, the person shall—(i) be sentenced to a term of imprisonment of not less than 25 years; and (ii) if the firearm involved is a machinegun or destructive device, or is equipped with a firearm silencer or firearm muffler, be sentenced to imprisonment for life." Section 403(a) of the Act amends this language by deleting the phrase "second or subsequent conviction under this subsection" and replacing it with the italicized language as follows: "In the case of a violation of this subsection that occurs after a prior conviction under this subsection has become final, the person shall—(i) be sentenced to a term of imprisonment of not less than 25 years; and (ii) if the firearm involved is a machinegun or

dangerous; (3) Marks' acts and accomplishments while incarcerated demonstrate that he has "evolved" and has been rehabilitated; (4) the factors in 28 U.S.C. 3553(a) favor early release; and (5) Marks deserves mercy.  The law and the record contradict all such arguments.

A.    The changes to 924(c) in the First Step Act do not apply to Marks

The First Step Act expressly states that the amendments to Section 924(c), which Marks cites in support of his early release motion, do not apply to defendants like Marks.  Section 403(b) provides that the amendments concerning § 924(c)'s penalty provisions "apply to any offense that was committed before the date of enactment of this Act, if a sentence for the offense has not been imposed as of such date of enactment."  Accordingly, the § 924(c) amendments do not affect defendants like Marks who were sentenced on or before December 20, 2018.

Had Congress wanted to make the changes to 924(c) retroactive, it certainly would have done it.  Marks cannot simply pick and choose the provisions of the First Step Act which he likes and disregard those that expressly preclude the remedy he seeks.

Marks' contention on page 12 of his memorandum of law that Congress' use of the word "clarification" in the title of Section 403 somehow warrants a broader application of the amendment must be rejected.  First, a word in a title cannot override the plain statutory language of section 403(b) providing that the amendments apply only if "a sentence for the offense has not

---

destructive device, or is equipped with a firearm silencer or firearm muffler, be sentenced to imprisonment for life."  Significantly, the amendments do not eliminate criminal liability for multiple § 924(c) offenses—even when a defendant does not have a prior, final § 924(c) conviction—and those multiple § 924(c) convictions must still carry consecutive sentences.  For example, a defendant who robs two banks in a row, brandishing a firearm during each robbery, will be guilty of two § 924(c) offenses and will have mandatory consecutive sentences of 14 years (composed of two consecutive 7-year sentences) plus the sentence for any predicate offense.

been imposed as of such date of enactment." The Supreme Court has long followed "the wise rule that the title of a statute and the heading of a section cannot limit the plain meaning of the text." Trainmen v. Baltimore & Ohio R. Co., 331 U.S. 519, 528–29 (1947). Second, the Congress in 2018 cannot dictate what a different Congress decades ago meant in drafting the provision. "[T]he views of one Congress as to the construction of a statute adopted many years before by another Congress have 'very little, if any, significance.'" United States v. Southwestern Cable Co., 392 U.S. 157, 170 (1968) (citations omitted). Third, after the Supreme Court decided Deal v. United States, 508 U.S. 129 (1993)[2], Congress revised § 924(c) - including by increasing the penalties for successive § 924(c) violations from 20 years to 25 years - but did not disturb Deal. Courts "presume that 'Congress is aware of existing law when it passes legislation,'" Mississippi ex rel. Hood v. AU Optronics Corp., 571 U.S. 161, 169 (2014) (citation and quotation marks omitted), and that includes the Supreme Court's interpretation of a statute. See, e.g., CBOCS West, Inc. v. Humphries, 553 U.S. 442, 452–53 (2008).

   B.   Marks was and remains a dangerous man.

   In his motion for release, Marks contends that he "is not a danger to the community." Marks further contends that "[t]here was no use or threat of violence by Marks in connection with his offenses." Memo at 12. This amazingly false statement is completely contradicted by the proof at trial, by Marks' violent and threatening conduct while in custody before and after trial and by this Court's repeated findings at sentencing that Marks was a violent and dangerous man.

---

[2]   In Deal, the Supreme Court upheld the application of the enhanced penalties under § 924(c)(1)(C) even where defendants did not have a prior final judgment of conviction under § 924(c).

1.     <u>Proof at trial of Marks' violence.</u>

The proof at trial established that Marks was the leader of a very violent drug dealing organization.  He used violence to keep his customers and his workers in line and he tried to murder rival drug dealers.

Marks viciously beat up one of his workers (Dominic Milia) because Milia gave a statement to the police after police raided one of Marks' drug houses where Milia worked.  Milia later told police that Marks had punched and kicked Milia after asking Milia if he thought that he would get away with snitching against Marks.  <u>See</u> Milia Statement to police and related police report, attached hereto as <u>Exhibit 1</u>.  Richard Ross and Tommy Hardy testified at trial that Marks had repeatedly punched and kicked Milia.  Indeed, Marks <u>bragged</u> about how he viciously beat up Milia during his conversation with Donald Molinari at the mall, which conversation was monitored and recorded via a body wire worn by Molinari and played during the trial to the jury:

> You know what we did to him [Dominic] last night?  Guess where he went?  Ten minutes later I knew where he was going, he has nowhere to go.  He went to Curtis street, Kim's house. . . .  I went there bro' and kicked his fuckin' head in, bro'.  I could have easily done that to you.

Molinari Transcript, <u>Exhibit 2</u>, p. 8.    As noted in Section B.1 below, Marks admitted to beating up Milia in one of his threatening letters to his wife: "I'm looking forward to meeting Danny on my terms! . . .  I pray it's just an ass whoopen, we're going to stomp him like Dominick." <u>See</u> Letter attached as <u>Exhibit 9.</u>  As it turned out, Milia never testified at Marks' trial because he died of liver failure related in part to the beating he received from Marks.

In that same recorded conversation with Molinari, Marks bragged about his unquestioned leadership role and his control over his workers.  Marks bragged about how he could make his workers do anything, including beat and even kill people:

I don't even have to do anything.  I can make other people do whatever I tell them to.  My boy, Wody, whatever I tell him, he does bro. . . . I got a team bro.  Abdul?  My boy, Abdul, the Muslim, the fuckin' crackhead Muslim . . .  You know what he'll do, bro'?  He'll do anything I tell him.  I tell him go over there and shoot that guy in the head right there.  I'm gonna get him outta here bro'.  These fuckers worship me bro'.  They look up to me, bro', they'll do anything I tell them.  If I wanted something done to you bro' and if I wanted something done to your family or your brother.

Molinari Transcript, pp. 8-9.

The proof at trial also established that Marks possessed and used firearms in furtherance of his drug distribution conspiracy to intimidate customers and to retaliate against rival drug dealers.  The trial testimony showed that Marks attempted to kill Tommy Hardy a/k/a "Wody" and another drug dealer named "Black," but was unsuccessful because the gun jammed.  See Trial Transcript, pp. 1193-1244.

The trial proof also showed that Marks even threatened to kill his own mother.  In one of the wiretap calls admitted and played at his trial, Marks threatened to spit at and shoot his mother.  In the call, Marks called his father to complain that Marks' mother was encouraging Marks to accept the fact that his sister Nicky was dating Tommy Hardy a/k/a "Wody," a black man who had been one of Marks' drug workers.

DAD:  You talk to anybody over there today

CHAD MARKS:  At my mom's?

DAD:  Yeah

CHAD MARKS:  Yeah I talked to both of them

DAD:  Ohh you did?

CHAD MARKS:  I told my mom to get the fuck out of here before I spit in her face.

DAD:  Why

CHAD MARKS:  She told me "Wody" is Nicki's boyfriend and we need to accept it or else she is gonna end up moving to Mississippi with him.

DAD:  Ohh really

CHAD MARKS:  Yeah she's known about it all along, I told her she better get the fuck out before I blast you, fucking cunt. She said ohh it was alright when he was your homeboy he can carry a gun and sell drugs then hah, then he was ok, I'm like yo man yo better just go ahead.

A copy of the transcript of the call, marked at the trial as Exhibit 1-701, is attached hereto as

Exhibit 3.

> 2.    The Court's findings at sentencing that Marks' was violent and dangerous.

At sentencing, this Court expressly found that Marks was violent and dangerous and a

menace to the community.  The Court found:

> [T]he picture I had during this trial was of someone who was deeply involved in all the dangerous, dirty aspects of the drug business.
> . . .
>
> I do remember the testimony in this case.  It was chilling in certain respects in terms of trying to find witnesses who were testifying against you, threatening them.  I mean, there was an aspect of fear around this whole case that I remember very well and I think the transcript speaks of.
>
> It's hard for me not to give you a life sentence because I think the danger to the community has been that serious. Whether it's life or 40 years, both are certainly significant and serious sentences.
> . . .
>
> This was a major, large scale drug conspiracy and you were right at the heart of it.  There was weapons and violence at every step of the way, and that's the way I see it and that's the way I think the evidence supports. . . .
>
> . . . Clear evidence that firearms were used, the jury found.  Cooperating people were threatened and beaten by you and your cohorts.
>
> And I think based on the nature and circumstances of the offense, a very severe sentence should be imposed.
> . . .

> The Court must also consider the seriousness of the offense. And I think 40 years, the statutory minimum, by my calculation reflects that seriousness. You're now 29 years of age. Even with good time, you will be into your sixties when and if you are released.
>
> I think a sentence of this nature certainly provides adequate punishment, and I think you do need a sentence that protects the public from your activities because you are a danger and a menace to this community.

Sentencing transcript, pp. 39-41 (emphasis added).[3]

3.     Marks' violence and threats while in custody

    a.     Marks threatened to kill Richard Ross if Ross cooperated with law enforcement.

Marks threatened to kill Richard Ross for cooperating against Marks. Sgt. Mike Desain, one of the two lead investigators in the Marks investigation, was contacted in May 2003 by Richard Ross and by Ross' Federal Probation Officer Kerry Chartier, both of whom told Desain that Chad Marks was calling the Volunteers of America ("VOA") (where Richard Ross was living at the time) and threatening Ross. This was after Marks had been arrested in this case. Desain went to the VOA and interviewed one of the residents there who told Desain that Marks had called the VOA on several occasions and had told the resident that Marks suspected that Ross was going to snitch on Marks, and that Marks was going to kill Ross if Ross snitched. Marks also told the resident to spread the word around the VOA that Ross was a "snitch."

---

[3] Given the foregoing statements by the Court and the proof at trial, it is extremely troubling that Marks' brief states "[t]here was no use or threat of violence by Marks in connection with his offenses, which involved low-level sales of narcotics by Marks and his co-defendants to a confidential informant. Marks's lengthy sentence was not based in any way on the dangerousness of his criminal conduct or the need to incapacitate him." Marks Memorandum, pp. 12-13.

b.      Marks threatened to kill others.

By letter dated July 29, 2004, an inmate at the Monroe County Jail with whom Chad Marks

had been incarcerated advised the government about various threats that Marks was making against

prospective witnesses and others.  A copy of the letter is attached hereto as Exhibit 4.  The inmate

testified under oath before the federal grand jury about these threats and the other information he

provided in his letter.  Portions of the inmate's letter are quoted below:

> [T]he following statements were made to this writer by inmate Chad Marks
> who was housed with me from July 4th, 2004 until July 28, 2004. . . .  Marks says
> that he has about four witnesses against him that he knows about. 'Peter Thousand'
> who he says took a undercover officer to buy drugs from Marks.  Marks refused to
> sell the unidentified man crack cocaine.  He took Peter Thousand to the back of a
> house or building and pulled a gun out on Peter and threatened to kill Peter.  . . .
> "Nathan  Brown" – Marks also has the computer checked for  Nathan Brown.  He
> said that Nathan was taken out of the Monroe County Jail by U.S. Marshals.  Marks
> wants Nathan Brown killed.  He said that if Nathan  Brown is dead, there is no
> conspiracy.  "A man named Rich," whom Marks believes is the most credible
> witness in the case, Marks says that he had his friend E[4] knock the fuck out of Rich.
> He said that E was arrested at a barber shop, his two kids were there and that E, the
> black guy, was charged with assault and tampering with a witness.  He says that E
> will not snitch on him and E will say that he was drunk and Marks had nothing to
> do with it.
>                                                   . . .
>
> Chad Marks said that he married an Italian girl named Jennie on June 3rd,
> '03.  . . .  He said that Jennie had a daughter named Joy about five-years-old and
> that Jennie had left Marks for a Spic named Danny from Webster who also has a
> daughter around the  same age as Joy.  He also said that Jennie had sex with 'a
> nigger'[5] when she was about 16 years old.  He said that he thought about beating
> her in the visiting room.  Marks came back from a visit on July 10th . . . extremely
> mad because Jennie wouldn't tell -- Jennie wouldn't tell where she is living.  And
> then she was -- and that he was going to have E smash out all of her car windows
> where she works at Foxy's Nightclub.  Marks also went to the phone book looking

---

[4]  "E" was the nickname of Evan Carroll who assaulted Richard Ross at a Wegmans parking lot
on May 30, 2004.

[5]   The witness clarified in the grand jury that the word "nigger" was in quotes because it was
Chad Marks word, not the witness'.

for private investigators.  He found two of them, wrote down their information and forwarded that information to Sandra Vierria, Marks' girlfriend.  Marks said that he is going to find Jennie and Danny under the falsehood of wanting a divorce.  And the need to get Jennie served with divorce papers.

· · ·

Marks said that he would kill his in-laws first.  He described his in-laws as Joe and Joann.  Joann is Jennie's mother.  Joe is Joann's live-in boyfriend.  Joe is a biker and Joann is a bitch with fake tits.  He said that they live at 91 Orchard Street and that he thinks about waiting around the house around 5 a.m. and when Joann leaves for work in the morning, drag her back inside the house tie her up and when Joe comes home, tie him up, beat the fuck out of both of them.  Find out where Jennie lives.  Kill Joe and Joann with a small baseball bat.  Then go to Jennie's house, tie her and Danny up.  Cut off Danny's penis and shove it into Danny's daughter mouth until she (the five-year-old) chokes to death while Danny watches.  Then kill Danny.  Then tie Joy, another five-year-old girl, and beat her on the stomach with the baseball bat until her insides become soft like Jello, the whole time while Jennie watches.  Have sex with Jennie probably one last time, then kill her.  Or just let her live so she can live and suffer her whole life about what Chad Marks did to her family.

See Letter attached as Exhibit 4 (emphasis added).

> c.   Marks' communications with his wife and threats to kill his wife's boyfriend.

The information in the above-quoted letter from the informant about Marks' threats to kill his wife's new boyfriend and the boyfriend's daughter was corroborated by Marks himself in letters he sent to his then-wife, Jennie.  In one letter, attached hereto as Exhibit 5, Marks wrote:

He's [the boyfriend] a fucking bum and I'm going to break his fucking back when I get out!  Or I'm sending Phil and E[6] to do it! . . .  I want to kill this Mother Fucker, rip his skin off with pliers and pour alcohol on him and cut his dick off and shove it down his daughter's throat, while she chokes to death and he bleeds to death!

---

[6] "E" is Evan Carroll, the same Evan Carroll who assaulted Richard Ross at Wegmans.  "Phil" is likely Phil Bianchi who, as established during the trial, worked in several of Marks' gate houses.

<u>Exhibit 5</u>, at p. 3.  The part about cutting off the boyfriend's penis and stuffing it in his daughter's mouth so she could choke to death is the same as what Marks' fellow inmate described Marks saying in Section B3b above.  In that same letter to his wife (<u>Exhibit 5</u>), Marks also wrote that his wife should, "tell him [the boyfriend] I'm going to get his daughter, I want him to be mad, I want that badly.  He's going to be tortured!  I promise it will be painful." <u>Id.</u> at p. 1.

In another letter to his wife, Marks wrote, "Spic boy has a penalty to pay!  I will hurt him! . . .  Let's be what we are!  A WHITE FAMILY, no niggers or spics!"  <u>See</u> <u>Exhibit 6</u>, p. 3.  In another letter, Marks wrote his wife, "[d]on't make me hurt this Spic, nigger scumbag.  He better be scared of me, he better get a gun!  That's what he better do!"  <u>See</u> <u>Exhibit 7</u>.  In another letter, Marks wrote his wife:

> I'm sending Phil and some people to put his lights out unless the lord change's my heart!  He has to pay for this or else I may not feel allright inside!  I personally would like for him to come to your Mother's house and us go in the backyard and do it like men, get it all off are chests and just fight and that will be that.  I'm going to crush him and beat him with fury!  I'll be home for your birthday, that would be a good day.  I'm going to beat him up Jennie real bad! . . .  I'll kill him and his family!

<u>See</u> <u>Exhibit 8</u>, pp. 2, 6.

In another letter to his wife, a copy of a letter from Donald Thompson to the undersigned, on which copy Marks handwrote various notes and threats, Marks wrote his wife,  "I'm looking forward to meeting Danny on my terms! . . .  I pray it's just an ass whoopen, <u>we're going to stomp</u>

him like Dominick."[7]  <u>See</u> <u>Exhibit 9</u>, p. 2 (emphasis added).  Marks' wife and her aunt (to whom

Marks was mailing the letters) filed harassment charges against Marks.

> d. <u>Marks' continuous and repeated violence and disciplinary</u>
> <u>violations while in custody.</u>

Marks has an extensive history of threatening and assaulting inmates and even threatening

corrections officers.  According to Agent Todd Tryon, from the Federal Detention Facility in

Batavia, Marks was charged with 12 separate disciplinary violations while he was housed in

Batavia, and he was convicted of ten of those charges after disciplinary hearings at the facility.

The charges for which he was convicted included an assault on an inmate for which he was

sentenced to 30 days in the Special Housing Unit.  Before the assault, Marks had warned the chief

that he did not want to be in a dorm unit with other inmates and wanted to be in his own cell.  The

jail guards believe that Marks assaulted the inmate so that the facility would be forced to move

him into a cell without other inmates.  Marks was charged with two other assaults while in Batavia.

Marks was also charged and convicted of interfering with staff, for which he received 21

days in the Special Housing Unit.  The basis for this conviction was that Marks yelled at one of

the guards, told the guard to give him a "fucking shower," told the guard that he was a fucking

asshole, and that he (Marks) wished there wasn't a door between them so that Marks could "kick

his fucking ass."  Marks also told the guard to "suck his dick."

---

[7]  Marks is referring to Dominic Milia, who as more discussed above, Marks beat up for
cooperating with law enforcement

Marks was also convicted of destroying government property.  The basis for this conviction was that Marks scratched the message "fuck INS" onto a mirror in his cell.

Marks' disciplinary record at the Monroe County Jail also evinces Marks' violent and threatening character.   According to Sgt. Larry Kloener, from the Monroe County Jail's Administration department, Marks' disciplinary violations included three fights, threatening two other inmates and engaging in disrespectful behavior toward a deputy.

After being sentenced in this case, Marks continued his violent and criminal activities. Marks joined the "Dirty White Boys" when he was incarcerated at the Coleman Federal Prison from September 2011 to January 2013.  The Dirty White Boys is a prison gang that espouses racist views and opinions.  Marks recently admitted to a Bureau of Prisons Special Investigations Sections technician that as a member of the Dirty White Boys gang he beat up other inmates at the direction of gang leaders.

In November 2013, Marks was charged with bribing a staff member at the prison.  Marks was found guilty and disciplined with disallowance of 27 days of good conduct time, 15 days disciplinary segregation, 180 days loss of commissary and 180 days loss of phone.

Consistent with his violent character and history, he was sanctioned for fighting with and/or assaulting other inmates in July 2010, September 2009 and November 2008.

4.      Marks remains a dangerous man

Section 3582(c) prohibits early release unless the defendant shows (among other conditions) that "the defendant is not a danger to the safety of any other person or the community."[8] Marks has not and cannot make that showing.

Marks remains a danger to the community and to the many people he has threatened to murder, rape and torture.  His history of actual violence (including brutal assaults and attempted murders) demonstrate that his threats cannot be dismissed as mere bluster.  At 41, Marks is still a young man.  There is nothing to suggest that he is ill or weak or in any way physically incapable of assaulting others or, much less, of pulling a trigger.  To the contrary, Marks has apparently used the gym facilities in the prisons where he has been housed.  A photo of him while in custody is attached as Exhibit 10.  He certainly is not the kind of old or infirm inmate who one can reasonably conclude no longer poses a danger to particular individuals or the community as a whole.[9] Releasing him will put the community and those he has threatened in danger.

---

[8]  Section 3582(c) includes as a condition of any reduction of sentence that "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission."  The Commission's pertinent policy statement appears at U.S.S.G. § 1B1.13.  As amended November 1, 2018, the statement repeats the text of Section 3582(c)(1)(A) and adds that the court should reduce the sentence only if the "defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)."

[9]  This clearly distinguishes Marks from the defendants who were granted early release in the cases cited by Marks in his brief.  See United States v. Cantu, 2019 WL 2498923 (SDTX 2019) (government agreed with release request because defendant was an eligible elderly offender (64 years old) who should be released under the Family Reunification Program.  Defendant's underlying offense was not a violent one and he had no violent criminal history during the 50 years prior to his incarceration. Early release would shorten defendant's sentence by less than one year.); United States v. Cantu-Rivera, 2019 WL 2578272 (SDTX 2019) (defendant, who was 69 years old, met the age-related definition of extraordinary and compelling circumstances in USSG 1B1.3 and was experiencing serious deterioration in physical health because of the aging process

C.   Marks' behavior while in custody does not demonstrate that he has "evolved" --
in any event rehabilitation is not a basis for early release.

Marks contends that "[t]he evolution of [his] character in the more than 16 years he has been incarcerated further precludes a finding that he poses a danger." Marks' Brief, p. 13.  As demonstrated above, there has not been any "evolution of Marks' character."  During the time that he has been incarcerated, he has continued to engage in assaults and threats and criminal behavior. His most recent litigated violation was in November 2013 when Marks attempted to bribe a staff member at the prison.  Marks was found guilty and disciplined with disallowance of 27 days of good conduct time, 15 days disciplinary segregation, 180 days loss of commissary and 180 days loss of phone.

However, to this day Marks continues to engage in criminal activity and to violate disciplinary rules.  As recently as this year, after his transfer to FMC Lexington in January, the SIS learned that Marks was violating prison contraband rules by attempting to obtain a cell phone and by possessing a SIM card.  Based on that information, officers searched Marks' cell and located, inside Marks' bible, a plastic card that SIM cards come in, but with the SIM card removed. SIS officers have also obtained information from other inmates that Marks is supplying and/or transporting Suboxone in the prison.

---

(arthritic conditions in multiple joints, cataracts, diabetes, prostrated conditions); United States v. Beck, 2019 WL 2716505 (MDNC 2019) (defendant had cancer in her left breast, cancer had spread to her lymph nodes and possibly to her right breast, and she had not incurred disciplinary violations while in BOP custody.)

The various classes he has taken and the certificates he has obtained while in custody which he cites as proof of his "evolution" were taken and obtained while he was continuing to commit crimes in prison and violate disciplinary rules.

Assuming, for purposes of argument, that Marks had rehabilitated himself (which clearly he has not), that still is not a basis for his early release.  Rehabilitation of the defendant is not, by itself, an extraordinary and compelling reason justifying early release.  Section 994(t) provides:

> The [Sentencing] Commission, in promulgating general policy statements regarding the sentencing modification provisions in section 3582(c)(1)(A) of title 18, shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples.  <u>Rehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason.</u>

28 U.S.C. § 994(t) (emphasis added).

As under prior law, in assessing the merits of an inmate's motion for compassionate release under Section 3582(c)(1)(A), the court's ultimate decision must be "consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c).  Sentencing Commission Policy Statement 1B1(3), with respect to "rehabilitation of the defendant" provides that "[p]ursuant to 28 U.S.C. 994(t), rehabilitation of the defendant is not, by itself, an extraordinary and compelling reason for purposes of this policy statement."

      D.    <u>Even if Marks were eligible for early release, which he is not, the factors in 28 U.S.C. § 3553(a) do not support early release.</u>

The factors set forth in Section 3553(a) do not warrant any type of reduced sentence for Marks.  Marks argues that the 3553(a) factors weigh in favor of a sentence reduction because of: "Marks involvement in a nonviolent drug conspiracy," "coupled with a criminal history devoid of

violent offenses," "and his good behavior during his incarceration." Marks' Motion, p. 14.  As noted above, the evidence at trial, the Court's findings at sentencing and the established history of Marks' violence and criminal activity subsequent to sentencing directly and completely contradict these stated reasons.

Even if the Court were inclined to take a fresh look at the 3553(a) factors today, they would still warrant the 40 years sentence imposed against Marks, if not a greater sentence.

### 1.      Nature and circumstances of the offense

The nature and circumstances of the offense of conviction have not changed.  As was proven at trial and as the Court found at sentencing, Marks was the leader of a "major, large scale drug conspiracy. . .   There was weapons and violence at every step of the way. . . Clear evidence that firearms were used . . . Cooperating people were threatened and beaten by you and your cohorts."  Transcript of March 4, 2008 Sentencing, p. 40.  The Court correctly found that "based on the nature and circumstances of the offense, a very severe sentence should be imposed." Id.

### 2.      History and characteristics of the defendant

With respect to Marks' history and characteristics, these showed a violent and at times sadistic drug dealer.  As a young man, he was convicted of felony assault and that violence continued throughout his adulthood and even after his incarceration on the sentence in this case.  Despite his claim to having evolved, his violent and criminal conduct while incarcerated shows that he remains a dangerous criminal.

3.      The need for the sentence imposed to:

        a.      Reflect the seriousness of the offense, promote respect for
               the law and provide just punishment.

At set forth above, the Court found that at sentencing that the "40 years, the statutory minimum, by my calculation reflects that seriousness [of the offense] . . . and "provides adequate punishment." Sentencing Transcript, 41.  As discussed below, a forty-year sentence continues to be a just punishment given Marks' crimes and his history and character.

        b.      Afford adequate deterrent

The sentence imposed should afford adequate deterrent to those who would commit similar crimes.  Releasing Marks early would undermine the goal of deterrence.

        c.      Protect the public from further crimes of the defendant

Releasing Marks early will certainly not serve the interest of protecting the public from further crimes by him.  He has threatened to murder, torture and rape people.  His violent history shows that he is more than capable and willing to carry out those threats.

At sentencing, this Court found that "a sentence of this nature certainly provides adequate punishment, and I think you do need a sentence that protects the public from your activities because you are a danger and a menace to this community." Sentencing Transcript, p. 41

        d.      Provide defendant with needed educational or vocational training

Marks appears to have availed himself of the educational and vocational training opportunities in prison.  Marks is certainly an intelligent man who knows how to manipulate the

system.  He understands that by taking these classes he can better "sell" himself as rehabilitated when in fact he is not.

### 4.      The sentences available and sentencing guidelines

Despite the changes to the 924(c) consecutive penalties, consideration of the applicable statutory maximums and minimums and of the sentencing guidelines also does not support early release.  At the time of his sentencing, Marks' recommended guideline sentence was 30 years to life, with a ten year mandatory minimum (on the drug counts) plus 30 years consecutive on the two 924(c) convictions.  See PSR, ¶¶ 75-81.  The Court departed downward from the Guidelines and/or imposed a non-guideline sentence of a total of 40 years, 10 on the drug counts and 30 on the gun counts.

Under the current drug and gun laws, the appropriate sentence as recommended by the Guidelines against Marks for the offenses of conviction would remain 40 years to life.

His drug relevant conduct, as established at trial and calculated by the PSR was 2868 grams of cocaine base. PSR, ¶ 47.  Under the current guidelines, this would subject Marks to a base offense level of 32. Guideline § 2D1.1(c)(4).  He would again receive the four level aggravating role enhancement under Guideline Section 3B1.1 and the two level obstruction enhancement under Guideline Section 3C1.1.

Under the current guidelines, Marks would now also receive a two level enhancement under Guideline Section 2D1.1(b)(2) because he "used violence, made a credible threat of violence, or directed the use of violence."  He would now also receive a two level enhancement

under Guideline Section 2D1.1(b)(12) because he "maintained a premises for the purpose of manufacturing or distributing a controlled substance."

Thus, his total guideline offense level if he were sentenced today would be 42, the exact same total offense calculated under his original PSR. See PSR, ¶¶ 46-57.  At offense level 42 and with the same Criminal History Category of  III. His guideline sentencing range on the drugs would remain 360 months to life, with the same 10 year mandatory minimum under 841(b)(1)(A).

His convictions on the two 924(c) counts would now require a mandatory minimum of 10 years, five years consecutive on each count.

Thus, under the guidelines as they are today, Marks recommended total sentencing range under the Guidelines would be 40 years to life (30 years to life on the drug counts, consecutive to 10 years mandatory minimum on the two 924(c) counts).

Even if the Court chose to sentence Marks at the low end of the recommended guideline range, the sentence would be the same 40 years that the Court at sentencing found appropriately reflected the seriousness of Marks' offense and his character.  Sentencing transcript, pp. 39-41

5.      The need to avoid unwarranted sentence disparities among defendants with similar records found guilty of similar conduct.

In his motion, Marks claims that he was treated unfairly because his sentence was higher than the sentences received by his codefendants.  The record shows that Marks was not like his codefendants.

Marks was the unquestioned leader of a large scale and violent drug trafficking conspiracy. At sentencing, the Court found as such in assessing the four level enhancement for role in the offense under Guideline Section 3B1.1:

> I think the evidence supports the four points under 3B1.1. I think the testimony clearly established there were five or more people involved in this operation. And I think as I said already a couple times, it's clear to me that you were the main person, you were the organizer, you set things up, you made the arrangements. I don't think you can listen to that trial for any length of time without coming to that conclusion.

Sentencing Transcript, p. 18.

As noted above, Marks' conversation with Donald Molinari, a police informant who testified at trial, establishes Marks unquestioned leadership role and his control over his workers. Marks bragged about how he could make his workers do anything, including beat and even kill people:

> I don't even have to do anything.  I can make other people do whatever I tell them to.  My boy, Wody, whatever I tell him, he does bro. . . . I got a team bro. Abdul? My boy, Abdul, the Muslim, the fuckin' crackhead Muslim . . .  You know what he'll do, bro'?  He'll do anything I tell him.  I tell him go over there and shoot that guy in the head right there.  I'm gonna get him outta here bro'.  These fuckers worship me bro'.  They look up to me, bro', they'll do anything I tell them.  If I wanted something done to you bro' and if I wanted something done to your family or your brother.

Molinari Transcript, pp. 8-9.

Marks' codefendants also did not threaten to torture, rape and murder others and did not try to actually kill rival drug dealers, as did Marks.

Finally, Marks' codefendants all pled guilty, and two of them cooperated with the government and testified at Marks' trial, thereby forever exposing themselves to the world as police informants or "snitches."  In contrast, Marks never pled guilty.  He made the government

prove its case before a jury, and his trial counsel exhaustively cross examined the government's witnesses and tried to impeach the government's proof.

Marks' contention that he was punished for exercising his right to go to trial is pure rubbish. Marks was not punished for going to trial.  He simply did not get the benefit that other defendants received for pleading guilty before trial and/or cooperating.  It would turn the federal criminal justice system on its head if defendants were allowed to exercise their right to go to trial (thereby preserving their ability to be acquitted), but if they are found guilty then be able to claim the benefits of plea offers never accepted.

E.    Marks deserves no more mercy

Marks is not entitled to and does not deserve any more mercy.  The government believed at the time of sentencing, and still believes, that Marks deserved a life sentence.  The Probation Department and the Sentencing Guidelines agreed and calculated Marks' sentence on the drug counts alone to be 360 months to life (to run consecutive with the 30 years' mandatory minimum on the two 924(c) counts).

This Court, in its discretion, deemed otherwise and departed downward as far as it legally could in sentencing Marks to the ten years' mandatory minimum on the drug counts, for a total sentence of forty years.  Despite this Court's mercy, Marks has continued to commit violent and criminal acts while in custody and to threaten and to physically assault other inmates.

As noted above, a forty year sentence remains reasonable, legal and even generous under the current sentencing guidelines and laws.  Marks deserves no more mercy.

If anyone does deserve mercy in this case, it is those who Marks has promised to torture, rape and murder when released.  These include his ex-wife and her family, her husband and his daughter, and the several cooperating witnesses who testified against Marks at trial.  Reducing Marks' sentence will make the community to which he returns less safe and will create a clear and present danger to those he has threatened.  The law, the safety of the community, common sense and the interests of justice compel the denial of Marks' motion for a reduced sentence.

## CONCLUSION

For the foregoing reasons, this Court should deny in its entirety Marks' motion for a reduced sentence.

DATED:        Rochester, New York, August 23, 2019.

Respectfully submitted,

JAMES P. KENNEDY, JR.
United States Attorney

BY:    s/EVERARDO A. RODRIGUEZ
Assistant United States Attorney
United States Attorney's Office
Western District of New York
100 State Street, Suite 500
Rochester, New York 14614
(585) 399-3950
Everardo.Rodriguez@usdoj.gov