1                    UNITED STATES DISTRICT COURT

2                    WESTERN DISTRICT OF NEW YORK

3     - - - - - - - - - - - - - -X
      UNITED STATES OF AMERICA          03-CR-6033(L)

4
      vs.
5                                       Rochester, New York
      CHAD MARKS,                       December 17, 2019
6                  Defendant.           9:30 a.m.
      - - - - - - - - - - - - - -X

7
                       TRANSCRIPT OF PROCEEDINGS
8             BEFORE THE HONORABLE DAVID G. LARIMER
                   UNITED STATES DISTRICT JUDGE

9

10                    JAMES P. KENNEDY, JR., ESQ.
                      United States Attorney
11                    BY: EVERARDO A. RODRIGUEZ, ESQ.
                          ROBERT A. MARANGOLA, ESQ.
12                    Assistant United States Attorneys
                      500 Federal Building
13                    Rochester, New York 14614

14
                      DEBEVOISE & PLIMPTON, LLP
15                    BY: JOHN GLEESON, ESQ.
                          MARISA R. TANEY, ESQ.
16                    919 Third Avenue
                      New York, New York 10022
17                          - and -
                      JILLIAN S. HARRINGTON, ESQ.
18                    P.O. Box 6006
                      Monroe, New Jersey 08831
19                    Appearing on behalf of the Defendant

20

21    ALSO PRESENT:      Kerry Chartier, U.S. Probation Office

22

23
      COURT REPORTER:    Christi A. Macri, FAPR-RMR-CRR
24                       Kenneth B. Keating Federal Building
                         100 State Street, Room 2120
25                       Rochester, New York 14614

1

# **I N D E X**

2

3 <u>**WITNESS FOR THE GOVERNMENT**</u>

4 Steven Wascher
        Direct examination by Mr. Rodriguez        Page  3
5        Cross-examination by Mr. Gleeson          Page 29
        Redirect examination by Mr. Rodriguez     Page 92
6

7

8

9

10

11

12 <u>**EXHIBIT              RECEIVED**</u>

Government 1
13 Government 2
Defense A
14 Defense B

15

16

17

18

19

20

21

22

23

24

25

**P R O C E E D I N G S**

\*          \*          \*

1

2

3          (**WHEREUPON**, the defendant is present).

4          **THE COURT:** Good morning to counsel.

09:46:30AM 5          **MR. RODRIGUEZ:** Good morning, Judge.

6          **THE COURT:** Mr. Rodriguez, Mr. Gleeson.

7          **MR. GLEESON:** Good morning, Judge.

8          **THE COURT:** Mr. Marks, good morning.

9          **THE DEFENDANT:** Good morning.

09:46:37AM 10          **THE COURT:** Ms. Harrington on the line?

11          **MS. HARRINGTON:** Yes, I am.  Good morning, Your

12  Honor.

13          **THE COURT:** All right, good morning, good morning.

14          I guess we are assembled and prepared to proceed?

09:46:49AM 15          **MR. GLEESON:** Yes.

16          **MR. RODRIGUEZ:** Yes, Judge.

17          **THE COURT:** Mr. Rodriguez, I suspect you have a

18  witness?

19          **MR. RODRIGUEZ:** I do, Your Honor.  We call -- may I

09:46:58AM 20  call him?

21          **THE COURT:** I think we're ready.

22          **MR. RODRIGUEZ:** We call Steven Wascher.

23          <u>**GOVERNMENT'S WITNESS, STEVEN WASCHER, SWORN**</u>

24          <u>**DIRECT EXAMINATION**</u>

09:47:10AM 25          **THE COURT:** Please state your name and spell it for

 1 | the record.

 2 |     **THE WITNESS:** Steven Wascher.  S-T-E-V-E-N;

 3 | W-A-S-C-H-E-R.

 4 |     **THE COURT:** W-A-S?

09:47:35AM 5 |     **THE WITNESS:** C-H-E-R.

 6 |     **THE COURT:** Thank you.  You can have a seat up there

 7 | in the witness area.  All right, keep your voice up a little

 8 | bit and we'll proceed when you're ready, Mr. Rodriguez.

 9 |     **MR. RODRIGUEZ:** Thank you, Judge.

09:47:58AM 10 | **BY MR. RODRIGUEZ:**

 11 | Q.   Good morning, Mr. Wascher.  How are you?

 12 | A.   I'm well.

 13 | Q.   Would you please tell Judge Larimer where you're employed?

 14 | A.   FMC Lexington.

09:48:05AM 15 | Q.   And FMC is?

 16 | A.   Federal medical center.

 17 | Q.   That's a Bureau of Prisons facility?

 18 | A.   That's correct.

 19 | Q.   And how long have you worked for the Bureau of Prisons?

09:48:16AM 20 | A.   Since 2014.

 21 | Q.   What is your current assignment with the Bureau of Prisons

 22 | at FMC Lexington?

 23 | A.   I'm an SIS technician.

 24 | Q.   What does an SIS technician do generally?

09:48:30AM 25 | A.   We're responsible for maintaining the safety and security

1    of the inmates and staff in the organization.  We do that by

2    gathering information, intelligence through monitoring of

3    e-mail communications, interviewing inmates, investigations,

4    stuff like that.

09:48:45AM 5    Q.    Now, how long have you --

6              THE COURT: I'm sorry, what's the SIS stand for?

7              THE WITNESS: Special Investigation Section, Your

8    Honor.

9              THE COURT: Oh, thank you.

09:48:54AM 10             MR. RODRIGUEZ: Thanks, Judge.

11   BY MR. RODRIGUEZ:

12   Q.    How long have you been a technician with SIS?

13   A.    Started in June of this year, sir.

14   Q.    What did you do before you became an SIS technician?

09:49:05AM 15   A.    I was an officer, correctional officer.

16   Q.    At FMC Lexington?

17   A.    Yes, sir.

18   Q.    Judge Larimer was good enough to point out that I referred

19   to you as officer at the last hearing, but you're not an

09:49:16AM 20   officer?  You're a technician, correct?

21   A.    That's correct.

22   Q.    You had been an officer before?

23   A.    Yes, sir.

24   Q.    And were you promoted to become a technician?

09:49:25AM 25   A.    Yes, sir.

1  Q.    Do technicians answer to officers?

2  A.    No.

3  Q.    We'll come back to what you do at the facility in a

4  moment, but I would like to talk a little bit about what you

09:49:39AM 5  did before you came to the Bureau of Prisons, okay?

6  A.    Yes, sir.

7  Q.    Would you tell us what you did out of high school?

8  A.    Graduated high school, joined the United States Army.

9  Q.    When did you get out of high school?

09:49:52AM10  A.    1991.

11  Q.    You went right into the Army?

12  A.    Yes, sir.

13  Q.    How long were you in the Army?

14  A.    From 1991 until 1998.

09:49:58AM15  Q.    And when you left the Army what was your rank?

16  A.    E5 sergeant.

17  Q.    What did you do in the Army during the eight years that

18  you served the country?

19  A.    My job assignment was military police officer.

09:50:11AM20  Q.    You've got to keep your voice up.

21  A.    Military police officer.

22  Q.    Were you stationed abroad at any time?

23  A.    I was stationed in numerous locations in the United States

24  and overseas in eastern Europe.

09:50:23AM25  Q.    What were some of the places where you were stationed

1  abroad?

2  A.   All over the Falkland theater, Hungary, Bosnia, Sarajevo,

3  Brcko, throughout the -- it was during the conflicts over

4  there, so I traveled in multiple locations.

09:50:36AM 5  Q.   Now, you indicated that you left the Army what year?

6  A.   1998, sir.

7  Q.   What did you do after you left the Army in 1998?

8  A.   I became a Department of Defense contractor.

9  Q.   And what kind of work did you do as a Department of

09:50:51AM 10  Defense contractor?

11  A.   It was mostly security and intelligence based contracting.

12  Q.   Can you describe to Judge Larimer what that entailed?

13  A.   Initially my first contracts were coordinated with the

14  military to locate and retrieve high value targets, people who

09:51:10AM 15  were designated as terrorists for the United States

16  Government.

17  Q.   Where did you do this type of work?

18  A.   In the Middle East:  Kuwait, Iraq, Afghanistan.

19  Q.   In addition to locating high value targets in these

09:51:25AM 20  places, what else did you do as a defense contractor?

21  A.   I did executive protection.  We guarded dignitaries, VIPs,

22  presidential motorcades, stuff like that overseas in hostile

23  environments; and I was a counterintelligence investigator for

24  the Department of Defense.

09:51:42AM 25  Q.   Without giving us obviously any classified information,

1  what type of work did you do as a counterintelligence

2  investigator?

3  A.    It was along the same lines as my initial contracts.    We

4  worked -- I was specifically tasked out to DIA, Defense

09:51:58AM 5  Intelligence Agency, to locate and apprehend high value

6  targets.

7  Q.    How long were you a defense contractor roughly?

8  A.    Approximately 17, 17 and a half years.

9  Q.    And after you stopped being a defense contractor did you

09:52:14AM 10  come over to BOP?

11  A.    Yes, sir.

12  Q.    Why did you stop being a defense contractor?

13  A.    Actually my wife got on to me about being gone all the

14  time, you know, having to two raise two boys on her own.    I

09:52:27AM 15  finally caved and came back to the United States to kind of

16  homestead.

17  Q.    Now, you joined BOP what year?

18  A.    2014.

19  Q.    When you first came into BOP what was your responsibility

09:52:39AM 20  and your position?

21  A.    I was an officer.    I had general responsibility as an

22  officer of the safety, well-being of the inmates and staff,

23  ensuring that the inmates followed policies and procedures

24  inside the institution.

09:52:51AM 25  Q.    And you said you did that for how long?

1  A.   Approximately four and a half years.

2  Q.   Then you became -- you were promoted to SIS?

3  A.   Yes, sir.

4  Q.   Now, was that a competitive position, the position that

09:53:04AM 5  you obtained at SIS?

6  A.   Yes, sir.

7  Q.   How many SIS officers are there at FMC Lexington?

8  A.   In our institution there's only two, sir.

9  Q.   You're one of the two?

09:53:16AM 10  A.   Yes, sir.

11  Q.   Now, during the course of your work as an SIS technician,

12  do you have -- how is it that you go about, generally

13  speaking, I don't want any names, generally speaking, how is

14  it that you go about trying to find out what's going on in the

09:53:33AM 15  facility and what -- who, if any, inmates may be engaging in

16  criminal or prohibited conduct?

17  A.   Generally speaking, we have certain things we have to

18  monitor daily:  Inmate communications, which are e-mails,

19  phone calls, written letters, correspondence.  We do that.  We

09:53:54AM 20  look for key words or anything that may be an indicator of

21  something going on.

22        We walk the institution, we help the officers with

23  shakedowns or searches throughout the institution.  We have

24  conversations daily with the inmates.  I'm pretty good at just

09:54:09AM 25  walking up and talking to them.  I like to keep a good, open

1  conversation with them.

2         We get information from other institutions, we get

3  information from other inmates.  You just put it all together

4  and try to find everything.

09:54:20AM 5  Q.   Fair enough.  You used the term "shakedown."  What's a

6  shakedown?

7  A.   A search, sir.

8  Q.   A search of what?

9  A.   Could be a general area, could be an inmate itself, it

09:54:29AM 10  could be a cell.

11  Q.   By the way, does the fact that an inmate takes many

12  classes at a Bureau of Prisons facility indicate that he's not

13  engaging in criminal or prohibited conduct?

14  A.   No, sir.

09:54:50AM 15  Q.   Does the fact that an inmate takes many classes at a BOP

16  facility indicate he's not a danger in the facility or could

17  be a danger outside?

18  A.   No, sir.

19  Q.   I want to direct your attention to February 21st of 2019.

09:55:06AM 20  On that day did you have occasion to become involved in the

21  search of cells?  Prison cells?

22  A.   I'm not sure of the exact date, but --

23  Q.   All right.  Is there anything that might refresh your

24  recollection on the date?

09:55:24AM 25  A.   My affidavit or the incident report or something showing

1    that date, sir.

2    Q.   Fair enough.

3             **MR. RODRIGUEZ:** Judge, I'm handing up to the witness

4    what I'm marking as Government Exhibit 1.  It is the Federal

09:55:48AM 5   Bureau of Prisons incident report from February 21, 2019.

6             **MR. GLEESON:** May I see it, please?  Thank you.

7             **THE COURT:** Mark it with a number.

8             **MR. RODRIGUEZ:** Sorry, Judge?

9             **THE COURT:** Do you want to mark it with a number?

09:56:09AM10            **MR. RODRIGUEZ:** Government Exhibit 1.

11            **THE COURT:** I'm sorry, I didn't hear it.  No. 1,

12   thank you.

13   **BY MR. RODRIGUEZ:**

14   Q.   Mr. Wascher, I show you what's marked as

09:56:18AM15  Government Exhibit 1.  Do you recognize what that is?

16   A.   Yes, sir.

17   Q.   What is it?

18   A.   It's an incident report, sir.

19   Q.   All right.  Did you prepare that incident report?

09:56:26AM20  A.   I did.

21   Q.   I'd like you to review it and see if it refreshes your

22   recollection as to the date of that jail cell search?

23   A.   It does, sir.

24   Q.   What was the date?

09:56:34AM25  A.   21 February 2019.

1   Q.   All right.   Now, at that time were you an SIS technician

2   or were you still an officer?

3   A.   I was a senior officer, sir.

4   Q.   All right.   Can you describe to the Court generally why it

09:56:46AM 5   is you searched the cell that day?

6   A.   On this occasion, sir, we were doing random cell searches

7   of the entire alley of the Bluegrass Unit where Mr. Marks

8   resides.

9            His cell was one of those on that alley, and we had

09:57:01AM 10   previous information that there may be contraband in his cell.

11   So we searched it along with the other cells.

12   Q.   All right, let's break that up a little bit.   You said

13   that you were conducting random searches.   Is that something

14   that commonly takes place at a Bureau of Prisons facility?

09:57:13AM 15   A.   It's supposed to happen daily throughout the day.

16   Q.   What's the purpose of these random cell searches?

17   A.   To control and eliminate contraband from the institution.

18   Q.   All right.   Now, you indicated that you in the course of

19   doing that set of searches, you also searched Mr. Marks' cell?

09:57:28AM 20   A.   Yes, sir.

21   Q.   And you had prior information about him?

22   A.   Yes, sir.

23   Q.   What was that information?

24   A.   We were given information that Mr. Marks had in his

09:57:37AM 25   possession a SIM card, which goes into a smart telephone, and

1    he was attempting to obtain a smart telephone for that SIM

2    card.

3    Q.   Did you obtain any -- had you had any information about

4    why he was trying to get a cell phone?

09:57:50AM 5    A.   The information we were given was that he was trying to

6    get into -- introduction of Suboxone inside the institution,

7    and that he was currently using another inmate's cell phone to

8    coordinate this and he wanted his own cell phone to coordinate

9    it.

09:58:05AM 10    Q.   What is Suboxone?

11    A.   It's a prescription drug that helps people get off opiate

12    addiction.

13    Q.   How is it used in any way by prison inmates?

14    A.   It gives you the same feelings -- or it's just like taking

09:58:20AM 15    an opiate, and it's easy to conceal.  The inmates take it.

16    Q.   Forgive me for something, what may be a silly question,

17    but why is it a violation or why is it of concern that an

18    inmate might have a cell phone in his possession?

19    A.   A cell phone is our most serious item in the institution.

09:58:39AM 20    Q.   A more serious item?

21    A.   Yes, sir.  We consider those more serious than weapons.

22    They use them to coordinate activities, talk to people on the

23    outside of the institution.  We've seen -- a prime example,

24    like in Puerto Rico they coordinated attacks on staff members

09:58:55AM 25    outside of the institution; that was done through cell phones.

1          So maintaining and eliminating cell phones from the

2   institution is one of our main priorities.

3   Q.   Were you involved in the actual search of Mr. Marks' cell?

4   A.   Yes, sir.

09:59:09AM 5   Q.   At the time did Mr. Marks share the cell with anybody

6   else?

7   A.   Yes, sir.

8   Q.   How many people were in Mr. Marks' cell?

9   A.   I believe, my recollection, there were two inmates in that

09:59:20AM 10   cell, sir.

11   Q.   Do you recall the name of the other inmate?

12   A.   Inmate Moore.

13   Q.   Okay.  Describe to Judge Larimer what happened when you

14   began the course of the search of Mr. Marks' cell.

09:59:34AM 15   A.   Initially we go in the cell, we ensure no inmates were

16   present inside the cell, we'll throw a blanket or towel,

17   something over the window -- we don't want the inmates

18   observing our search procedures because then they'll know how

19   we search and it helps them hide more contraband.  So we'll

09:59:50AM 20   secure the cell, cover the window.  We just go in and conduct

21   a search.

22   Q.   And was any contraband found during this search of the

23   cell?

24   A.   Yes, sir.

09:59:58AM 25   Q.   Describe to Judge Larimer what you found.

1    A.    A plastic card that you receive -- that a SIM card is

2    attached to and you snap the SIM card out.  We found one of

3    those.

4    Q.    You found the card holder, but not the SIM card itself?

10:00:11AM 5    A.    That's correct.

6    Q.    And --

7          THE COURT: I'm sorry.  You found -- tell me again

8    what you found.

9          THE WITNESS: Your Honor, when you get a new cell

10:00:20AM10    phone they give you that plastic card, it looks like a credit

11    card, and it has the SIM card into it, and you kind of snap it

12    out.  That card is what we found, not the actual SIM card.

13          THE COURT: All right. I take it that none of the --

14    neither Mr. Marks nor Mr. Moore were in the cell when it was

10:00:36AM15    searched?

16          THE WITNESS: No, sir.

17          THE COURT: Okay.

18    BY MR. RODRIGUEZ:

19    Q.    Had they been in the cell, you would have asked them to

10:00:42AM20    step out?

21    A.    Yes, sir.

22    Q.    Okay. Where did you find the SIM card holder?

23    A.    It was located inside a red Gideon Bible.

24    Q.    And where was the red Gideon Bible?

10:00:54AM25    A.    It was located on top of a wall locker, institutional wall

```
 1  locker.
 2  Q.   How many wall lockers were in that cell, if you recall?
 3  A.   I believe there were four in the cell at the time.
 4  Q.   Okay.  And were you able -- was the Bible inside a locker
 5  or on top of a locker?
 6  A.   It was on top of a locker.
 7  Q.   So anybody in that cell could have grabbed the Bible?
 8  A.   Yes, sir.
 9  Q.   Were you able to determine whose locker the Bible was on
10  top of?
11  A.   Yes, sir.
12  Q.   Whose locker was it?
13  A.   We identified it as Inmate Moore's locker.
14  Q.   Inmate Moore's locker, Mr. Marks' cellmate?
15  A.   That's correct.
16  Q.   What happened after you identified the Bible, you located
17  the plastic SIM card holder inside the Bible on top of the
18  locker?
19  A.   We secured the contraband and continued with the search of
20  the cell.
21  Q.   Did you find any other contraband?
22  A.   No, sir, I don't believe we did.
23  Q.   What happened after the search was completed?
24  A.   We took the contraband over to the lieutenant's office and
25  we escorted Moore to the lieutenant's office as well.
```

10:01:12AM (line 5)
10:01:24AM (line 10)
10:01:33AM (line 15)
10:01:46AM (line 20)
10:01:58AM (line 25)

17

1   Q.   Why did you take Moore to the lieutenant's office?

2   A.   Because the location of the SIM card was identified as his

3   property, so he was the only inmate we could physically link

4   to the SIM card.

10:02:15AM 5   Q.   Were you present when Moore was taken to the lieutenant's

6   office?

7   A.   Not during the escort.  I was in the lieutenant's office

8   when he arrived there.

9   Q.   All right.  And was Mr. Moore asked any questions while he

10:02:28AM 10   was inside the lieutenant's office?

11   A.   Yes, sir.

12   Q.   What, if anything, did he say about the Bible and the SIM

13   card, if anything?

14   A.   He stated it was his Bible, that he had one Bible, red

10:02:39AM 15   Bible, that he used for religious services.

16   Q.   Now, what happened to Mr. Moore after he had this initial

17   communication with the lieutenant?

18   A.   He was escorted to the Special Housing Unit and secured

19   there.

10:02:53AM 20   Q.   Was he at some point -- I forget the term -- adjudicated

21   one way or the other, that he was guilty or not guilty of

22   possessing that contraband?

23   A.   He was seen by the lieutenant and the DHO.  I'm not sure

24   what their findings were on it, sir, but he was seen by both

10:03:11AM 25   of them.

1  Q.   What's a DHO?

2  A.   Disciplinary hearing officer.

3  Q.   Did you have occasion to check to see whether there was

4  any indication of Mr. Moore's having been disciplined as a

10:03:22AM 5  result of this activity?

6  A.   Yes, sir.

7  Q.   What was your finding?

8  A.   That he had no disciplinary history.

9  Q.   What's that indicate?

10:03:29AM 10  A.   It would either indicate that he was not charged with the

11  cell phone or that his record was expunged.

12  Q.   Why would a record be expunged?

13  A.   It could either be due to not enough evidence for the DHO

14  to substantiate the charge; or if the DHO himself felt that

10:03:43AM 15  the inmate wasn't guilty.

16  Q.   All right.  Now, you were involved in the search, you were

17  present when Mr. Moore was interviewed.  Who do you believe

18  that SIM card belonged to?

19  A.   My belief it belonged to Mr. Marks.

10:03:56AM 20  Q.   Why is that?

21  A.   The previous information we had, the intelligence stating

22  that he was in possession of it, he was trying to gain access

23  to a cell phone, the interactions with Mr. Marks versus the

24  interaction with Inmate Moore.  Two completely different

10:04:12AM 25  personalities.

1  Q.    In what way?

2  A.    Inmate Moore is very, very polite, very respectful, not

3  like strong-willed at all.  He's the type of inmate that if he

4  sees you in the hallway, he says God bless you or how you

10:04:28AM 5  doing, hopes you have a safe day at work, stuff like that.

6            Mr. Marks is more confident, a little bit of

7  arrogance to him, doesn't interact the same way.

8            So based on my experience, if I had to pick an

9  inmate and guess who it belonged to, I would say Mr. Marks.

10:04:45AM10  Q.    And had you had occasion -- are you familiar with

11  Mr. Marks' disciplinary record?

12  A.    Slightly.

13  Q.    Does he have a disciplinary history in BOP?

14  A.    Yes, sir.

10:04:56AM15  Q.    Did Mr. Moore have a disciplinary history at BOP?

16  A.    No, sir.

17  Q.    Based on your training and experience and your work as an

18  SIS technician, why would Mr. Moore claim responsibility for

19  something that didn't -- or contraband that wasn't his?

10:05:12AM20  A.    There could be numerous reasons.  Sometimes inmates will

21  hold or claim responsibility for contraband for other inmates.

22  Could be either done out of loyalty, out of fear, coercion.

23  Inmates can pay or bribe other inmates to hold contraband for

24  them.

10:05:29AM25            Most likely your smarter, more well-connected

1    inmates are never going to hold their own contraband so they

2    won't have a significant history report for that.  It will be

3    the inmates who don't have any pull or influence in the

4    institution.

10:05:42AM 5    Q.   Do you consider Mr. Marks a well-connected inmate?

6    A.   I'd say he's somewhat connected.  He's a very intelligent

7    person, and I don't think, if he had contraband, he would hold

8    it his self.

9    Q.   By the way, I forget if I asked you this, but the

10:05:58AM 10   information about somebody holding a SIM card and trying to

11   get a cell phone, who was trying to -- who was holding a SIM

12   card, who was trying to get a cell phone according to the

13   information you had obtained before the search?

14   A.   According to the information, Inmate Marks had a SIM card

10:06:14AM 15   and was trying to obtain a cell phone for that SIM card.

16   Q.   All right.  I want to move you ahead to August of 2019 of

17   this year.

18   A.   Okay.

19   Q.   Around that time were you contacted by BOP lawyers and

10:06:40AM 20   asked to look into a tattoo that Mr. Marks had?

21   A.   Yes, sir.

22   Q.   Can you describe that communication to Judge Larimer?

23   A.   I was contacted by the Legal Department at FMC Lexington.

24   They advised me that the AUSA's Department had observed a

10:06:56AM 25   tattoo on Inmate Marks on social media and asked if I could

1    get a picture of the tattoo or get an explanation of what the

2    tattoo was.

3    Q.   What, if anything, did you do to follow-up that request --

4    follow-up on that request?

10:07:09AM 5    A.   I just had Mr. Marks come over to the lieutenant's office,

6    talked to him a little bit and took pictures of his tattoos

7    and upper body.

8    Q.   Could you describe Mr. Marks' demeanor when he came into

9    the lieutenant's office to meet with you?

10:07:22AM 10   A.   He was a little nervous.  Getting called to the

11   lieutenant's office, he was wanting to know if he was in

12   trouble.  He was confident, a little bit arrogant.  That's

13   just -- that's normally his personality, but he was a little

14   nervous being in the lieutenant's office.

10:07:37AM 15   Q.   Describe to Judge Larimer what happened when Mr. Marks

16   came into the lieutenant's office.

17   A.   He asked me why he was there, and I told him I needed to

18   take pictures of his upper body, he may have been involved in

19   a physical altercation.  Just needed to get pictures and find

10:07:52AM 20   out what's going on.

21            He submitted.  There was no issue.  He didn't --

22   wasn't confrontational whatsoever.

23   Q.   Did you photograph him?

24   A.   Yes, sir.

10:07:59AM 25   Q.   During the course of your having this meeting with him did

1  he say anything?

2  A.   Yes, we had a casual conversation.

3  Q.   Did he discuss at any time whether or not he had belonged

4  to any groups in facilities before?

10:08:17AM 5  A.   He had mentioned that he had ran with the Dirty White Boys

6  at -- I believe it was USP Coleman.

7  Q.   What did he say about that?

8  A.   He said that he was used to stuff like this, being brought

9  in, accusations being made, like, for the photographs.   Stuff

10:08:34AM 10  like that happened at USP Coleman.

11          He ran with the Dirty White Boys.   He got tired of

12  their politics; as he got older and more mature, didn't want

13  to be involved in it.   They would ask him to assault inmates

14  if they were minorities or homosexual, and as he got older he

10:08:50AM 15  realized how stupid that was and he was trying to distance his

16  self from it.

17  Q.   Did he indicate whether or not he had, in fact, assaulted

18  minorities and gay people?

19  A.   His words were that the Dirty White Boys had instructed

10:09:02AM 20  him to do it.

21  Q.   Did he say whether or not he had done it?

22  A.   He didn't say specifically he did it.   He said that they

23  would ask him to do it.

24  Q.   All right.   Now, Mr. Wascher, do you remember roughly when

10:09:17AM 25  it was?

1          THE COURT: I'm sorry --

2          MR. RODRIGUEZ: I'm sorry, Judge.

3          THE COURT: Either your own knowledge or the record,

4     do you know when Mr. Marks was at Coleman?

10:09:30AM 5          THE WITNESS: He was there, I believe, a couple

6     years.  I'm not sure the exact dates, Your Honor.

7          THE COURT: Just before Lexington or do you know?

8          THE WITNESS: I think he had been in an institution

9     prior between Coleman and us, sir.  I think it was Ray Brook.

10:09:43AM 10   I'm not sure, sir.

11         THE COURT: All right.

12    BY MR. RODRIGUEZ:

13    Q.   Mr. Wascher, do you remember roughly when it was that you

14    and I first spoke about Mr. Marks?

10:10:04AM 15   A.   I don't remember the exact date, no.  I believe it was

16    shortly after I received the e-mail from Legal.

17    Q.   All right.  After you had taken photographs and had this

18    meeting?

19    A.   Yes, sir.

10:10:11AM 20   Q.   And during that session did you discuss with me what

21    happened during your meeting with Mr. Marks?

22    A.   Yes, sir.

23    Q.   And did you also describe what you recall happening during

24    the search of Mr. Marks' cell earlier in the year in February?

10:10:33AM 25   A.   I believe so, yes, sir.

1  Q.   When you told me about what had happened during the search

2  of his cell, did you have access or were you in a position to

3  review that report when we initially talked?

4  A.   Not at that time, sir.

10:10:50AM 5  Q.   All right.  I want to move you to one last topic that I

6  want to cover.  As part of your work at SIS, do you have

7  occasion to follow the money, if you will, to determine how

8  much money is coming into inmates' accounts and whether any

9  money is going out of the inmates' accounts?

10:11:11AM 10  A.   Yes, sir.

11  Q.   And did you have occasion to look at Mr. Marks' account to

12  see if any money was coming in?

13  A.   Yes, sir.

14  Q.   And what, if anything, did you find?

10:11:24AM 15  A.   I found numerous connections to dozens of other inmates

16  that were either sending or receiving money to Mr. Marks; and

17  a couple of outside contacts that were sending or receiving

18  money to Mr. Marks.

19  Q.   Did you find any indication that payments were coming from

10:11:39AM 20  outside the facility in to Mr. Marks' account?

21  A.   I believe there were a couple coming to him, most of them

22  were going to another individual outside the institution.

23  Q.   Do you remember how many payments were coming in?

24  A.   Not the number of payments, no, sir.

10:11:52AM 25  Q.   Would it help to refresh your recollection by reviewing

1  your declaration?

2  A.   Yes, sir.

3          THE COURT: So you said money was going from other

4  inmates to Mr. Marks, and there was money coming from outside

10:12:12AM 5  in to his account as well?

6          THE WITNESS: Yes, Your Honor.

7          THE COURT: All right.

8  BY MR. RODRIGUEZ:

9  Q.   I show you what's marked as Government Exhibit 2.  Can you

10:12:20AM10  identify what this is for the record?

11  A.   This is my affidavit, sir.

12  Q.   The affidavit that you signed and submitted to me?

13  A.   Yes, sir.

14  Q.   I'd like you to --

10:12:32AM15          THE COURT: That's part of the record?

16          MR. RODRIGUEZ: It is, Judge, it's an exhibit to my

17  sur-reply.

18  BY MR. RODRIGUEZ:

19  Q.   I'd like you to turn to paragraph 8 of your affidavit and

10:12:45AM20  review it and see if it refreshes your recollection.

21  A.   Yes, sir.

22  Q.   Now, were you able to determine how much money Mr. Marks

23  was receiving from outside the facility at the time of this

24  affidavit?

10:13:10AM25  A.   At the time, sir, but we don't have listed here the total

1 | from everyone that he was receiving.

2 | Q.   Okay. Were you able to determine whether a Ms. Jacobi was

3 | sending him funds?

4 | A.   Yes, sir.

10:13:23AM 5 | Q.   Were you able to determine how much he had received during

6 | his time at FMC Lexington from Ms. Jacobi?

7 | A.   Yes, sir.

8 | Q.   How much was that?

9 |         **THE COURT:** I'm sorry, I didn't catch the name.

10:13:33AM 10 |         **MR. RODRIGUEZ:** Ms. Jacobi.

11 |         **THE COURT:** Jacobi.

12 | **BY MR. RODRIGUEZ:**

13 | Q.   How much was that?

14 | A.   At the time of this affidavit, sir, it was $5,400.

10:13:41AM 15 | Q.   $5,400?

16 | A.   Yes, sir.

17 | Q.   Coming from Ms. Jacobi into Mr. Marks' account?

18 | A.   Yes, sir.

19 | Q.   Is that a lot of money --

10:13:50AM 20 | A.   Yes, sir.

21 | Q.   -- for an inmate to receive from outside?

22 | A.   Yes, sir.

23 | Q.   Now, you signed this affidavit on October 5, 2019?

24 | A.   That's correct, sir.

10:14:00AM 25 | Q.   And we filed our response on October 15, 2019.  Did you

1  have occasion to go back and review whether additional

2  payments had been made by Ms. Jacobi to Mr. Marks' account

3  after that affidavit?

4  A.   Yes, sir.

10:14:21AM 5  Q.   What did you find?

6  A.   I found -- I believe it was two more transactions,

7  approximately $200 each.

8  Q.   When were they?

9  A.   I believe it was October 13th.

10:14:33AM 10  Q.   And after that were there any more payments --

11  A.   No, sir.

12  Q.   -- from Ms. Jacobi?

13  A.   No, sir.

14  Q.   Did you also find payments from other inmates out to

10:14:43AM 15  Ms. Jacobi?

16  A.   Yes, sir.

17  Q.   Is it a violation of BOP rules to run a business in a BOP

18  facility?

19  A.   Yes, sir.

10:14:51AM 20  Q.   And do you believe this is what was going on with these

21  payments?

22  A.   I believe there was some type of business going on.  I'm

23  not exactly sure of the nature of the business.  It had

24  something to do with preparation of legal paperwork.  So, yes,

10:15:04AM 25  sir.

1  Q.    But the payments stopped after we filed our papers,

2  correct?

3  A.    That's correct, sir.

4  Q.    I forgot to ask you something, but going back to your

10:15:47AM 5  meeting with Mr. Marks when you photographed his tattoos, do

6  you remember the exact words he said to you during that

7  meeting?

8  A.    In what reference, sir?

9  Q.    The exact words about the Dirty White Boys.  The exact

10:16:03AM 10  words?

11  A.    To my recollection, his words were that he had run with

12  the Dirty White Boys at Coleman, and that he had gotten tired

13  of the politics because he had matured and realized how stupid

14  it was; and they wanted him to assault -- or asked him to

10:16:18AM 15  assault minorities and homosexuals and as he got older he

16  realized how stupid that was, he tried to distance his self

17  from those groups.

18  Q.    I show you what's marked as -- direct your attention to

19  Government Exhibit 2, the affidavit.  Just with respect to

10:16:37AM 20  what he said about the beating of other inmates, take a look

21  at the last sentence of paragraph 7.

22  A.    Yes, sir.

23  Q.    Does that refresh your recollection as to what he told you

24  about beating up other inmates?

10:16:53AM 25  A.    Yes, sir.

1  Q.   What did he say?

2  A.   He told me he was a member of the Dirty White Boys and he

3  beat up other inmates at the direction of gang leaders.

4           **MR. RODRIGUEZ:** Thank you, Mr. Wascher.  That's all

10:17:06AM 5  I have, Judge, thanks.

6           **THE COURT:** That report is different from your

7  testimony a few minutes ago where you said he did not say

8  that?  He did not admit assaulting anybody?

9           **THE WITNESS:** Yes, sir.  This is the actual written

10:17:23AM 10  document.  I was trying to go off memory, sir.

11           **THE COURT:** Anything else, Mr. Rodriguez?

12           **MR. RODRIGUEZ:** Nothing further, Judge.  Thanks.

13           **MR. GLEESON:** May I, Judge?

14           **THE COURT:** Cross.

10:17:33AM 15                    <u>**CROSS-EXAMINATION**</u>

16  **BY MR. GLEESON:**

17  Q.   Good morning.

18  A.   Good morning, sir.

19  Q.   My name is John Gleeson.  I represent Chad Marks.

10:17:51AM 20  A.   Yes, sir.

21  Q.   You're an SIS technician?

22  A.   That's correct, sir.

23  Q.   Who's in charge, sir, of -- what should I call you?

24  Officer?  What is your title?

10:18:09AM 25  A.   At the institution it's -- they just call me Wascher.

1  Q.    Okay.

2  A.    SIS technician is kind of a long title, sir.

3  Q.    I'll call you Mr. Wascher.

4  A.    That's fine, sir.

10:18:18AM 5  Q.    Mr. Wascher, who initiates the investigations that the SIS

6  division conducts?

7  A.    It would depend on the investigation, sir.

8  Q.    Okay. Sometimes it comes from inmates?  It begins with

9  information from inmates?

10:18:33AM 10  A.    It could start with information from inmates, yes, sir.

11  Q.    Okay. And you're a technician.  Who's Lieutenant Fowler?

12  A.    Lieutenant Fowler was one of the lieutenants at FMC

13  Lexington.

14  Q.    Okay. You said "was."  He's gone?

10:18:49AM 15  A.    Yes, sir.  He transferred.

16  Q.    He was a lieutenant in SIS?

17  A.    He filled in.  Currently we don't have an SIS lieutenant,

18  so they would fill in different lieutenants to cover that

19  position.

10:19:00AM 20  Q.    Okay. What do you have now besides you?  You said there

21  were two SIS folks.

22  A.    There's myself and another technician, and then we have

23  the SIA.

24  Q.    That's an agent, right?

10:19:11AM 25  A.    Correct.

31

1  Q.   The hierarchy is technician, then above that is the

2  lieutenant, above that is the agent?

3  A.   That's correct, sir.

4  Q.   Who is the agent at FMC Lexington?

10:19:20AM 5  A.   SIA Sean Burchett.

6  Q.   Spell that please.

7  A.   B-U-R-C-H-E-T-T.

8  Q.   Okay. Who is Richard Stump, do you know?

9  A.   He is a former SIS technician.

10:19:30AM 10  Q.   And was he a former SIS technician at FMC Lexington?

11  A.   Yes, sir.

12  Q.   He's rotated somewhere else I take it?

13  A.   He's still there.  He took another position, sir.

14  Q.   Got it.  The name Joyce Horikawa, familiar to you?

10:19:47AM 15  A.   I believe she's in our Legal Department, sir.

16  Q.   Yeah.  Do you know if she's in the Legal Department in

17  Regional in Philadelphia?

18  A.   No, sir.

19  Q.   Okay.  And Carlos Martinez is in the Legal Department,

10:19:53AM 20  correct?

21  A.   I believe so, yes, sir.

22  Q.   When you get inmate information regarding suspected

23  criminal activity of other inmates, do you make a record of

24  that?

10:20:13AM 25  A.   Sometimes, sir.

1  Q.   Sometimes you do, sometimes you don't?

2  A.   That's correct.

3  Q.   What influences when you do and when you don't?

4  A.   If the information sounds credible or something that needs

10:20:22AM 5  to be looked into.

6  Q.   Okay. So the stuff that you don't think is credible and

7  don't think you need looking into doesn't get recorded?

8  A.   That would be correct.

9  Q.   Okay. Are there any BOP records of this inmate information

10:20:47AM10  about Chad Marks and the SIM card?

11  A.   I don't believe so, sir.

12  Q.   You didn't create any, right?

13  A.   No, sir.

14  Q.   Is that because you didn't regard that information you got

10:20:55AM15  from the inmate as credible?

16  A.   That's correct, because I wasn't an SIS technician at that

17  time, sir.

18  Q.   I see.  So some other SIS technician made that decision

19  not to memorialize it?

10:21:04AM20  A.   I couldn't tell you what they decided, but --

21  Q.   -- but, in any event, it wasn't memorialized, right?

22  A.   That's correct.

23  Q.   Nothing in the BOP files about this, right?

24  A.   I have no idea, sir.

10:21:13AM25  Q.   You looked, didn't you?

1  A.   I can't tell you what's in all the BOP files, sir.

2  Q.   Did you look in the files of FMC Lexington to see if

3  there's anything in the files regarding the SIM card

4  allegations by other inmates against Chad Marks?

10:21:28AM 5  A.   No, sir.

6  Q.   You never looked?

7  A.   No.

8  Q.   But you know there's not -- it's not there, right?

9  A.   No, I don't.

10:21:33AM 10  Q.   I thought you testified a moment ago there's nothing in

11  the file about it?

12  A.   You asked me if there were anything in all the BOP files,

13  and I said I couldn't tell you that.

14  Q.   Is there anything in the FMC Lexington file?

10:21:44AM 15  A.   Not to my knowledge.

16  Q.   Did you look?

17  A.   I haven't looked for that specifically, sir.

18  Q.   Did you look at the files at FMC Lexington for information

19  about reported criminal activity by Chad Marks?

10:21:59AM 20  A.   Yes.

21  Q.   Is there a single piece of paper in those files that

22  records such information?

23  A.   Which information?

24       MR. RODRIGUEZ: Objection.  What information?

10:22:08AM 25  BY MR. GLEESON:

1 Q. Any information about criminal activity.

2 A. Yes, sir.

3 Q. What?

4 A. There's numerous entries about him trying to introduce

10:22:15AM 5 Suboxone; being involved in altercations and fights.

6 Q. How about SIM cards?

7 A. No, sir.

8 Q. Nothing, right?

9 A. No, sir.

10:22:25AM 10 Q. Okay. Now, the technicians support the lieutenant and the

11 agents, correct?

12 A. The SIS lieutenant?

13 Q. SIS.

14 A. Yes, sir.

10:22:34AM 15 Q. You write reports?

16 A. Yes, sir.

17 Q. Okay. You maintain evidence, correct?

18 A. Correct.

19 Q. Provide some computer support?

10:22:42AM 20 A. Yes, sir.

21 Q. Okay. Do you keep track of the Bureau of Prisons "public

22 safety factor"?

23 A. Yes, sir.

24 Q. They effect prison security, correct?

10:22:51AM 25 A. That's correct.

1   Q.   They effect placement within the BOP system, correct?

2   A.   Yes, sir.

3   Q.   There's a bunch of public safety factors, right?

4   A.   Yes.

10:22:59AM 5   Q.   A sex offender is one, right?

6   A.   Yes, sir.

7   Q.   Deportable aliens another, right?

8   A.   Yes, sir.

9   Q.   And one is called "disruptive group," correct?

10:23:09AM10   A.   Yes, sir.

11   Q.   Is the Dirty White Boys a disruptive group?

12   A.   No, sir.

13   Q.   Okay. So if someone were in the Dirty White Boys, that

14   wouldn't be a public safety factor, correct?

10:23:20AM15   A.   Yes, sir.

16   Q.   Did you get training when you were promoted from being a

17   corrections officer to an SIS technician?  Did you get

18   training?

19   A.   Yes, sir.

10:23:34AM20   Q.   Do you get training on creating reports?

21   A.   Yes, sir.

22   Q.   Okay. You wrote up BOP incident reports like the one that

23   you saw here today when you were a corrections officer,

24   correct?

10:23:45AM25   A.   That's correct, sir.

1  Q.   Okay.  Is it important that they be accurate?

2  A.   Yes, sir.

3  Q.   Important they be truthful?

4  A.   Yes, sir.

10:23:51AM 5  Q.   Complete?

6  A.   As complete as possible, sir.

7  Q.   All right. Record the facts that are important to the

8  incident and the investigation?

9  A.   Yes, sir.

10:24:06AM 10  Q.   Okay. Marks arrived at FMC Lexington in January of 2019,

11  correct?

12  A.   I'm not sure of the exact date, sir.

13  Q.   Sound about right?

14  A.   It does.

10:24:15AM 15  Q.   Okay. Came from Ray Brook as far as you recall?

16  A.   I don't believe -- I don't know the exact location.  I

17  believe it was Ray Brook.

18  Q.   Okay. Does it refresh your recollection that you told AUSA

19  Martinez (sic) a few times that --

10:24:30AM 20          **MR. RODRIGUEZ:** Rodriguez.

21          **MR. GLEESON:** I'm sorry, excuse me, Rodriguez,

22  excuse me, sir.

23  **BY MR. GLEESON:**

24  Q.   Does it refresh your recollection that you told him or let

10:24:38AM 25  me -- withdrawn.

1          Do you recall telling him during your information

2    exchanges in this case that Mr. Marks was in a federal

3    penitentiary in Coleman from roughly September of 2011 to

4    January of 2013?  Do you recall that?

10:25:02AM 5    A.    Probably, yes, sir.

6    Q.    Sounds right?

7    A.    Yes, sir.

8    Q.    Okay. Do you know that you're here in connection with a

9    motion by Chad Marks to reduce his sentence?

10:25:14AM 10    A.    Yes, sir.

11    Q.    Okay. When did you first find that out approximately?

12    A.    I discussed it with AUSA Martinez (sic).

13          **MR. RODRIGUEZ:** Rodriguez.

14          **THE WITNESS:** Rodriguez.

10:25:25AM 15          **MR. GLEESON:** Sorry.  I started something here.

16    **BY MR. GLEESON:**

17    Q.    Did he show you the opposition that he filed in

18    August after your conversations?

19    A.    I don't believe so.

10:25:37AM 20    Q.    Have you ever seen it?

21    A.    I don't believe so.

22    Q.    Well, let me show it to you.  I'm going to mark this

23    Defense Exhibit 2.

24          Ms. Taney, can I trouble you for a copy for the

10:25:59AM 25    Court and one for the AUSA, whose name I won't get wrong

```
 1   again?
 2              THE COURT: Why don't we use letters -- A, B, C and
 3   so forth.
 4              MR. GLEESON: Fair enough.
 5   BY MR. GLEESON:
 6   Q.   This will be Defense A.
 7   A.   Thank you.
 8              MR. GLEESON:  Can I hand one up to the Court?
 9              THE COURT: Sure.  So this is Exhibit A, this is
10   the --
11              MR. GLEESON: This is the opposition filed by the
12   Government.
13   BY MR. GLEESON:
14   Q.   You have it before you, sir?
15   A.   I do, sir.
16   Q.   You see at the top the date is -- I'll represent to you,
17   but you see at the top of the document it's filed August 23rd
18   of 2019?
19   A.   I do, sir.
20   Q.   And do you recall speaking to AUSA Rodriguez on that date?
21   A.   I don't recall specific dates.  I know I talked to him in
22   August.
23   Q.   I want to invite your attention to page 16 because it
24   relates to the information you've imparted to the Court here
25   today.  And when you get to page 16, there's two full
```

1    paragraphs, the second sentence of the first paragraph says --

2    excuse me, of the second paragraph --

3    A.   Yes, sir.

4    Q.   -- "as recently as this year after his transfer to FMC

10:27:44AM 5    Lexington in January, the SIS learned that Marks was violating

6    prison contraband rules by attempting to obtain a cell phone

7    and by possessing a SIM card.  Based on that information,

8    officers searched Marks' cell and located inside Marks' Bible

9    a plastic card that SIM cards come in, but with the SIM card

10:28:10AM 10    removed."

11              Do you see that?

12    A.   I do, sir.

13    Q.   You don't recall if you spoke to AUSA --

14              **MR. RODRIGUEZ:** Rodriguez.

10:28:28AM 15    **BY MR. GLEESON:**

16    Q.   -- Rodriguez that morning?

17    A.   I don't recall the exact dates, no, sir.

18    Q.   I'm going to show you Defense Exhibit B, which I'll

19    represent to you is a cover letter and a bunch of e-mails

10:28:43AM 20    supplied to the Government by AUSA Rodriguez.  Fair enough?

21    A.   Yes, sir.

22              **MR. RODRIGUEZ:** Can I take a quick look?

23              **MR. GLEESON:** Yes, I've got a copy for you.

24              **THE WITNESS:** Thank you, sir.

10:29:25AM 25    **BY MR. GLEESON:**

1   Q.   And if you look -- and, again, these were e-mails supplied

2   to me by the Assistant U.S. Attorney.  If you look to page 27,

3   look at the bottom, it says e-mails.  If you turn to 27 --

4                 **THE COURT:** Page 27, that's the Bates number?

10:29:55AM 5              **MR. GLEESON:** Yes, at the bottom, Judge, where it

6   says e-mail 27 in bold in the lower left-hand corner.

7                 **THE COURT:** Thank you.

8   **BY MR. GLEESON:**

9   Q.   See that on August 23rd at 7:37 a.m. Mr. Rodriguez

10:30:11AM 10 introduced himself as a federal prosecutor here in Rochester,

11  said he wanted to talk to you about Chad Marks.

12               You see that, sir?

13  A.   Yes, sir.

14  Q.   Does that refresh your recollection that you spoke to him

10:30:21AM 15 on that day?

16  A.   It's here, sir.  Like I said, I still don't remember it

17  personally, but it's here.

18  Q.   All right.  If you turn to page 28, you see that later

19  that morning, 8:26 a.m., this is the top of e-mail 28, you

10:30:40AM 20 sent an e-mail to Mr. Rodriguez attaching four photos of Chad

21  Marks?

22  A.   Yes, sir.

23  Q.   Okay. And you also on page -- back on page 27, you send

24  him an e-mail -- this is at the top -- informing him that

10:30:59AM 25 Marks was at Coleman from September 1 of 2011 to January 15th

1    of 2013.

2    A.   Yes, sir.

3    Q.   You see that?

4    A.   Yes, sir.

10:31:07AM 5    Q.   And fair to say you communicated with him on that day?

6    A.   Yes, sir.

7    Q.   You communicated with him by phone as well, correct?

8    A.   I don't recall, sir.  I know I communicated by e-mail, but

9    I don't recall if I talked to him on the phone.

10:31:23AM 10   Q.   You don't recall talking to him on the phone?

11   A.   I don't recall, no, sir.

12   Q.   Okay.  You gave him information to use in opposition to

13   the motion, correct?

14   A.   I gave him the information that was requested, sir.

10:31:41AM 15   Q.   Okay. If I can refer you back to the memo that I showed

16   you, which is Defense Exhibit A, page 16, which says that

17   officers searched Marks' cell and located inside Marks' Bible

18   a plastic card that SIM cards come in.

19            You'll agree with me the statement that the

10:32:05AM 20   officers located this plastic case inside Marks' Bible is

21   false, correct?

22   A.   It's incorrect, yes, sir.

23   Q.   It was Moore's Bible, correct?

24   A.   Moore claimed possession of the Bible, yes.

10:32:16AM 25   Q.   Excuse me.  It was Moore's Bible, correct?

1          **MR. RODRIGUEZ:** Objection.

2          **THE COURT:** What's the question, Mr. Gleeson?

3 **BY MR. GLEESON:**

4 Q.   It was Moore's Bible, right?

10:32:27AM 5 A.   Sir, Moore claimed possession of the Bible.

6 Q.   Do you have any reason to doubt that it was Moore's Bible?

7 A.   That the Bible belonged to Moore?  I do not.

8 Q.   It was on top of his locker?

9 A.   Yes, sir.

10:32:36AM 10 Q.   He was examined about it?

11 A.   Yes, sir.

12 Q.   In a lieutenant's office?

13 A.   Yes, sir.

14 Q.   He said it was his Bible?

10:32:42AM 15 A.   That's correct.

16 Q.   In that locker were Moore's possessions?

17 A.   That's correct.

18 Q.   Did you tell AUSA Rodriguez that the SIM card was seized

19 from Marks' Bible?

10:32:56AM 20 A.   I believe I did initially, yes, sir.

21 Q.   And that was wrong?

22 A.   Yes, it was incorrect.

23 Q.   Okay. Did you tell him that the Bible belonged to Thomas

24 Moore?

10:33:06AM 25 A.   Not during this phone conversation, no, sir.

1  Q.   And did you tell him in that conversation that Moore and

2  not Marks was charged with possessing this piece of plastic

3  that you say contained a SIM card?

4  A.   No, sir.

10:33:24AM 5  Q.   In fact, you yourself wrote up the incident report

6  charging Moore, right?

7  A.   That is correct.

8  Q.   And Moore ended up in the SHU, right?

9  A.   The Special Housing Unit, yes, sir.

10:33:32AM 10  Q.   Marks was never charged, right?

11  A.   That is correct.

12  Q.   Marks was never disciplined, right?

13  A.   That is correct.

14  Q.   He was never even asked about that, right?

10:33:41AM 15  A.   I don't believe so, sir.

16  Q.   Did you tell the AUSA that?

17  A.   Not --

18         **MR. RODRIGUEZ:** I'm going to object to the form of

19  the question.

10:33:48AM 20         **THE COURT:** Overruled.

21  **BY MR. GLEESON:**

22  Q.   Did you tell the AUSA that?

23  A.   Not during this initial conversation.

24  Q.   Did you think it important that the AUSA tell the Court

10:33:57AM 25  that someone else was punished for this SIM card?

44

1  A.    Did I think?  I don't understand what you mean, sir.

2  Q.    Did you think it important when you were speaking to AUSA

3  Rodriguez that the Court should know that someone else was

4  charged with possessing the SIM card?

10:34:16AM 5  A.    At this time I had no idea what was going on, sir.

6  Q.    I'm asking you whether you thought it was important?

7  A.    I can't answer that question, sir.

8  Q.    Did you think it was important to tell the Court that

9  Marks was not charged with it, but Moore was?

10:34:30AM 10  A.    At what time, sir?

11  Q.    At that time, August 23rd, 2019.

12  A.    Sir, at this time I provided the information in my memory.

13  I wasn't -- I didn't look at any documentation, I didn't

14  refresh my memory.  That was the memory I had.

10:34:43AM 15  Q.    You'll agree, won't you, that this brief that I drew your

16  attention to makes it look like the BOP found evidence of

17  contraband in Marks' Bible, correct?

18  A.    Yes, sir, that statement does.

19  Q.    And that wasn't true, right?

10:34:58AM 20  A.    That's an incorrect statement, yes, sir.

21  Q.    Did AUSA Rodriguez ask you for a copy of the incident

22  report?

23  A.    Yes, sir.

24  Q.    Did you send it to him on August 23rd?

10:35:14AM 25  A.    I can't recall if I sent it to him or if Legal pulled it

1  from the files.  I can't remember which one happened, sir.

2  Q.   Do you know whether he had it before he wrote this

3  memorandum to the Court?

4  A.   I have no idea.

10:35:24AM 5  Q.   In any event, AUSA Rodriguez eventually came back to

6  you -- withdrawn.

7          Did you learn that we, Chad Marks' lawyers, told

8  the Court that there were false and misleading statements in

9  this memorandum that I've shown you?

10:36:05AM 10          **MR. RODRIGUEZ:** Object to the form of the question.

11          **THE WITNESS:** I don't understand your question.

12          **THE COURT:** Overruled.

13  **BY MR. GLEESON:**

14  Q.   Did you learn that Chad Marks' lawyers told the Court that

10:36:16AM 15  this memorandum that I've shown you, and specifically those

16  statements that I read to you, were false and misleading?

17  A.   Did I learn that you said that to the Court?

18  Q.   Yes.

19  A.   No.

10:36:28AM 20  Q.   Okay. In any event, AUSA Rodriguez came back to you and

21  asked you to file -- to write a declaration, correct?

22  A.   That's correct, sir.

23  Q.   Okay. Let's turn to that declaration, which I think you

24  might have up there.

10:36:43AM 25          Did you mark that, Mr. Rodriguez?

1          **MR. RODRIGUEZ:** No. 1, I believe.  No. 2, No. 2.

2          **THE COURT:** Exhibit 2.

3          **MR. GLEESON:** Ms. Taney, do you have extra copies of

4     that?  This is Government Exhibit 2.

10:37:12AM 5     **BY MR. GLEESON:**

6     Q.    You still have it in front of you, sir?

7     A.    Yes, sir.

8     Q.    At paragraph 3 you wrote that after Marks arrived at FMC

9     Lexington, SIS, other corrections officers and I obtained

10:37:42AM 10     information from inmates in the facility that Marks was

11     violating prison contraband rules by attempting to obtain a

12     cell phone and by actually possessing a SIM card, right?

13              I read that correctly?

14     A.    That's correct, sir.

10:38:00AM 15     Q.    Okay. Now, you say "SIS, other corrections officers and

16     I."  Did all three of you obtain that information

17     independently?

18     A.    That's more than three.  It's multiple corrections

19     officers, the SIS department, several lieutenants.

10:38:17AM 20     Q.    So SIS got that information, right?

21     A.    Yes, sir.

22     Q.    And do you know who in SIS got it?

23     A.    At that time the SIS technicians would have been Mr. Stump

24     and Mr. Lawson.

10:38:29AM 25     Q.    Okay. And so they received information -- this information

1  you claim, correct?

2  A.   Yes, sir.

3  Q.   And then multiple corrections officers?

4  A.   Yes, sir.

10:38:39AM 5  Q.   Okay. And do you know who they are?

6  A.   I can't tell you all of them, sir.  I know myself, Officer

7  Hacker, Officer Vago.  There's quite a few of us that

8  regularly conduct searches and interact with the inmates.

9  Q.   Okay. Then you --

10:38:53AM 10  A.   Yes, sir.

11  Q.   -- also?

12  A.   Also myself.

13  Q.   So multiple sources of information, correct?

14  A.   That is correct, sir.

10:38:59AM 15  Q.   Okay. And the incident -- you testified earlier that there

16  was -- the search occurred on February 21st, correct?

17  A.   I believe that was correct, sir.

18  Q.   And you have before you, the Government marked it, I

19  believe, the incident report.  You have it up there, right?

10:39:20AM 20  A.   Yes, sir.

21  Q.   Government Exhibit 1?

22  A.   Yes, sir.

23  Q.   Okay. Who decided to search the cell?

24  A.   That particular cell?

10:39:32AM 25  Q.   Yes.

A.   We searched it.  It was on the alley that we were
searching other cells.

Q.   And who made the decision to search the cell?

A.   I can't recall that, sir.

10:39:41AM Q.   There a process that, you know, out here, outside of
prisons, there's a process for conducting a search where
authority is obtained from a judge.  Is there anything
analogous to that in the BOP setting where someone's authority
is obtained to search?

10:40:01AM A.   Whose authority, sir?

Q.   Anyone.

A.   You mean like an inmate's authority to search?

Q.   Yeah, I mean, it may be true -- and you're going to edify
me in this regard -- that an SIS technician can just decide to
10:40:13AM search a cell on his or her own; is that correct?

A.   An officer can search an inmate's person, property,
assignments at any time he decides.  So if an officer can do
it, anyone from an officer to staff member to SIS to
lieutenant to the warden himself can do it, sir.

10:40:29AM Q.   Okay.  In this case this search on February 21st, do you
remember specifically who authorized the search?

A.   I just said I don't remember that, sir.

Q.   Okay. In any event, if you look at Government Exhibit 1,
which is the incident report, it says -- and I'll invite your
10:40:55AM attention to paragraph 11, which is the description of the

1    incident -- "on Thursday 21 February 2019 at approximately

2    10:40 p.m. I, SCO S. Wascher, was conducting random cell

3    searches in the Bluegrass Unit," correct?

4    A.   That's what it says, sir, yes.

10:41:30AM 5    Q.   Okay. Is that correct?

6    A.   That is correct.

7    Q.   Okay. And you also testified and you wrote in your

8    declaration that the basis for the search was this suspicion

9    that Chad Marks possessed a SIM card, correct?

10:41:47AM 10    A.   For that particular cell, yes, sir.

11    Q.   Excuse me?

12    A.   For that particular cell, yes, sir.

13    Q.   But you didn't write that in the incident report, correct?

14    A.   No, sir.

10:41:58AM 15    Q.   The incident report says that this was a random search,

16    this was pursuant to a random search of all the cells in the

17    Bluegrass Unit, correct?

18    A.   That's not what it says, sir.

19    Q.   Well, it says conducting random cell searches of the

10:42:13AM 20    Bluegrass Unit, correct?

21    A.   That is correct.

22    Q.   And there's nothing in here that suggests that the purpose

23    of the search of this cell was other information about Chad

24    Marks, is there?

10:42:24AM 25    A.   No, there is not.

1   Q.   And is that written anywhere?

2   A.   I don't believe so, sir.

3   Q.   Other than your declaration?

4   A.   I don't believe so.

10:42:31AM 5   Q.   Isn't it a fact that the basis of the search was this

6 random search and not information supplied by other inmates?

7   A.   Of which part of the search, sir?

8   Q.   Of the search of Chad Marks' cell.

9   A.   The initial search was a random search of that alley.

10:42:52AM 10 When we got to his cell, we had prior information about

11 Inmate Marks, so we decided to include his cell into that

12 search.

13   Q.   Why didn't you put that reason in this incident report?

14   A.   Incident report is supposed to be factual information,

10:43:04AM 15 sir, not what I believed or what I thought.  It's factual

16 information about what occurred at that time.

17   Q.   And the factual information you're testifying to here

18 today is that the reason for the search was suspicion of Chad

19 Marks, correct?

10:43:20AM 20   A.   The reason of the search was suspicion that Chad Marks may

21 have in his possession contraband.

22   Q.   And that's factual information, correct?

23   A.   Yes, sir.

24   Q.   And the purpose set forth here was to conduct a random

10:43:33AM 25 search, correct?

1  A.   It doesn't say random search of Inmate Marks' cell, sir.

2  It says of the Bluegrass Unit.

3  Q.   Would you agree with me that the statement that Wascher

4  was conducting random cell searches of the Bluegrass Unit is a

10:43:47AM 5  factual assertion?

6  A.   Yes, sir.

7  Q.   And that factual assertion is different from the one

8  you're including here is the purpose of your search, right?

9  A.   For Inmate Marks' cell or for the Bluegrass Unit, sir?

10:44:00AM 10  Q.   You tell me.

11             MR. RODRIGUEZ: Object to the form.

12             THE WITNESS: I did tell you, sir.  It was a random

13  search of the Bluegrass Unit of that alley.  When we came upon

14  Marks' cell, we had prior information he may be in possession

10:44:10AM 15  of contraband.  So we decided to include that cell as well.

16  BY MR. GLEESON:

17  Q.   Your testimony is the search of his cell was pursuant to

18  an investigation of Chad Marks, correct?

19  A.   No, I never said that.

10:44:23AM 20  Q.   But it was based on information that he had a SIM card,

21  right?

22  A.   Yes.

23  Q.   There is -- just to cut to one chase with respect to this

24  incident report -- the name Chad doesn't appear anywhere in

10:44:35AM 25  the report, right?

1    A.   Which report, sir?

2    Q.   Your incident report that's in front of you.

3    A.   No, sir.

4    Q.   The name Marks doesn't, correct?

10:44:42AM 5    A.   No, sir.

6    Q.   What was the reason you didn't place on this incident

7    report that the basis for the search of this particular cell

8    included information about Marks?

9              **MR. RODRIGUEZ:** Objection, asked and answered.

10:45:12AM10              **THE COURT:** Overruled.  It's cross-examination.

11              **THE WITNESS:** As stated earlier, I only put the

12   factual information about what occurred in that cell.  I

13   wasn't putting my opinions or what I believed or what I

14   thought happened.  I was putting the factual information about

10:45:25AM15   what happened during that search and what we found in the

16   cell.

17   **BY MR. GLEESON:**

18   Q.   You wrote in your declaration in October that I and other

19   officers believed that the plastic SIM card belonged to Chad

10:45:40AM20   Marks.  Do you recall that, sir?

21   A.   Yes, sir.

22   Q.   Okay. Did you believe that at the time the plastic was

23   seized?

24   A.   At the time we located it?

10:45:47AM25   Q.   Yes.

1  A.   Yes, sir.

2  Q.   Okay. And you based your belief on your claim that it's

3  common -- withdrawn.

4       Did you say on direct examination that if you had

10:46:08AM 5  to guess whether Moore was coerced, you would say he was

6  because Chad Marks is arrogant?

7  A.   I did not say that at all, sir.

8  Q.   You based your belief of your claim that this is -- you

9  based your belief that this was Marks' SIM card on your claim

10:46:31AM 10  that it's common in BOP facilities that stronger or more

11  connected inmates coerce weaker and less connected ones; is

12  that correct?

13  A.   That's not what I said either, sir.

14  Q.   Could you look at your declaration that's before you,

10:46:47AM 15  paragraph 5?  Second sentence of paragraph 5 you wrote "it is

16  common in BOP facilities that stronger or more connected

17  inmates coerce weaker or less connected cellmates."

18       You wrote that, right?

19  A.   Yes, sir.

10:47:19AM 20  Q.   Isn't that, sir, didn't you just say to the Court in this

21  declaration that the basis of your belief that the SIM card,

22  that plastic -- withdrawn.

23       Am I understanding it correctly that your

24  declaration attributes your belief that Marks coerced Moore to

10:47:44AM 25  this common phenomenon in BOP?

1      **MR. RODRIGUEZ:** Object to the form of the question.

2  **BY MR. GLEESON:**

3  Q.   Do you understand my question?

4      **THE COURT:** Overruled.

10:47:53AM 5      **THE WITNESS:** Common phenomenon, sir?

6  **BY MR. GLEESON:**

7  Q.   It is common -- I'm reading from your declaration.

8  A.   Yes, sir.

9  Q.   "It's common in BOP facilities that stronger or more

10:48:04AM10  connected inmates coerce weaker or less connected cellmates,"

11  right?  I read that correctly?

12  A.   Yes, sir.

13  Q.   That's one of the bases of your belief that this was

14  actually Marks' plastic and not Moore's; is that correct?

10:48:19AM15  A.   Are you talking about at the time of this affidavit or at

16  the time of the search, sir?

17  Q.   Well, let's separate it.  At the time of the search?

18  A.   At the time of the search I had no reason to believe that

19  Mr. Marks had intimidated or coerced anyone.

10:48:33AM20  Q.   All right.

21  A.   I was following up on information.

22  Q.   So at the time you wrote the affidavit you thought -- you

23  wrote the declaration, okay.

24      And you also based it on the fact that if

10:48:44AM25  contraband is discovered -- I'm paraphrasing from your

1    declaration -- a stronger inmate coerces the cellmate to take

2    responsibility, correct?

3    A.   That's very common, yes, sir.

4    Q.   And Moore had no history of disciplinary violations?

10:48:57AM 5    A.   None.

6    Q.   And based on that you concluded that Marks coerced Moore

7    into holding the plastic card, correct?

8    A.   I believe he could have, yes, sir.

9    Q.   That he could have?

10:49:07AM 10    A.   Yes, sir.

11    Q.   Okay. And is that what you told AUSA Rodriguez, that he

12    could have?

13    A.   It's written here is that he did, but yes, I believe he

14    could have.

10:49:17AM 15    Q.   Which is it, did or could have?

16    A.   Both, sir.

17    Q.   Okay.  On the night of the search Moore was taken to the

18    lieutenant's office to be questioned, correct?

19    A.   That is correct, sir.

10:49:31AM 20    Q.   And the incident report describes the questioning, right?

21    A.   I don't believe so, sir.

22    Q.   Well, let me invite your attention back to Government

23    Exhibit 1, paragraph 11.  It has a long single spaced

24    paragraph that describes the information that Moore imparted

10:49:53AM 25    in the lieutenant's office, correct?

1  A.    Yes, sir.

2  Q.    And this is obviously based on an interrogation of Moore,

3  right?

4  A.    We don't interrogate inmates, sir.

10:50:01AM 5  Q.    What do you call it?

6  A.    Interviews.

7  Q.    Sorry?

8  A.    An interview.

9  Q.    Based on an interview of Moore?

10:50:06AM 10  A.    It's based on it, yes, sir.

11  Q.    And the interview includes asking questions of Moore?

12  A.    It does.

13  Q.    Okay. So he was asked whether it was his Bible, right?

14  A.    Yes, sir.

10:50:15AM 15  Q.    Asked whether he had other Bibles?

16  A.    I believe so, sir.

17  Q.    He was asked what he used the Bible for, correct?

18  A.    Yes, sir.

19  Q.    Okay. Where he kept it?

10:50:26AM 20  A.    Yes, sir.

21  Q.    Okay. You now say that Moore was being coerced by Marks to

22  take the fall, correct?

23  A.    Yes, sir.

24  Q.    Okay. And you knew then, so you say, you knew then there

10:50:40AM 25  was informant information that -- or inmate information that

1  Marks was trying to possess a SIM card, correct?

2  A.   Yes, sir.

3  Q.   Okay. But there's nothing in here about Marks in this

4  incident report, correct?

10:50:56AM 5  A.   That's correct, sir.

6  Q.   There's no indication in here whatsoever of any suspicion

7  that the SIM card was Marks', right?

8  A.   That's correct, sir.

9  Q.   Okay. Was he questioned about whether it was Marks' SIM

10:51:11AM 10  card?

11  A.   I don't believe he was asked if it was specifically Marks'

12  SIM card.

13  Q.   Did you ask him, "is this Marks' SIM card?"

14  A.   I didn't ask him anything, sir.

10:51:19AM 15  Q.   Who did the questioning?

16  A.   Lieutenant Burchett.

17  Q.   Were you present?

18  A.   Yes, sir.

19  Q.   Okay. Did anybody ask him whether Marks was the owner of

10:51:27AM 20  this SIM card holder?

21  A.   I don't recall whether he asked him or not.

22  Q.   Isn't it a fact it wasn't asked at all?

23  A.   I can't say it was a fact, sir, because I told you I don't

24  remember.

10:51:35AM 25  Q.   And your testimony is that the search of that cell was

1  based on a suspicion that Marks was trying to possess a SIM

2  card, right?

3  A.   Yes, sir.

4  Q.   And there was no questioning of Moore about whether Marks

10:51:51AM 5  was the person responsible for the SIM card holder, isn't that

6  a fact?

7  A.   Sir, I've already answered that.  I can't remember.

8  Q.   And that would have been important to your investigation,

9  right?

10:52:00AM 10  A.   I didn't have an investigation, sir.

11  Q.   That would be important to the investigation of the SIM

12  card, the attempt to hold a SIM card, wouldn't it, sir?

13  A.   There was no investigation, sir.

14  Q.   When the SIM card holder was found and Moore was

10:52:18AM 15  questioned, there was no investigation as to whether Chad

16  Marks was responsible for the SIM card?

17  A.   No, sir.

18  Q.   None?

19  A.   No, sir.

10:52:30AM 20  Q.   I thought you testified that was the purpose of the search

21  of that cell?

22  A.   No, sir.  I testified that the purpose of the search of

23  that cell was that we had previous information.  There was no

24  open investigation on Inmate Marks.

10:52:48AM 25  Q.   You had previous information of what?

1    A.   As I stated earlier, that he had possession of a SIM card

2    and was trying to obtain a telephone.

3    Q.   That was the purpose of the search of the cell, correct?

4    A.   Yes, sir.

10:53:00AM 5    Q.   And what you say was a SIM card holder was retrieved?   Was

6    seized, correct?

7    A.   Correct.

8    Q.   And Moore was questioned, interviewed about that as you

9    say, correct?

10:53:13AM 10    A.   That's correct.

11    Q.   And nobody thought to question him as to whether Marks had

12    any connection to the SIM card holder?

13    A.   I can't remember the exact questions that were answered,

14    sir.  I didn't --

10:53:26AM 15    Q.   I'm not asking you the exact questions.  I'm asking you

16    whether or not in those circumstances there was no -- whether

17    there was any suspicion of Marks in the questioning --

18    withdrawn, bad question.

19           This was your summary of the interview of Moore,

10:53:40AM 20    correct?

21    A.   Correct, sir.

22    Q.   You said on direct in response to AUSA Rodriguez's

23    question why Moore was brought to the lieutenant's office,

24    correct?

10:54:08AM 25    A.   Correct, sir.

1   Q.   And you said it was because the location of the SIM card

2   identified as his property, correct?

3   A.   It was among his other personal possessions, so it was

4   linked to him, yes, sir.

10:54:24AM 5   Q.   It was on top of a locker, right?

6   A.   Yes, sir.

7   Q.   Okay.

8        THE COURT: We've been proceeding a while, maybe

9   this would be a time to take a break.

10:54:39AM 10        MR. GLEESON: Fine, Judge.  Thank you.

11        THE COURT: All right, take about a ten minute

12   break, give the court reporter some relief.  Thank you.

13        (**WHEREUPON**, there was a pause in the proceeding.)

14        (**WHEREUPON**, the defendant is present).

11:12:09AM 15        THE COURT: We'll continue with --

16        MR. GLEESON: Can I continue, Judge?

17        THE COURT: -- with cross-examination, and maybe try

18   to bring this area to some conclusion here.

19        MR. GLEESON: I'm already moving on, Judge.

11:12:37AM 20   BY MR. GLEESON:

21   Q.   Do you recall that in early August Mr. Martinez -- Mr.

22   Martinez, to set the stage again, is an attorney at FMC

23   Lexington, correct?

24        THE COURT: Mr. Rodriguez.

11:12:53AM 25        MR. GLEESON: Mr. Martinez is an attorney at FMC --

1          **MR. RODRIGUEZ:** Another Martinez.

2          **THE WITNESS:** Yes, sir.

3          **MR. RODRIGUEZ:** His name is probably Rodriguez as

4     well.

11:13:02AM 5          **MR. GLEESON:**  Source of my confusion.

6          **THE COURT:** I'm sorry.

7     BY MR. GLEESON:

8     Q.   Did you learn that he passed along a request to SIS from

9     Regional about Chad Marks?

11:13:16AM 10    A.   Are you referring to the photographs, sir?

11    Q.   No.  Earlier in August.

12    A.   You'd have to clarify, sir.  I'm not sure what you're

13    asking.

14    Q.   Sure, let's take a look at the e-mails which we've marked

11:13:32AM 15    as Defense Exhibit B, and let me invite your attention to page

16    48.  At the top you see an e-mail from you -- see Mr. Stump,

17    Mr. Stump at the time was an SIS technician at FMC Lexington,

18    right?

19    A.   That's correct, sir.

11:14:02AM 20    Q.   Okay. And actually look at the bottom.  You see on

21    August 5th Mr. Stump writes an e-mail saying I spoke with

22    Mrs. Horikawa and supplied the information she requested.

23          You see that?

24    A.   I do, sir.

11:14:18AM 25    Q.   Did you have any involvement in this?

1    A.    Not to my knowledge, sir.

2    Q.    You know Horikawa is a Regional -- an attorney in

3    Regional, correct?

4    A.    I know she's in Legal for the Bureau.  I'm not sure of her

11:14:31AM 5    exact position, sir.

6    Q.    Okay. Look on page 48.  You can see Horikawa, the attorney

7    for BOP, asked Martinez, the attorney at FMC Lexington, to see

8    if Marks had any SIS information linking him to criminal or

9    bad activity.

11:14:59AM 10             Do you see that, sir?

11    A.    Down at the bottom of the page, sir?

12    Q.    Yes.  See that?

13    A.    Yes, sir.

14    Q.    That's August 2nd, correct?

11:15:13AM 15             **MR. RODRIGUEZ:** Objection.

16    **BY MR. GLEESON:**

17    Q.    According to the e-mail.

18    A.    According to the e-mail, yes, sir, August 2nd.

19    Q.    Okay. And we just read that, an e-mail pursuant to

11:15:23AM 20    which -- not pursuant to which.  An e-mail stating that Stump

21    supplied that information to Horikawa on August 5th.

22             You saw that?

23    A.    I'm not sure what he's supplying.  He said I spoke with

24    Ms. Horikawa and supplied the information.

11:15:38AM 25    Q.    That's my question.  What information was that?

1   A.   I have no idea, sir.

2   Q.   Were you in SIS then?

3   A.   I was.

4   Q.   Did you confer with Stump then?

11:15:46AM 5   A.   No.

6   Q.   Did you confer with Horikawa then?

7   A.   No.

8   Q.   Do you know what information was supplied by SIS to

9   Regional in response to the Government's request?

11:15:56AM 10   A.   As stated, sir, I have no idea what it was.

11   Q.   Do you know we requested that?

12   A.   No.

13   Q.   Okay.  You know it was refused?

14   A.   No, sir.

11:16:02AM 15   Q.   In any event, you weren't involved in that?

16   A.   No, sir.

17   Q.   So the information in the SIS files about Chad Marks was

18   supplied by one of your colleagues, Stump, correct?

19          **MR. RODRIGUEZ:** Objection.  He said he didn't know,

11:16:16AM 20   Judge.

21          **THE WITNESS:** According to the e-mail, it shows

22   Mr. Stump, but I'm not sure.

23   **BY MR. GLEESON:**

24   Q.   All right. In any event, a couple weeks later you were

11:16:25AM 25   asked to perform a particular task, right?

1  A.   I'm not sure.  Again, the exact date, I'd have to look at

2  the e-mails to see the exact date.

3  Q.   We'll get to the e-mails in a minute.  But you were asked

4  to examine a specific tattoo on the body of Chad Marks,

11:16:38AM 5  correct?

6  A.   Correct, sir.

7  Q.   Okay. And you know that that request emanated from the

8  Assistant U.S. Attorney in this case, right?

9  A.   Yes, sir.

11:16:54AM 10  Q.   And it arose out of -- you were told that it arose out of

11  the fact that he saw a photograph of Chad Marks on social

12  media, correct?

13  A.   I believe that's correct, sir.

14  Q.   Okay.  If you turn to page 35 in the same exhibit -- tell

11:17:18AM 15  me when you're there, please, Mr. Wascher.

16  A.   I just passed it.  Okay, sir.

17  Q.   At the top there's an e-mail from Horikawa to Martinez

18  saying, "Carlos, sorry about this, but the AUSA searched

19  social media and saw what appears to be a recent photo Marks

11:17:41AM 20  posted on a social media page."

21          Did you see this message at any point, sir?

22  A.   I can't recall, sir.

23  Q.   Was the essence of this conveyed to you?

24  A.   What was conveyed to me was they were curious about the

11:17:54AM 25  tattoo, they wanted information about the tattoo.

1  Q.    A tattoo with the word Pride on it, correct?

2  A.    I believe that was all that was visible on the picture.

3  Q.    And that's the tattoo in question, correct?

4  A.    Correct, sir.

11:18:05AM 5  Q.    All right.  And what specifically were you asked to

6  inquire about or look into?

7  A.    Just get more information about the tattoo, what it was.

8  Q.    Okay. Was the Dirty White Boy issue raised before you?

9  A.    No, sir.

11:18:22AM 10  Q.    Okay. Were you looking for anything in particular on the

11  tattoo?

12  A.    No, sir.

13  Q.    Okay. Were you looking for any evidence that it was a

14  tattoo affiliated -- evidence of affiliation with the Dirty

11:18:34AM 15  White Boys?

16  A.    No, sir, I wasn't looking for anything.  I was just trying

17  to get a clear picture of the tattoo for them.

18  Q.    Okay. And the inquiry you were asked to conduct was

19  specific to that tattoo, correct?

11:18:47AM 20  A.    That's correct.

21  Q.    And that's the reason you had Chad Marks brought to your

22  office on August 17th, correct?

23  A.    To get a picture of the tattoo, yes, sir.

24  Q.    Just for the Court's edification, let me invite your

11:19:17AM 25  attention to page 37 of Defense Exhibit B.  Had you seen that

1   photo before August 17th?

2   A.    Not to my knowledge, sir.

3   Q.    Okay.  Is that the photo that gave rise, as far as you

4   know, gave rise to your meeting on August 17th with Chad

11:19:43AM 5   Marks?

6   A.    To the best of my knowledge, sir.

7   Q.    Okay. And it's on his left arm -- it's hard to see from

8   this photograph, but looks like the word Pride peeking out

9   from below his left shirt sleeve, correct?

11:19:56AM10   A.    Yes, sir.

11   Q.    Okay. It turns out that's right, it is Pride, right?

12   A.    Yes, sir.

13   Q.    You saw it close up, right?

14   A.    Yes, sir.

11:20:03AM15   Q.    And so you brought him to your office, correct?

16   A.    That's incorrect.

17   Q.    Someone else brought him?

18   A.    I don't recall who brought him over, if he came over by

19   his self.  He came to the lieutenant's office, though, sir.

11:20:17AM20   Q.    I got it.  And you had him strip down?

21   A.    I believe I had him just go down to his shorts.

22   Q.    Yeah.  Did you need to do that to examine this tattoo?

23   A.    That's our standard practice for doing a photo shoot of an

24   inmate, sir.

11:20:33AM25   Q.    You didn't need to do that to examine the tattoo, correct?

1  A.   I conducted the standard practice for doing a photo shoot,

2  sir.

3  Q.   Did you need to have him strip to his shorts?

4          **MR. RODRIGUEZ:** Objection, asked and answered.

11:20:45AM 5          **THE WITNESS:** Sir, I followed our standard practice

6  for conducting a photo shoot.

7  **BY MR. GLEESON:**

8  Q.   Were you asked to conduct a photo shoot?

9  A.   I provided a photo shoot.

11:20:56AM 10  Q.   I know that.  Were you asked to examine a tattoo on the

11  one hand or asked to conduct a photo shoot on the other?

12  A.   I don't recall what the exact instructions were.  They

13  just wanted information regarding that tattoo.

14  Q.   Did you think you might help out AUSA Rodriguez by going

11:21:12AM 15  beyond the mission you were given?

16  A.   Quite the opposite.  I was a little busy.  That was a step

17  out of my lane right now because I was extremely busy with

18  other stuff.

19  Q.   Did you find the tattoo that you were asked to examine

11:21:28AM 20  suspicious?

21  A.   No.

22  Q.   Okay. What's the rest of it consist of?

23  A.   Of the tattoo, sir?

24  Q.   Yes.

11:21:36AM 25  A.   I believe it was Irish Pride, and don't even ask me to

1  describe what the character is.  I don't know if it's a

2  leprechaun or a guy dancing.  I'm not sure.

3  Q.   Isn't it a fact it's Irish Pride and a leprechaun?

4  A.   Again, sir, I said I don't know.  I couldn't tell you if

11:21:54AM 5  it's a fact.  I don't know what that figure was.  I know it

6  says Irish Pride.

7  Q.   And do you -- in your mind, is that indicative of any gang

8  membership?

9  A.   No, sir.

11:22:06AM 10  Q.   Okay. Did you write back to -- by the way, there are other

11  Irish related tattoos on Mr. Marks, correct?

12  A.   I don't recall, sir.

13  Q.   Do you recall Erin go Braugh?

14  A.   No, sir.

11:22:19AM 15  Q.   You don't recall that tattoo?

16  A.   I don't recall what other tattoos were on him, sir.  I

17  wasn't focused -- I was just taking the pictures.

18  Q.   You wrote back to Ms. Horikawa that day, correct?

19  A.   I can't recall, sir.  If the e-mails say that.

11:22:37AM 20  Q.   Okay. Well, let me invite your attention to page 53.

21  A.   53, sir?

22  Q.   Yes.  Of that set of e-mails that's marked as Defense

23  Exhibit B.

24  A.   Yes, sir.

11:23:06AM 25  Q.   And you wrote to her, and this is in the middle of page

1   53, "I pulled the inmate in and took photographs of the

2   inmate.  Attached you will find a photo of the tattoo in

3   question.  It says Irish Pride on it."

4              And then you go on and say "the inmate admitted he

11:23:30AM 5   had previously been part of the Dirty White Boys.  However, I

6   do not know if this tattoo is affiliated with that group.  If

7   you have any questions or require any further information,

8   don't hesitate to contact us."

9              Prior to your conversation with Chad Marks, had you

11:23:57AM 10   heard of the Dirty White Boys?

11   A.   Yes, sir.

12   Q.   Is that a prominent gang within the Bureau of Prisons?

13   A.   I wouldn't say they're prominent.  They're a mid to low

14   level.  They're not like the Aryan Brotherhood or the Bloods

11:24:10AM 15   or the Crips.

16   Q.   And they're not a group that is a public safety factor?

17   A.   We have different public safety factors.  Which ones do

18   you mean, sir?

19   Q.   Are they a designated -- earlier on I asked you whether or

11:24:29AM 20   not the disruptive group public safety factor included the

21   Dirty White Boys, and I think you said it does not, correct?

22   A.   Disruptive group doesn't, but disruptive group is very

23   exclusive.  There's STGs and there's disruptive group.

24   Q.   But you knew about the Dirty White Boys?

11:24:47AM 25   A.   Yes, sir.

1  Q.   Do you know about the tattoos that are associated with

2  that group?

3  A.   I am familiar with their main tattoos that associate them.

4  Q.   Which are what?

11:24:55AM 5  A.   It's typically a guard tower or prison wall, something

6  like that, representing an institution; and sometimes it will

7  have like the name of that institution somewhere on that

8  tattoo.

9  Q.   And you didn't see any of that on Chad Marks?

11:25:09AM 10  A.   I did not.

11  Q.   You didn't see DWB, correct?

12  A.   Not to my recollection, no, sir.

13  Q.   You heard 707 is affiliated with the Dirty White Boys?

14  A.   I'm not sure, sir.

11:25:18AM 15  Q.   Okay.  Did you -- when you wrote this e-mail to

16  Ms. Horikawa on August 17th, did you believe that it's

17  possible that Irish Pride and a leprechaun might be associated

18  with the Dirty White Boys?

19  A.   I had no idea.  It could be.  I don't know.  As I stated,

11:25:37AM 20  I don't know all of their tattoos or everything that goes with

21  it.

22  Q.   And you knew at the time of this encounter with Mr. Marks

23  he had this motion to reduce his sentence pending, correct?

24  A.   I don't believe so, sir.  I was just asked about the

11:25:58AM 25  tattoo.

1  Q.    Okay.

2  A.    No one briefed me on everything that was going on.

3  Q.    All right.  And you said on your direct that you had in a

4  casual conversation with him he told you that he ran with the

11:26:12AM 5  Dirty White Boys, correct?

6  A.    Correct, sir.

7  Q.    When was the first time that you said to anyone that Marks

8  supposedly said to you that he ran with the Dirty White Boys?

9  A.    I don't recall, sir.  It was probably in my e-mail reply

11:26:30AM 10  regarding the tattoo.

11  Q.    The e-mail reply on page 53?

12  A.    Is that the first response I had, sir?

13  Q.    Sorry?

14  A.    Was that the first response back regarding the tattoo?

11:26:44AM 15  Q.    I don't know.

16  A.    So I can't -- I would assume it would be the first

17  response back.  I'm not sure if that's the first response

18  back.

19  Q.    Didn't he tell you that he quit the Dirty White Boys,

11:26:55AM 20  according to you, that he quit the Dirty White Boys when he

21  was in Coleman?

22  A.    He didn't say he quit.  He said he didn't -- would

23  distance himself from them because he didn't believe in what

24  they believed basically.

11:27:06AM 25  Q.    Did you write in your declaration that he dropped out of

1  it while he was in FCC Coleman?

2  A.    I don't believe so, sir.

3  Q.    Look at paragraph 7 of your declaration.

4  A.    Yes, sir.

11:27:31AM 5  Q.    Right?  He told you that he quit, he dropped out of the

6  Dirty White Boys according to you, correct?

7  A.    Correct, sir.

8  Q.    Do you know that the AUSA -- do you know that the

9  Government in its application to the Court in opposition to

11:27:46AM 10  the motion to reduce sentence stated that, according to you,

11  he told you that he joined the Dirty White Boys?

12  A.    I don't know anything about that, sir.

13  Q.    But he never told you that, correct?  According to you?

14  A.    He never told me specifically he joined the Dirty White

11:28:03AM 15  Boys, no, sir.

16  Q.    And in this conversation that you had with Mr. Marks, he

17  just volunteered that he had been part of the Dirty White Boys

18  during the period of time that ended six years earlier

19  roughly, correct?

11:28:25AM 20  A.    I don't believe specific timeframes were ever mentioned.

21  And, honestly, I don't recall how it even came up.  We were

22  just talking casual and he was telling me about other

23  institutions and stuff like that.

24         I believe it was because of the photographs, he

11:28:38AM 25  said he understood why we were needing to take the photographs

1    or something.

2    Q.    Yeah.   Isn't it a fact that he told you that the only gang

3    that he was part of was the Christian gang?

4    A.    No, sir.

11:28:48AM 5    Q.    And you didn't see any evidence on him of this sort that

6    the Government was looking for, correct?

7    A.    I had no idea what the Government was looking for, sir.

8    Q.    Government was looking for evidence that his tattoos were

9    indicative of gang membership, correct?

11:29:07AM 10    A.    But I wasn't looking for that, sir.   That's what you asked

11    me.

12    Q.    The Government was, is that your testimony?

13    A.    I have no idea what they're looking for now, sir.

14    Q.    We established earlier the photographs were taken and you

11:29:34AM 15    talked to Chad Marks on August 17th, correct?

16    A.    I believe that's correct, sir.

17    Q.    And you spoke to AUSA Rodriguez?   Do you recall we

18    established earlier you spoke to him, communicated with him on

19    August 23rd?

11:29:47AM 20    A.    Yes, sir.

21    Q.    Okay. And did you speak to him on the phone about your

22    meeting with Marks?

23    A.    At what time, sir?

24    Q.    On August 23rd.

11:30:04AM 25    A.    I don't recall on that date if I spoke.   I have spoken to

1    him on the phone, but I don't recall if it was on that date.

2    Q.   And you sent him the photos that you took of Marks,

3    correct?

4    A.   I don't remember if I sent them directly to him or to

11:30:18AM 5    Ms. Horikawa who was requesting them.  I can't remember who I

6    sent them to directly, sir.

7    Q.   Let me -- just to be clear, let me invite your attention

8    to the Government's opposition to the motion that's pending

9    before the Court, and which is Government -- Defense

11:30:41AM 10   Exhibit A, page 2.

11               Do you have that, sir?

12   A.   Yes, sir.

13   Q.   And the second full paragraph, first sentence, "when he

14   was incarcerated at Coleman federal prison from September 2011

11:31:00AM 15   to January of 2013, Marks joined the Dirty White Boys."

16               Do you see that?

17   A.   The second paragraph, sir?

18   Q.   Second full paragraph.

19   A.   Okay.  Yes, sir.

11:31:14AM 20   Q.   Okay.  That's not what you say Marks told you, correct?

21   A.   Not word-for-word, no, sir.

22   Q.   Well, in fact, Marks told you the opposite, right?  Didn't

23   he tell you that he quit the Dirty White Boys?

24   A.   That was part of what he told me, yes, sir.

11:31:40AM 25   Q.   Okay. And did you tell AUSA Rodriguez that Marks told you

1  that he quit the Dirty White Boys?

2  A.   At what time?

3  Q.   At any time.

4  A.   Sir, yes, I did, but I don't recall if it was at this

11:31:54AM 5  time.

6  Q.   Did you tell him before this was filed on August 23rd?

7  A.   I don't recall, sir.

8  Q.   Okay. You say that Marks told you that he participated in

9  beatings at the behest of the leaders of the Dirty White Boys;

11:32:15AM 10  is that correct?

11  A.   I believe I said that Marks informed me that he was

12  instructed to beat up homosexuals and minorities at their

13  direction.

14  Q.   At Coleman?

11:32:26AM 15  A.   I believe it was at Coleman, yes, sir.

16  Q.   You're an investigator?  You consider yourself an

17  investigator?

18  A.   That is what I am, yes, sir.

19  Q.   Did you pull the BOP files about his tenure at the

11:32:39AM 20  penitentiary in Coleman?

21  A.   Yes, sir.

22  Q.   You saw in there there's not a single mention of any

23  violence on his part while he was in Coleman, correct?

24  A.   That's correct.

11:32:49AM 25  Q.   Okay. Not a single mention of any beatings, correct?

1   A.    That's correct.

2   Q.    Not a single mention anywhere of affiliation with Dirty

3   White Boys, right?

4   A.    No, sir.

11:32:59AM 5   Q.    That's correct, right?

6   A.    Yes, that's correct.

7   Q.    Is Dirty White Boys a secret organization?

8   A.    No, sir.

9   Q.    It doesn't hide its light under a bush in the BOP,

11:33:06AM 10   correct?

11   A.    You have to clarify what you're asking.

12   Q.    It beats people up, right?

13   A.    Allegedly, yes, sir.

14   Q.    It is, as far as Bureau of Prisons administrative staff is

11:33:23AM 15   concerned, it's a significant problem, right?

16   A.    I wouldn't classify it as significant, no, sir.

17   Q.    Would you classify it as a sort of problem where there

18   would be a mention in the inmate's file if the inmate was

19   thought to be affiliated with the Dirty White Boys?

11:33:37AM 20   A.    There might be.  There's a very thorough process we have

21   to go through to link an inmate to a disruptive or a serious

22   threat group.  So it may be in there, may not.  Depends how

23   much information they have to link that inmate.

24   Q.    There's references that can be made in the BOP files to

11:33:56AM 25   suspect affiliation even before they're linked, correct?

1   A.   Yes, sir.  You can put intelligence entries or notes, yes,

2   sir.

3   Q.   You can write a report as an SIS technician if you receive

4   inmate information that another inmate is in the Dirty White

11:34:11AM 5   Boys, right?

6   A.   Yes, sir.

7   Q.   And there's none of that in the BOP files, correct?

8   A.   Not that I saw, sir.

9   Q.   And you looked at the files?

11:34:19AM10   A.   Yes, sir.

11   Q.   In fact, there's not a single disciplinary infraction of

12   any sort on the part of Chad Marks while he was at Coleman,

13   right?

14   A.   I don't believe so, sir.

11:34:37AM15   Q.   You know that's the case, right?

16   A.   I said I don't believe so, sir.

17   Q.   You looked for it, correct?

18   A.   I did look for it.

19   Q.   And you didn't find one?

11:34:44AM20   A.   I don't believe I found any at Coleman.

21   Q.   If you found one would you have brought it to the Court's

22   attention?

23   A.   If asked, yes, sir.

24   Q.   Yeah.  And you didn't, correct?

11:34:52AM25   A.   I don't believe I found anything at Coleman, sir.

1  Q.    You don't believe it or you know that you didn't?

2  A.    I know that I looked.  And unless I have that intelligence

3  file directly in front of you or in front of me, I can't quote

4  you exactly.

11:35:05AM 5  Q.    Did you receive training, sir, on how to elicit

6  confessions from inmates?

7  A.    Elicit confessions, sir?

8  Q.    Yeah. Did you receive training?

9  A.    What do you mean by "elicit confessions"?

11:35:20AM 10  Q.    On how to get confessions from inmates.

11  A.    I've received training on how to interview and obtain

12  information from inmates, yes, sir.

13  Q.    Did you find it surprising that an inmate who has no

14  record of any affiliation with the Dirty White Boys after more

11:35:38AM 15  than a decade in the Bureau of Prisons would admit to you in a

16  casual conversation such an affiliation?

17  A.    No.

18  Q.    You didn't think that was unusual?

19  A.    No, I didn't.

11:35:48AM 20  Q.    Do you think it's unusual for someone who is looking to

21  reduce his sentence to offer that up?

22  A.    I had no idea he's looking to reduce his sentence, sir.

23  Q.    AUSA Rodriguez prepared the initial draft of your

24  declaration, correct?

11:36:02AM 25  A.    I believe so.

1  Q.   You gave him information and he drafted the declaration,

2  right?

3  A.   Yes, sir.

4  Q.   Okay. You told him that Marks may be responsible for the

11:36:14AM 5  SIM card, right?

6  A.   At what time?  One of the --

7  Q.   When you spoke to him about -- about the information that

8  ended up in your declaration, you told him that Marks may be

9  responsible for it, right?

11:36:28AM 10           **MR. RODRIGUEZ:** Object to the form of the question.

11           **THE COURT:** Overruled.

12           **THE WITNESS:** I talked to him on numerous occasions,

13  sir.  I mean, I'm sure at one point I've said that, yes.

14  **BY MR. GLEESON:**

11:36:38AM 15  Q.   Didn't he send you a declaration that said Marks was

16  responsible for it and you changed it to may be?

17  A.   He sent me a declaration.  I don't recall the exact words.

18  I told him I would go through it and make corrections as I saw

19  fit and return it.

11:36:51AM 20  Q.   Do you remember changing the language that Mr. Rodriguez

21  put into your declaration from he was supplying and

22  transporting Suboxone to attempting to supply Suboxone?

23  A.   Do you have --

24  Q.   I'm asking what your recollection is.

11:37:10AM 25  A.   No, sir.  I've told you, I don't remember the exact

1   verbiage.  I remember he sent me one.  I corrected it, sent it

2   back.  If you're gonna ask me exact verbiage, I need a copy of

3   that to review.

4   Q.   Do you remember making changes to your declaration?

11:37:24AM 5   A.   Yes, sir, I've already said I did.

6   Q.   Okay. Are you familiar with other -- any cases in the

7   Bureau of Prisons of inmates in the Dirty White Boys?

8   A.   Familiar of cases?

9   Q.   Particular individuals.

11:37:48AM 10   A.   Like specific individuals?

11   Q.   Yes.

12   A.   No, sir.

13   Q.   Okay. Ever have any at FMC Lexington?

14   A.   I don't believe we have any that are actually tagged as

11:37:58AM 15   Dirty White Boys right now at FMC Lexington.

16   Q.   Yeah.  And does that effect designation if you're tagged

17   as a Dirty White Boy?

18   A.   What designation, sir?

19   Q.   Let me be more direct about it.  Would it be unusual for

11:38:15AM 20   someone who was thought to be a member of the Dirty White Boys

21   to be transferred from a high security facility to a medium

22   security facility?

23   A.   Depends on what -- the reason for the transfer, what they

24   needed.

11:38:28AM 25   Q.   So there's no impediment to being designated to a lower

1    security facility if you're a member of the Dirty White Boys?

2    A.   There's numerous factors that go into that.   In our

3    institution we have everybody from minimum custody to high

4    custody.   So there's a lot of factors that go into that.

11:38:48AM 5          It's usually the CMC Department that does all those

6    calculations on points, retainers, everything like that.

7    Q.   Is there anything akin to like a profile of what a member

8    of a Dirty White Boys --

9          **MR. RODRIGUEZ:** Objection.

11:39:00AM 10  **BY MR. GLEESON:**

11   Q.   -- is or does in the BOP?

12         **MR. RODRIGUEZ:** Objection, Judge.   This goes into an

13   area of BOP intelligence gathering that I don't think is

14   relevant to this hearing, and I don't think the witness should

11:39:14AM 15  have to disclose in terms of what particular profiles there

16   are.

17         **THE COURT:** I think he can answer if there is such a

18   profile.   Maybe he doesn't have to say what it is.

19         **THE WITNESS:** There are profiles for each individual

11:39:26AM 20  STG and DTG.   They're profiles like the information they use,

21   symbols they use, practices they use, statements they follow

22   or policies they follow for their groups.

23   **BY MR. GLEESON:**

24   Q.   Do you know what those are for the Dirty White Boys?

11:39:46AM 25  A.   Specifically all of them?

1  Q.    Any of them.

2  A.    I know a couple of them.  I don't know everything about

3  the Dirty White Boys.

4  Q.    Tell us what you know, please.

11:39:55AM 5            **MR. RODRIGUEZ:** Objection.

6            **THE COURT:** Overruled.

7            **THE WITNESS:** They're a low to medium threat group.

8  They're usually whites, don't like minorities or homosexuals.

9  Again, their tattoos are commonly something to do with the

11:40:11AM 10  institution they were at, it could be a picture or a tattoo of

11  a prison or a guard tower, something like that.

12  **BY MR. GLEESON:**

13  Q.    Is it -- is it common for a member of the Dirty White Boys

14  to complete thousands of hours of programming, do you know?

11:40:30AM 15  A.    What do you mean by "is it common" for them?

16  Q.    Would it be typical in your judgment as an SIS technician

17  and investigator, would it be common in your judgment for a

18  member of the Dirty White Boys to complete more than 1,600

19  hours of prison programming?

11:40:47AM 20  A.    In my judgment at SIS, whether an inmate is in STG or DTG,

21  would have no bearing on whether he wanted to get an education

22  or complete courses.

23  Q.    And would you expect if you reviewed the file of a Dirty

24  White Boy member to see favorable recommendations from BOP

11:41:05AM 25  staff?  That's something you would expect as an investigator?

1  A.   There's nothing common place to expect.  An inmate can be

2  a member of an STG and be an extremely polite and honest

3  person inside the institution.

4  Q.   And would you expect that a BOP corrections officer, a

11:41:23AM 5  lieutenant, would recommend a member of a Dirty White Boys --

6  the Dirty White Boys for employment in the workforce?

7  A.   Yes, sir.

8  Q.   You would expect that?

9  A.   Yes.

11:41:33AM 10  Q.   And you would expect that a member of the Dirty White Boys

11  would be a proficient and successful tutor for other inmates

12  to pass their GED?  Is that something you would expect?

13  A.   Is it specifically a Dirty White Boy or is this any person

14  in an STG?

11:41:58AM 15  Q.   I'm asking you as an investigator in determining whether

16  one of the inmates is in the Dirty White Boys --

17          **THE COURT:** I think this is straying a little far

18  afield what this officer might know or what his opinion is.

19          **MR. GLEESON:** I get it, Judge.  I'll move on.

11:42:14AM 20  **BY MR. GLEESON:**

21  Q.   You mentioned that Mr. Marks is suspected of supplying

22  Suboxone, correct?

23  A.   Yes, sir.

24  Q.   Any specifics on that?

11:42:26AM 25  A.   Nothing specific.  It was just information.

1  Q.   Are there any incidents in which -- I mean, just

2  information?

3  A.   Yes, sir.

4  Q.   Is the information on which -- based on which you suspect

11:42:40AM 5  Mr. Marks of supplying Suboxone, does any of that information

6  include other inmates actually being punished for the Suboxone

7  like Moore was punished for the SIM card?

8           Do you understand my question?

9  A.   No, sir.

11:42:52AM 10  Q.   If we went past your statement and went down to the brass

11  tacks of the information about Suboxone trafficking by Chad

12  Marks, would it include any events in which other people were

13  punished for Suboxone?

14           **MR. RODRIGUEZ:** Objection to "brass tacks."  Object

11:43:14AM 15  to the form.

16           **THE COURT:** I'm sorry, Mr. Rodriguez, I didn't hear

17  you.

18           **MR. RODRIGUEZ:** Sorry, Judge.  I object to the form

19  and particularly the phrase "brass tacks."

11:43:22AM 20           **THE COURT:** Well, if the witness understands what

21  that means.

22           **MR. GLEESON:** I'll withdraw it, Judge.

23  **BY MR. GLEESON:**

24  Q.   When it came to the SIM card, the Court got told that Chad

11:43:33AM 25  Marks possessed a SIM card, correct?

1  A.   I wasn't here.   I assume that's what happened.

2  Q.   I showed you the -- and the Government (sic) challenged

3  that.   In response to that you provided a declaration,

4  correct?

11:43:49AM 5  A.   Yes, sir.

6  Q.   And --

7       **MR. RODRIGUEZ:** Objection.   The Government didn't

8  challenge it.   It was the defense who challenged it, Judge.

9       **MR. GLEESON:** Defense challenged it.   Thank you,

11:43:57AM10  Mr. Rodriguez.

11       **MR. RODRIGUEZ:** You're welcome.

12  **BY MR. GLEESON:**

13  Q.   And after the challenge it was revealed that, in fact,

14  someone else was punished for that SIM card, correct?   It was

11:44:10AM15  Moore?

16  A.   Yes, sir.

17  Q.   And you looked at the incident report and there's no

18  mention of Chad Marks, correct?

19  A.   No, sir.

11:44:18AM20  Q.   Right?   That's correct, right?

21  A.   That is correct.

22  Q.   Now, this Suboxone, we have no details, correct?

23  A.   Correct.

24  Q.   And my question for you is if we got them, would they

11:44:31AM25  include another incident report where someone else was

1    punished for Suboxone?

2    A.   Are you asking me to specifically identify inmates that

3    provide information to the SIS Department?

4    Q.   No.   I'm asking you whether there are inmates' incident

11:44:45AM 5    reports for Suboxone trafficking that you attribute to Chad

6    Marks where someone else was charged with it.

7              Do you understand the question?

8    A.   Are you specifically asking me if there's another incident

9    report somewhere that lists Chad Marks?

11:45:00AM 10   Q.   I'm asking you whether if we pursued beyond your blanket

11   statement that you suspect him of Suboxone and we got the

12   details, whether the details would include an incident report

13   like the one we have against Thomas Moore?

14             **MR. RODRIGUEZ:** Object to the form.

11:45:25AM 15             **THE COURT:** Overruled.

16             **THE WITNESS:** I'm still not sure what you're asking

17   me because if you're asking if there's an incident report that

18   reflects Chad Marks, I'm not sure.   I don't write all the

19   incident reports in the Bureau.

11:45:39AM 20             If you're asking me if a specific inmate provided

21   information, you're asking me to provide identification of an

22   inmate that provides information to SIS in front of another

23   inmate.

24   **BY MR. GLEESON:**

11:45:49AM 25   Q.   Has there ever been any disciplinary action against Chad

1  Marks based on Suboxone?

2  A.   Not to my knowledge.

3  Q.   And you would know, right?

4  A.   At FMC Lexington?

11:46:00AM 5  Q.   Yes.  You would know?

6  A.   At FMC Lexington?

7  Q.   Correct.

8  A.   Not at FMC Lexington.

9  Q.   Did you check to see whether he was subjected to other

11:46:09AM10  discipline in other facilities?

11  A.   Yes, sir.

12  Q.   Was he for Suboxone?

13  A.   He was part of an investigation in another institution.  I

14  can't recall --

11:46:15AM15  Q.   My question was whether he was --

16          **MR. RODRIGUEZ:** Judge, I object.  The witness should

17  be allowed to answer the question without being interrupted.

18  He had not finished the answer.

19          **THE COURT:** All right. Had you finished your answer?

11:46:28AM20          **THE WITNESS:** Almost, sir.

21          **THE COURT:** Go right ahead.

22          **THE WITNESS:** When I reviewed his files, yes, he had

23  been under investigation for Suboxone.  I don't recall if he

24  had been charged with it or disciplined for it.  I know

11:46:40AM25  there's an investigative file regarding him and Suboxone.

1   BY MR. GLEESON:

2   Q.   If you had -- if you had learned that he was disciplined

3   for distributing Suboxone, would you recall that?

4   A.   Possibly.

11:46:53AM 5   Q.   The testimony you gave with regard to Chad Marks and

6   receiving money for providing legal services, do you recall

7   that testimony?

8   A.   Yes, sir.

9   Q.   Did you ever speak to Lieutenant Fowler about Marks

11:47:15AM 10   providing legal assistance to other inmates?

11   A.   I can't remember specifically, but probably.

12   Q.   Isn't it a fact that Marks told Fowler he was doing that?

13   A.   I have no idea, sir.

14   Q.   Isn't it a fact he told Fowler that he was providing legal

11:47:29AM 15   assistance and on some occasions he received money for it?

16   A.   I just stated, sir, I have no idea.

17   Q.   Now, did you ask Mr. Fowler that?

18   A.   I don't recall that.

19   Q.   Did you ask other SIS people that?

11:47:41AM 20   A.   Did I ask them what, sir?

21   Q.   Whether or not Marks told them that he was providing legal

22   assistance to other inmates and receiving money for it?

23   A.   No, I've never asked him that.

24   Q.   Okay. Did you ask the other people what information was

11:47:55AM 25   provided in early August?

1  A.   Originally.

2  Q.   About Mr. Marks?

3  A.   I've already told you I had no idea what was asked.  So of

4  course I didn't.

11:48:05AM 5  Q.   I'm almost finished, Judge, you'll be happy to hear.

6          Did you -- have you interviewed Marks at all about

7  this allegation of conducting a business?

8  A.   I don't believe I have.

9  Q.   Have you ever written him up for it?

11:48:35AM 10  A.   No.

11  Q.   Haven't filed an incident report?

12  A.   No.

13  Q.   Okay. Did you look at Chad Marks' PSR?  Did you read his

14  presentence report?

11:49:02AM 15  A.   Is it the same thing we call a PSI?

16  Q.   Yes, presentence investigative report.

17  A.   I don't believe I ever pulled his PSI.

18  Q.   Okay. And the information that is provided to SIS

19  officers -- I'll withdraw that.

11:49:23AM 20          One thing I want to be clear before I finish, sir,

21  the testimony you provided here and the declaration you

22  provided here is that Chad Marks said to you he was once a

23  member of the Dirty White Boys, correct?

24  A.   Correct.

11:49:43AM 25  Q.   And the testimony you provided here is that Chad Marks is

1  suspected of having tried to possess a SIM card, correct?

2  A.   Correct.

3  Q.   If one were to -- so if one were to look in the Bureau of

4  Prisons files, would you find any reference to either of those

11:50:09AM 5  assertions on your part?

6  A.   From myself?

7  Q.   From anyone.

8  A.   If you go through the entire Bureau of Prisons files, I

9  don't know, sir.  If you go through my files you won't find

11:50:20AM 10  anything.

11  Q.   You wouldn't find anything about the SIM card and Chad

12  Marks, correct?

13  A.   No, sir.

14  Q.   And you wouldn't find anything about Dirty White Boys and

11:50:29AM 15  Chad Marks, correct?

16  A.   Other than the statements that have been provided to the

17  Court, no, sir.

18  Q.   Yeah.  And you regard being affiliated with the Dirty

19  White Boys as a security concern within the Bureau of Prisons?

11:50:43AM 20  A.   They would fall under the STGs, sir, not the DTGs as I

21  stated.

22  Q.   Is that different for people who are presently members

23  as --

24            **THE COURT:** I didn't hear the answer.

11:50:55AM 25            **THE WITNESS:** They would fall under the STGs, Your

1  Honor.  There's serious threat groups and then there's

2  disruptive groups.  He keeps saying disruptive groups, which

3  are extremely violent groups of inmates.

4           **THE COURT:** Dirty White Boys is something less than

11:51:06AM 5  that?

6           **THE WITNESS:** They would fall under STGs, Your

7  Honor, a lower category, yes, sir.

8           **THE COURT:** S-D?

9           **THE WITNESS:** STG, serious threat group.  Okay.

11:51:18AM 10 **BY MR. GLEESON:**

11 Q.   And is someone considered to be part of the serious threat

12 group if they're a former member of one of those groups?

13 A.   If they are a current member, former member, associate,

14 affiliate, yes, sir.

11:51:31AM 15 Q.   Did you do anything within the Bureau of Prisons -- not in

16 this court, not in your declaration -- did you do anything

17 within the Bureau of Prisons to document Chad Marks'

18 membership in a serious threat group?

19 A.   "Document" his membership?  What do you mean, sir?

11:51:47AM 20 Q.   Did you do anything within the Bureau of Prisons -- fill

21 out any forms, take any action -- based on your assertion that

22 Chad Marks is a former member of a serious threat group?

23 A.   The only thing I did was respond to the Court, provide the

24 information that was given.

11:52:02AM 25 Q.   You filled out no paperwork within the institution,

1   correct?

2   A.   No, sir.

3              **MR. GLEESON:** Thank you.  I have nothing further.

4              **THE COURT:** Keep in mind repetitive examination is

11:52:22AM 5  not appreciated.  We covered a lot of the waterfront here and

6   I think I get it.  So, please, something that needs to be

7   done, not...

8                   <u>**REDIRECT EXAMINATION**</u>

9   **BY MR. RODRIGUEZ:**

11:52:40AM 10  Q.   I want to go back to your declaration that you signed,

11  Mr. Wascher.

12  A.   Yes, sir.

13  Q.   Mr. Gleeson pointed out that I sent you a draft; is that

14  correct?

11:52:52AM 15  A.   Yes, sir.

16  Q.   And that you made corrections -- and that you made

17  corrections to it and let me know, and then I sent you a

18  revised version; is that correct?

19  A.   That is correct, sir.

11:53:07AM 20  Q.   Is the version that you signed -- is the version -- is the

21  version of the declaration that you signed accurate in terms

22  of what you believe to be true?

23  A.   That is correct, sir.

24  Q.   It was the version that you ultimately approved, including

11:53:25AM 25  your changes, correct?

1  A.    That is correct, sir.

2  Q.    Have I ever shown you a copy of my legal memoranda to the

3  Court in this case?

4  A.    No, sir.

11:53:33AM 5  Q.    You indicated earlier, I think when Mr. Gleeson was asking

6  you questions, that the Dirty White Boys is a group that

7  targets gay people and minorities?

8  A.    Typically they're pro white.  So they target homosexuals,

9  minorities, anyone that's not white.

11:53:58AM 10  Q.    Okay.  And would you say that somebody who has referred to

11  "niggers" and "Spics" in correspondence with others might very

12  well share those values as being pro white and anti-minority?

13  A.    I would say they could share some of the values, yes, sir.

14  Q.    Mr. Gleeson asked you several times whether there's any

11:54:29AM 15  indication in Mr. Marks' disciplinary file that he beat people

16  either for the White Boys or for anybody else while he was at

17  Coleman.

18          Do you remember those questions?

19  A.    Yes, sir.

11:54:40AM 20  Q.    Let me ask you this: Is every time an inmate beats another

21  inmate, is that somehow reported or reflected in the

22  assaulting inmates's record?

23  A.    Definitely not.

24  Q.    Why not?

11:54:54AM 25  A.    It's different inside a prison than it is outside a

1  prison.   Inside a prison inmates don't want us involved in

2  their business.   Probably nine out of ten fights or assaults

3  happen in prison we have no idea they happen.   The inmates

4  don't want to report it for fear of retaliation or they don't

11:55:11AM 5  want us getting involved in their business.

6  Q.   Prior to your meeting with Chad Marks to take the photo of

7  the tattoo, had anybody talked to you about asking him about

8  the Dirty White Boys?

9  A.   No, sir.

11:55:38AM 10  Q.   Did you have in mind that when he came in to meet with you

11  to take photographs that you would ask him about the Dirty

12  White Boys?

13  A.   No, sir.

14  Q.   Who initiated the entire subject of the Dirty White Boys?

11:55:52AM 15  A.   Chad Marks.

16  Q.   I think you indicated in connection with -- in response to

17  Mr. Gleeson's last few questions that FMC Lexington is not the

18  only facility where information about Chad Marks distributing

19  Suboxone exists; is that correct?

11:56:27AM 20  A.   That's correct, sir.

21  Q.   And where did the information about the leaders of the

22  Dirty White Boys gang directing Marks to beat up people, beat

23  up minorities and gay people come from?   From whom?

24  A.   From Chad Marks, sir.

11:57:27AM 25  Q.   And last question, Judge, I think Mr. Gleeson asked you

1  whether you would expect a member of a gang to take -- I think

2  he said 1,600 hours of classes.  Does the fact that an inmate

3  takes 1,600 or more hours of classes have anything to do with

4  whether he's violent or whether he's a member of a gang?

11:58:19AM 5  A.   No, sir.

6  Q.   Does it have anything to do with whether he will be

7  dangerous if he is released?

8  A.   No, sir.

9            **MR. RODRIGUEZ:** Thank you, Judge.  Thank you,

11:58:30AM 10  Mr. Wascher.  Appreciate it.

11            **THE COURT:** Anything else of Mr. Wascher?

12            **MR. GLEESON:** Not from us.  Thank you, Judge.

13            **THE COURT:** All right, thank you, sir.

14            **THE WITNESS:** Thank you, Your Honor.

11:58:41AM 15            **THE COURT:** You are excused, you may step down.

16            (**WHEREUPON**, the witness was excused).

17            **THE COURT:** That conclude the Government's proof on

18  the matters?

19            **MR. RODRIGUEZ:** Yes, Judge.

11:59:08AM 20            **THE COURT:** I'm sorry?

21            **MR. RODRIGUEZ:** I'm sorry, Judge.  Yes, it does with

22  respect to the issues in this.

23            **THE COURT:** Okay.  Mr. Gleeson, you have a witness?

24            **MR. GLEESON:** Judge, can we have a moment to discuss

11:59:20AM 25  it?  Can we take a break?

1          **THE COURT:** Yeah.

2          **MR. GLEESON:** Give us a few minutes to discuss

3   whether or not --

4          **THE COURT:** Certainly can do that.  We can also

11:59:29AM 5   break for lunch.  I just envision the questioning might be --

6   I can never guess from attorneys how long the questioning will

7   be, but --

8          **MR. GLEESON:** Your call, Judge.  We could use the

9   lunch hour to make a decision as to what the contours of the

11:59:47AM 10  case will be, if any.

11         **THE COURT:** All right.  Well, I've got a full

12  afternoon, but I think this will take precedence.  We can move

13  some other things, I think, or do them in night court here.

14  Would, like, 45 minutes be enough time to get sustenance?

12:00:04PM 15         **MR. GLEESON:** Plenty.  Thank you.

16         **THE COURT:** All right, why don't we come back about

17  quarter to 2?  Quarter to 1.  All right, 12:45.  All right,

18  thank you.

19         **MR. GLEESON:** Judge, can I ask a question --

12:00:23PM 20         **THE COURT:** You can ask.

21         **MR. GLEESON:** -- about procedure?  You may recall

22  from the last time we were here we asked for an opportunity to

23  speak to the Court briefly at the conclusion of the

24  evidentiary presentation.

12:00:38PM 25         This is a motion to reduce sentence.  I'm going to

1  ask the Court to consider at that time hearing separate and

2  apart from any testimony that may or may not be given, hearing

3  an allocation from Mr. Marks.  Just I wanted to throw that out

4  there so the Court can mull it over, not to surprise you.

12:00:59PM 5       **THE COURT:** Well, I guess it's a little unusual

6  request, but the motion for relief is unusual, so I think it

7  could be part of his testimony, I guess, ask him questions

8  and --

9       **MR. RODRIGUEZ:** That was going to be my request,

12:01:23PM 10  Judge.  If he's going to say something, it should be subject

11  to cross-examination and not simply some closing statement

12  that his lawyer should be making.

13       **MR. GLEESON:** The reason I make the request is this

14  is unusual, this is a motion under 3582(c)(1), but if it's

12:01:44PM 15  akin to anything that you do normally, it's akin to a

16  sentencing.

17       And even assuming Mr. Marks testifies, I would like

18  him to be able to address the Court in the way that a

19  defendant seeking leniency addresses the Court.

12:02:03PM 20       **THE COURT:** Yeah, a true sentencing statement of

21  course is made and the Government doesn't cross-examine,

22  although the Government questions about it, but --

23       **MR. GLEESON:** Right.

24       **THE COURT:** Mr. Marks can, as you say, allocute or

12:02:14PM 25  make a statement if he wants, and I guess if Mr. Rodriguez

1    thinks he wants to cross-examine about that, I guess I'll take

2    it question-by-question.  I mean, you can make your oral

3    arguments as to why the relief should be granted.

4               **MR. RODRIGUEZ:** I understand that, Judge.  I'm not

12:02:32PM 5  clear where we're going.  Is the request to allow this

6    allocution in substitution of under oath testimony subject to

7    cross-examination?

8               **THE COURT:** No, I think there will be both.

9               **MR. GLEESON:** It's not that complicated.

12:02:47PM 10             **MR. RODRIGUEZ:** I do think it's complicated because

11   if he's gonna get up and say things -- first of all, this

12   isn't a sentencing, Judge.  It's not.  It's a motion for

13   relief that Your Honor hasn't yet --

14             **THE COURT:** I understand that.

12:03:01PM 15             **MR. RODRIGUEZ:** -- granted.

16             **THE COURT:** My expectation that Mr. Marks may

17   address some of the issues that the Government has seen fit to

18   raise here, he'll be subject to cross-examination about that.

19             When we're through, I guess I don't see any harm in

12:03:15PM 20  him making a pitch for an allocution as to why I should grant

21   the relief.

22             **MR. GLEESON:** See you at 12:45.  Thank you, Judge.

23             **THE COURT:** Thank you both.

24             (**WHEREUPON**, there was a pause in the proceeding.).

12:53:48PM 25             (**WHEREUPON**, the defendant is present).

1        **THE COURT:** All right, let me just -- all right,

2    Mr. Gleeson?

3        **MR. GLEESON:** Judge, the defendant rests and I'd

4    like to use a little bit of the time I just gave back to the

5    Court to be heard in support of our motion, and the remarks I

6    make will address the Government's allegations of more recent

7    wrongful activity.

8        **THE COURT:** All right, so there will be no proof

9    from the defense ?

10        I guess both sides wish to argue today in lieu of

11    filing any briefs, although I have several very thorough

12    briefs, so I think we sort of agreed -- or both sides

13    requested leave to argue today, and that's fine.

14        **MR. RODRIGUEZ:** Whatever you like.  I'm happy to

15    argue today, I'm happy to submit post-hearing briefs.

16    Whatever you prefer.

17        **THE COURT:** All right.  Well, we can argue today.

18        I guess, Mr. Gleeson, you want to recite first?

19        **MR. GLEESON:** Thank you, Judge.

20        **THE COURT:** Is it still your request that

21    Mr. Marks -- that you, I guess, give some of your time to

22    Mr. Marks to allocute, or not?

23        **MR. GLEESON:** Yeah, it is.  And I should have made

24    clear before the lunch break that I don't want to allocute

25    with regard to the disputed facts, about SIM cards and Dirty

1   White Boys.  I wanted him to speak to the Court about his

2   rehabilitation, about what the Court has written in the past,

3   on more than one occasion, about how extraordinary it is.

4           He's here.  I wanted you to hear from him.  I'm

12:56:41PM 5   going to leave that up to the Court.  But by no means did I

6   intend to suggest I was going to offer what is quasi-testimony

7   about events that I'll suggest have not been proven.

8           **THE COURT:** All right.  Well, as I say, this is a

9   motion to reduce, but there are legal issues that the Court

12:57:05PM 10   has to decide, which I don't think Mr. Marks has any

11   particular expertise relative to.

12           **MR. GLEESON:** Correct.

13           **THE COURT:** I will let you get back -- that's not

14   quite the term -- some of your time.  And rather than have you

12:57:22PM 15   talk about his rehabilitation, I would let him do that.

16   Mr. Gleeson, you may go first, then Mr. Rodriguez can.

17           **MR. GLEESON:** Judge, I'm sorry.  I interrupted the

18   Court.

19           **THE COURT:** It happens all the time, both here and

12:57:38PM 20   at home.

21           **MR. GLEESON:** Judge, this is a motion to reduce the

22   sentence obviously under 3582(c)(1), and I'd like to take a

23   moment to level set a bit.

24           The question before the Court -- and I'm not going

12:57:58PM 25   to repeat my arguments with regard to your authority.  To the

1    extent the Court has questions on that, I'll address them.  We

2    covered that.  Happy to address any questions, happy to brief

3    it again if you wish.

4              I really want to summarize for the Court, not

12:58:13PM 5   repeat, but summarize the extraordinary and compelling reasons

6    we respectfully suggest you should find there should be a

7    sentence reduction.

8              One is the simple length of the sentence, 40 years,

9    and as I pointed out to the Court the last time I was at this

12:58:32PM10  podium, among the factors specifically in mind when Congress

11   enacted the -- what is now known as the Compassionate Release

12   Statute -- was sentences of extraordinary length.

13             The second of the -- of the reasons we suggest this

14   case holistically fits the description of one in which there

12:58:57PM15  are extraordinary and compelling reasons to reduce the

16   sentence is the reason for the extraordinary length, which

17   despite all the hyperbole in the Government's opposing brief,

18   really had everything to do with -- well, 20 years of it had

19   to do with the exercise of the right to jury trial.

12:59:19PM20            As this Court knows, most of the conduct on which

21   the Government relied and is arguing that Mr. Marks is a

22   danger is conduct of which the Government was aware when it

23   offered him a 20 year plea bargain, which if accepted by

24   Mr. Marks would have had him out in 2020.

12:59:40PM25            It was the superseding to add the 924(c) counts was

1    done only after he decided not to plead guilty.  So that --

2    and I'm not gonna burden the Court with the contemporary

3    discussion about the trial penalty and the way there's a

4    diminution in the percentage of trials, but long and short of

01:00:00PM 5    it is the extraordinary length of this sentence is due in

6    substantial part to the imposition of a trial penalty.

7         The third of the circumstances that contribute to

8    this case presenting extraordinary and compelling reasons is

9    the rehabilitation, and I recognize there's kind of a sliding

01:00:25PM10    scale here.

11         And to the extent I'm going -- you're going to

12    permit my client to address that, I will truncate my remarks

13    about it, except to reiterate that as this Court has already

14    expressed, this is the sort of programming and contribution to

01:00:45PM15    prison life and to others in prison life that you can go a

16    long time in your position and in our position and never see,

17    but I'll let Mr. Marks address that.

18         **THE COURT:** The statute suggests that rehabilitation

19    alone -- I underscore alone -- is not sufficient to warrant

01:01:08PM20    relief.  I guess on a sliding scale, does the Court consider,

21    you know, 50%?  80%?  Or it's not able to be quantified?

22         **MR. GLEESON:** I don't -- I would imagine that in

23    different cases it would -- it would have different weight in

24    the calculus.  We acknowledge the fact -- we can afford to

01:01:35PM25    acknowledge the fact that rehabilitation alone cannot sustain,

1    cannot support a reduction in the sentence.

2              But it seems to me, Judge, in light of the

3    extraordinary length and the reason for the length, that you

4    can certainly -- as the *Urkevich* court did, you can certainly

01:02:01PM 5    consider that.  And I don't see there's any artificial or --

6    in terms of the exercise of your discretion, any particular

7    constraint you should impose and the degree to which it should

8    influence your decision.

9              It can't support your decision alone.  We get that.

01:02:18PM 10   But it is kind of out of the ballpark type rehabilitation in

11   this case.

12             I want to address now in this context the

13   Government allegations.  And there's a pattern here, you know,

14   the pattern is a -- kind of a relentless search for

01:02:41PM 15   additional, obviously a very deep-seated animosity towards the

16   defendant by the Government.  It's not often you can hear an

17   AUSA say in a courtroom, well, I don't think he's Satan, but I

18   think he's evil.  That's, you know, I don't think the

19   Government has covered itself with professional glory here.

01:03:04PM 20             And I want to address specifically these

21   allegations that have been made -- that were made after we

22   filed on July 26th our motion.

23             The first thing I want to point out for the Court,

24   you may not have noticed this in the examination, but a week

01:03:24PM 25   after the motion was filed the Government reached out for SIS

1   at FMC Lexington and asked for information about Chad Marks.

2   That happened on August 2nd.

3           And Richard Stump, one of the -- one of the SIS

4   technicians -- who was then one of the witness' colleagues,

01:03:51PM 5   responded to that on August 5th, provided the information.

6   You heard nothing about that on direct.

7           And we've tried to get the substance of that

8   communication.  We were told we would get the communications

9   from Mr. Wascher, but not from the folks and the lawyers that

01:04:11PM 10   are in Regional.  That's where Ms. Horikawa is.

11          I'm going to suggest to the Court that the only

12   inference you can draw from that is the first effort to obtain

13   some useful information against Chad Marks fell flat.

14          You should also infer from this evidence that the

01:04:30PM 15   Assistant U.S. Attorney didn't want to take no for an answer.

16   The evidence shows you a foraging around on social media and

17   the discovery of that photograph you saw in the

18   cross-examination of Mr. Wascher, a photograph of Chad Marks

19   in a T-shirt that had looked like at the bottom of it a tattoo

01:04:56PM 20   that was otherwise obscured by the T-shirt the word Pride on

21   it.

22          And that occasioned by the AUSA of another mission

23   to FMC Lexington take a look at that tattoo, see what that

24   tattoo is about.  And that in turn produced the February 21 --

01:05:22PM 25   excuse me, the August 21st interaction between Wascher and the

1    defendant.

2              Before -- I'm going to come back to that in minute,

3    but I really want the Court in its determination as to whether

4    the Government, separate and apart from the significance of

01:05:39PM 5    these allegations, if proved, and I stood before you the last

6    time I was here and said if you find they're proved, I'm going

7    to argue to you that they're not relevant to your

8    determination about a reduction in sentence.

9              But I'm going to ask the Court to consider very

01:05:57PM 10    carefully in determining, and I know you will, whether or not

11    the Government has proved this allegation of more recent

12    criminal activity on the evidence before you with regard to

13    the SIM cards.

14             The other pattern that develops as we get a shot

01:06:18PM 15    across the bow of adverse information about Chad Marks and

16    then upon further scrutiny, it just isn't there.  I remember

17    so vividly when I was an AUSA standing in Leo Glasser's

18    courtroom, him telling me and other AUSAs, you know, the

19    Government -- I never quite fully understood this -- the

01:06:36PM 20    Government has to be as pure as Caesar's wife, probably an

21    expression that wouldn't properly be used now.

22             I got it then.  I knew what it meant.  The

23    Government has to turn square corners.  It's got a burden of

24    proof.  It has to turn square corners.

01:06:52PM 25             You got told in the Government's opposition

1    brief -- you got told that because there was suspicion that

2    Chad Marks was trying to obtain a SIM card, that there was a

3    search conducted of his cell and a SIM card was -- a container

4    was retrieved from Chad Marks' Bible.  And both of those were

01:07:19PM 5    dead wrong.

6              I respectfully urge this Court to find based on the

7    testimony here today and based on this incident report that is

8    Government Exhibit 1, it just says flat out that Wascher was

9    conducting random cell searches in the Bluegrass Unit.

01:07:40PM10              And, Judge, if you read further in this description

11   of the search and of the interview of Moore, and of course

12   read the fact that this is a write up of Moore, you will find,

13   I respectfully suggest, that that search had literally nothing

14   to do with any allegation against Chad Marks.  There's no

01:08:04PM15   reason that wouldn't have been in here.

16              And, of course, the search did not retrieve a Bible

17   of Chad Marks.  And you were not told -- I'll suggest the

18   Court ought to ask itself, you know, why wasn't I told someone

19   else was written up for this ? Why wasn't I told the search,

01:08:23PM20   according to BOP paperwork, was conducted for a different

21   reason and not for the reason advanced by the Government?  Why

22   wasn't I told that the very same person who was brought in

23   here as a witness became -- authored the report based on which

24   Thomas Moore was sent to the SHU?

01:08:43PM25              That's information that the Court should have been

1   apprised of and you were not apprised of it.  Only when we

2   went beyond -- of course, we asked AUSA Rodriguez for the

3   paperwork.  He said no.  Only when we got it and went beyond

4   it was there some more light shed on this SIM card incident.

01:09:09PM 5          There is nothing anywhere.  We know that the SIS

6   keeps files.  It keeps files of what it considers to be

7   significant inmate information about contraband and other

8   criminal activity.

9          The only place anybody could ever find a Government

01:09:27PM 10   writing about Chad Marks allegedly attempting to possess a SIM

11   card is in this court.  It's nowhere in the BOP files.

12          The -- turning to the Dirty White Boy allegation,

13   again, this -- the -- this all arises out of a tattoo

14   inspection requested by AUSA Rodriguez at the time -- he

01:10:01PM 15   testified otherwise, but at the time, and you can see this

16   from page 35 of our Defense Exhibit B, I believe you can see

17   that, of course, Wascher was aware of the fact that Chad Marks

18   was seeking a sentence reduction.  He knew what his mission

19   was.

01:10:22PM 20          His mission was to find dirt for the Government to

21   use.  And he looks at the tattoo in question, which is an

22   Irish Pride tattoo.  The other photos in here reveals an

23   Erin go Braugh is a pattern that develops.  He's an Irish guy.

24   He's an Irish guy with Irish tattoos.

01:10:42PM 25          And this witness is so bent on helping the

1 Government that he can't even bring himself to say that he's

2 not sure whether the Irish Pride tattoo doesn't reflect an

3 affiliation with the Dirty White Boys.

4 Also, Judge, I'm going to suggest to you little

01:11:02PM 5 details matter.  He was given a specific mission.  He was told

6 to look at the tattoo in question.  Tattoo in question was on

7 his left -- is on my client's left arm.  You don't need to

8 strip search someone to look at the tattoo in question.

9 This Wascher -- the previous inquiry to the SIS

01:11:24PM 10 folks at FMC Lexington produced a dry well for AUSA Rodriguez,

11 but when the person performing the mission was this Wascher,

12 Wascher was a gold mine.  All of a sudden a SIM card violation

13 that was -- someone else was punished for and written up for

14 became our client's.  All of a sudden the specific tattoo

01:11:50PM 15 inspection that was directed becomes a strip search.

16 All of that proves negative.  He doesn't find a

17 tattoo of an FCI up there like the Dirty White Boys.  He

18 doesn't find anything.

19 But lo' and behold, lo' and behold, in casual

01:12:07PM 20 conversation he says  my client just offers up that he

21 committed assaults many years earlier between September of

22 2011 and January of 2013 in Coleman at the behest of the --

23 the bosses of the Dirty White Boys, and he quit the Dirty

24 White Boys that year.

01:12:31PM 25 In re: You should expect more of the Government.

1    Let me suggest to you that one of the questions you should be

2    asking is why when Wascher allegedly hears my client say that

3    he quit the Dirty White Boys between 2011 and 2013, why you

4    get told in the Government reply, Government opposition to our

01:12:52PM 5    motion that's when he joined it?

6         These are the sorts of things of which -- that

7    reflect conduct that you should expect of the Government that

8    you did not get in this case.

9         And so here we have an SIS investigator, a

01:13:08PM 10    technician at FMC Lexington who claims that my client

11    volunteers that he was affiliated with this dangerous group.

12         He says himself that the fact that you were

13    formerly affiliated with a dangerous group doesn't alter the

14    obligation within the facility to take action about that.

01:13:31PM 15         But he does nothing.  There's nothing in August in

16    terms of BOP paperwork, there's nothing in terms of separation

17    orders, there's nothing, there's no write up.  There's

18    nothing.

19         It's only in this courtroom that one person in the

01:13:48PM 20    Bureau of Prisons makes the suggestion that Chad Marks used to

21    be affiliated with the Dirty White Boys.  It's an utterly

22    implausible confession.  If it were made, it would have

23    produced and should have produced -- this witness' own

24    testimony tells you it should have produced action within the

01:14:08PM 25    Bureau of Prisons, but it didn't.

1          And we get as of a week ago, we get a message from

2     AUSA Martinez (sic) there's no -- there's nothing in the

3     Bureau of Prisons that suggests any affiliation in the Bureau

4     of Prisons paperwork by -- on Chad Marks' part with the Dirty

01:14:27PM 5     White Boys.

6          So the notion that he was is unsupported by any

7     documentation that this Court has a reason to expect would

8     exist.

9          And then lastly, and I told you this last time I

01:14:45PM 10     was here and I meant it when I said it, I suggest this Court

11     should not have an evidentiary hearing on this because if you

12     did, you would conclude that the Government can't prove this

13     by any standard, even by a preponderance standard.

14          But I would also argue to you that the -- if it

01:15:05PM 15     proved it, now we know the Government's allegation is not that

16     he joined it, now the allegation is that he quit it -- that

17     it's not a public safety factor.  It's kind of a lower level

18     affiliation.

19          It's not even one of significant magnitude that

01:15:21PM 20     there's any record of it in the Bureau of Prisons.  And it's

21     long in the past, and in between is a period of extraordinary

22     rehabilitation.

23          And I suggested to this Court that should you find

24     any concern, should you even find these facts have been

01:15:37PM 25     proved, the proper approach to that is an association

 1  restriction imposed upon my client when he is serving his

 2  eight years of supervised release.

 3          One other thing, Judge, and, you know, again as I

 4  say, the pattern is outrageous.  Really hyperbolic

01:16:01PM 5  allegations.  I urge you, once again, to read that missive of

 6  the Government's on August 23rd.  When I read it I thought

 7  holy cow, this is pretty wild, this is pretty bad stuff.

 8          And then you look at it and you scrutinize it and

 9  you get the incident report and you get the testimony and you

01:16:19PM 10  see, well, he was actually told something different and there

11  are plenty of facts that undermine the credibility of it.

12          So once you get past that superficial allegation,

13  it doesn't -- it doesn't hang together.  The whole SIM card

14  thing does not hang together.  The admission about the Dirty

01:16:37PM 15  White Boys doesn't hang together.

16          And then, you know, you also got some over the top

17  language about rapist and torturer and murderer.  You know, we

18  got over the transom last night some -- a whole pile of stuff

19  about the defendant's conduct in Batavia before the trial.

01:16:59PM 20          And I don't want to make too much of this.  I'm

21  going to say it fits the pattern.  We got it last night.  You

22  look at it, it doesn't bear out what the Government said.

23          The Government said he had three assaults.  Well,

24  there's actually two assaults and one fighting.

01:17:14PM 25          There are 23 incidents.  You know, we get this --

1   as I said, we got this over the transom last night -- in a

2   colloquial way.  We got it over the e-mail last night 23

3   incidents.  More than half of them either no disciplinary

4   action or he was not convicted.

01:17:32PM 5         I noticed last week the Court got kind of a

6   discovery request.  There is what I'll suggest is kind of this

7   frantic effort to characterize the Chad Marks that sits there

8   today to do anything really that in a way -- to characterize

9   the Chad Marks who sits there today, 17 years after he was

01:18:01PM 10  first incarcerated on this case, as the street punk that you

11  described.  I'm sorry I keep saying that, but that you once

12  described.

13        And, you know, you get -- and you saw it with

14  Wascher.  Well, he's arrogant.  Well, okay, fine.  He's not

01:18:22PM 15  the most docile inmate Wascher had to deal with.  Not the most

16  docile person that this AUSA has provoked in his career.

17        But so what?  That's not a prerequisite for

18  extraordinary and compelling circumstances.  And it certainly

19  is not a reason to guess that he must have coerced Thomas

01:18:43PM 20  Moore to take the fall for that SIM card.  That's not what you

21  should expect of a Government investigator.

22        And the results of it and the way the results of it

23  were cast to this Court are not what you should expect of an

24  AUSA.  You should expect more.

01:19:01PM 25        And I'm going to -- just to finish up on the

1    belatedly relied upon alleged criminal activity.  It has not

2    been proven.  This Court should conclude it has not been

3    proven.

4           If you conclude that it has, I suggest to you that

01:19:19PM 5    in the entire mix of facts this Court has before it in terms

6    of whether they're extraordinary and compelling reasons, it

7    doesn't warrant in any respect a diminution in the appropriate

8    reduction of sentence that this Court should effect based on

9    our motion.

01:19:35PM 10          I know the Court has more facts before it.  I'm not

11   gonna -- I'm not gonna, you know, bring up -- I'm gonna -- I

12   know you're gonna make a decision today based on the facts as

13   you heard them, the arguments as you heard them, but I'm sure

14   you're mindful as we are that you told the Assistant U.S.

01:19:56PM 15   Attorney that if you were to have imposed a 15 year sentence,

16   had you been able to, Judge, or at least based on what you

17   knew at the time you wrote that letter, we respectfully

18   suggest to the Court that its wisdom in reaching that

19   conclusion after being apprised of the rehabilitation of Chad

01:20:16PM 20   Marks was spot on.

21          And the last thing I'm gonna say before I sit down

22   is this : I also think what you're seeing here in this

23   courtroom, honestly -- honest to goodness, separate and apart

24   from the discrete facts of this case -- I think you're seeing

01:20:34PM 25   the natural institutional response to Congress returning a

1  little bit of power to judge -- back to judges.

2         There is -- there is really no justification for,

3  in my mind, I'll suggest to you, there is no reasonable

4  justification for this conduct by the Government when really

01:21:04PM 5  what's at issue is this Court's been afforded the opportunity

6  to take a second look in only a very narrow slice of cases,

7  ones presenting extraordinary and compelling reasons, and to

8  blunt what is, I think by any reasonable person's measure, an

9  accessibly harsh sentence.

01:21:26PM 10        And there's really, I'll suggest, no legitimate

11  reason for the virulence, for the unscrupulousness -- I'll say

12  that -- of this push back.  I suggest that respectfully.

13        Thank you, Judge.

14       **THE COURT:** Before you sit down, let me ask at least

01:21:44PM 15  one question here.  I think the Government has already

16  addressed this in its -- perhaps both of its filings, but the

17  question relates to Congress' decision not to make the

18  stacking provision retroactive.  The stacking is what caused

19  the onerous sentence that Mr. Marks faces, five years plus 25

01:22:12PM 20  years.

21        The Government suggests that really precludes the

22  Court from granting the relief here.  That if Congress

23  intended some retroactive effect, they could have said so.

24        Another argument could be made that just because

01:22:41PM 25  Congress elected not to make the stacking provisions under

1  924(c) retroactive, that doesn't speak to the discretion the

2  Court has under the statute on which you move.  That the Court

3  could still consider the seachange in the law now that

4  stacking is no longer appropriate.

01:23:15PM  5         Not unexpectedly, the Government suggests that

6  Congress really has already spoken on this, Judge, but how

7  would you -- what would you like to be heard to say about

8  this?

9         The Court's going to have to deal with it, the fact

01:23:31PM 10  that Mr. Marks does not automatically get the benefit of the

11  anti-stacking provisions.  If he did, we wouldn't be here.

12         So, you know, how much should the Court consider

13  the congressional action to change the stacking in deciding

14  your motion?

01:23:52PM 15        **MR. GLEESON:** I suggest here's how the Court should

16  consider it: If Congress had made the -- we'll call it the

17  anti-stacking part of the First Step Act retroactive, every

18  single 924(c) in the U.S. -- in the prison system would have

19  presumptively an application to go back before the sentencing

01:24:19PM 20  court.

21         As all of the Fair Sentencing Act folks -- Fair

22  Sentencing Act provisions were made retroactive -- sorry.

23        **THE COURT:** That they have done that.

24        **MR. GLEESON:** Yes, they come back.  They would

01:24:35PM 25  presumptively have an application.  It's not automatic as the

1    Court knows.

2            Congress didn't do that.  We acknowledge that.  At

3    the same time there's an existing statute 3582(c)(1) that

4    Congress amended to allow inmates to come back directly to

01:24:57PM 5    their sentencing judge and to make an application for a

6    reduction of sentence based on extraordinary and compelling

7    reasons.

8            There are obviously other bases set forth in that

9    statute, but we're relying on extraordinary and compelling

01:25:14PM 10    reasons.

11           And neither at the time nor now is there any reason

12    based on the text of that statute for this Court to conclude

13    that someone who is serving stacked 924(c) sentences is

14    ineligible for that avenue of relief.

01:25:37PM 15           As I mentioned to you the last time I was here, you

16    would think the Government's argument that this Court's

17    precluded from considering this ground of sentence reduction,

18    you would think the Government's argument, you would look at

19    3582(c)(1) and you would say there's an exception here for

01:25:59PM 20    924(c) stacking.  There's none.

21           Congress was aware of the bases of relief under

22    3582(c)(1).  They include extraordinary and compelling

23    circumstances.  Every single inmate can make such an

24    application.  It was aware that there was a BOP gatekeeper

01:26:20PM 25    provision that wasn't working.  They never opened the gate.

1        So it said we're taking BOP out of the way, the

2   inmates can come in directly.  And they did not say, by the

3   way, all inmates except 924(c) stacking victims can come to

4   the Judge Larimers in our system.  And they could have said

01:26:43PM 5   that.  They didn't.  Text is text.

6        **THE COURT:** Maybe Congress passing that expansion of

7   3582(c) knew that another statute under the First Step Act,

8   the anti-stacking provision, provided that there would be no

9   retroactive effect.  One could argue that Congress didn't need

01:27:10PM 10   to add any prohibition under 3582(c).

11        I mean, I'm not -- I'm just being the devil's

12   advocate here.

13        **MR. GLEESON:** Understood.  And to finish my thought

14   about how you should view it, the -- I'll suggest to the Court

01:27:28PM 15   it's perfectly logical to suggest that Congress decided not to

16   presumptively -- not to provide a presumptive motion to every

17   924(c) stacking inmate.

18        But, rather, decided that if relief was gonna be

19   afforded to such an inmate, any such inmate, it would only be

01:27:51PM 20   in the very narrow slice of the inmate population whose

21   circumstances viewed holistically present extraordinary and

22   compelling reasons.

23        And there is -- I say this respectfully, there is

24   no reason for you to read into -- read a limitation into

01:28:11PM 25   3582(c)(1) that is not there.  That is, to imply from the fact

1  that -- that the anti-stacking provision was not made

2  retroactive, to imply that in the amended 3582(c)(1), that

3  means there is an implied exception for 924(c) stacking

4  victims.

01:28:36PM 5        The result of the legislative enactments that I

6  described to the Court is a legislative determination that a

7  very narrow slice of the inmates in the Bureau of Prisons who

8  are subjected to 924(c) stacking will have an application to

9  go back to the District Court and present extraordinary and

01:29:01PM 10  compelling reasons, only one of which would be that he was

11  subject to a sentencing regime that was so onerous that

12  Congress decided no one else would be subjected to it.

13        It would be kind of ironic, I suggest to the Court,

14  that -- think about it this way.  Think of the irony of this.

01:29:24PM 15  These are bone crushing sentences.  They're really harsh.

16  It's not a shrinking violent Congress that passed that

17  statute, and not a shrinking violent President that signed

18  it -- signed it into law.

19        They decided these provisions are so bad, that no

01:29:45PM 20  one will ever be subjected to them again.  Think of the irony

21  associated with the fact that when they open up an avenue of

22  safety valve relief the way they did by taking BOP out, BOP

23  motion requirement out of 3582(c)(1), right?

24        They -- they open up an avenue to this Court, think

01:30:12PM 25  of the irony that you're gonna -- that the Government wants

1   you to imply into that a limitation, and this is the only

2   exception near as I can tell the Government's arguing, they're

3   gonna open up for a second look for sentencing judges to look

4   at extraordinary and compelling circumstances.

01:30:35PM 5          Think of the irony associated with except there's

6   this one category of folks who got really clobbered by

7   sentences we think are so excessive that nobody will ever get

8   them again, but they can't come in.

9          Judge, I'm gonna suggest to you that makes no

01:30:50PM 10  sense.  Not only that, it's completely -- text as I keep

11  saying this, text is text.

12         One irony of this is the whole reason 924(c)

13  stacking happened wasn't because Congress intended it.  It was

14  because the Supreme Court held in that *Deal* case back in the

01:31:17PM 15  '90's.  Text is text.  Second or successive could be in the

16  same case as the first.  That's why we're here to begin with.

17         So, you know, what's sauce for the goose is sauce

18  for the gander.  And if text is text, and that's why he got

19  clobbered to begin with, I'm gonna suggest to you that it's

01:31:35PM 20  good enough for us to say you read 924 -- 3582(c)(1) and it

21  doesn't limit the category of inmates who can come to you to

22  seek the sentence reduction we're seeking by excluding 924(c)

23  victims I'll call them.

24         **THE COURT:** Thank you.

01:31:58PM 25         **MR. GLEESON:** Thank you.

1          **THE COURT:** You wish Mr. Marks to address the Court?

2          **MR. GLEESON:** Yes.  Do you want him to do it now,

3 Judge?

4          **THE COURT:** Yes.

01:32:07PM 5          **MR. GLEESON:** Okay, come on up.  Come up here, is

6 that all right?

7          **THE COURT:** All right with me.  Mr. Marks, good

8 afternoon.

9          **THE DEFENDANT:** Good afternoon to you.

01:32:27PM 10          **THE COURT:** We're not discussing legal issues now.

11 Your attorney and the Government have supplied the Court with

12 that, but the nature of this proceeding, although it's not

13 technically like a sentencing, it certainly relates to that.

14          So I'm exercising some discretion to give you a

01:32:44PM 15 chance to address the Court.

16          **THE DEFENDANT:** Thank you.  I'll like to start off

17 by saying that Psalms 21 once said the heart of the King is in

18 the hands of the Lord.  I know that it's by your mercy, your

19 compassion and God's grace that I'm even here today and I want

01:32:59PM 20 you to know that I'm grateful.

21          I know that I made some irrational and

22 irresponsible choices many years ago to engage in drug

23 trafficking, possession of weapons.  I'm guilty.  Guilty of

24 every one of them charges.

01:33:09PM 25          I'm not that person no more.  I'm not.  I've

1  learned to respect the rule of law.  I've learned a lot about

2  the law, about our forefathers.  Life, liberty and the pursuit

3  of happiness, it means something to me.  I respect the rule of

4  law, Judge.  I want you to know that.

01:33:27PM 5          There's been a lot of filings in this case so you

6  know my history.  I never really had a father.  I looked up to

7  my brother; my brother killed his self.  I didn't have any

8  respect for men at all in my life.

9          I came to respect you, and I mean that.  And I say

01:33:45PM 10  that to say this: I don't know what's gonna happen.  But I

11  want you to know that I would never disrespect you by

12  reoffending.  I'd never violate post-supervised release

13  because my freedom means something.

14          Today's not simply about Chad Marks.  Failure is

01:34:02PM 15  not an option.  To fail is to disappoint you, disappoint Judge

16  Gleeson, Marisa Taney, Elizabeth Costello, all the people over

17  there, Jill Harrington, Families Against Mandatory Minimums.

18  These people believe in me.  So failure is not an option.

19          I came to prison with a 40 year sentence.  Tough.

01:34:18PM 20  Not something easy to deal with.  But I dealt with it.  And I

21  learned, and as I learned I knew that it wasn't just about me

22  doing time.  I owed more than just doing time.

23          That's why I decided to go to the Alternative

24  Violence Project seminar.  Then after that I started

01:34:34PM 25  facilitating.  There's a brotherhood in there, we change lives

1   in there.  Leaders Breed Leaders taught people how to be real

2   men, real fathers.  I didn't know what that was many years

3   ago, but I do now.

4               Then I went to FMC Lexington and there was this old

01:34:50PM 5   man trying to push his self to commissary one day.  I decided

6   to push him.  His name was Foster Davis.  He was a Vietnam

7   vet, tunnel rat in Vietnam, won a bunch of awards.

8               I made a promise to come to church Friday night,

9   which I do every week, Fridays and Sundays.  And we started

01:35:08PM 10   talking.  I helped him and I kind of formed this thing I

11   called the Wheelchair Ministry.  I got some of the other

12   brothers to start helping people.  We start getting people

13   from the Medical Unit, we start taking them to church, we

14   start taking them to commissary.  We couldn't push them --

01:35:21PM 15   they couldn't get themselves in places, Judge.  It mattered.

16   It mattered.

17               So we started that Wheelchair Ministry.  Foster

18   Davis, I take him outside, walk him around.  He always used to

19   say, man, you're my buddy.  Really, he was my buddy.

01:35:34PM 20               I did his compassionate release, I did his clemency

21   petition.  Four weeks ago he died.  But he didn't die in

22   prison.  He didn't die alone.  He died with his family.  That

23   was important to him.  Something I was afraid of.

24               And Criminal Legal News sent me out a thing, they

01:35:53PM 25   wanted me to write an article about -- about Lester Holt.  He

 1 visited a prison in Louisiana, went to the Hospice Unit.  And

 2 there was old man in there, been in prison 45 years.  He asked

 3 him to open his candy for him, couldn't even open his candy.

 4          That motivated me to go to the chaplain at FMC

01:36:11PM 5 Lexington.  I said, hey, no one is up here ministering to

 6 these guys and they're dying, I want to go up there.

 7          The only way I could do that is if I refused to go

 8 to lunch on Saturdays.  So I did it.  I went up there.  I

 9 administered love of Christ to them guys up there.

01:36:24PM 10          And in the process I worked with them on some

 11 compassionate release motions, wrote their stuff for them,

 12 sent it off to the attorneys, I built some relationships at

 13 FAMM.  I did the work because the lawyers were overburdened.

 14 I sent that stuff down there all for free.

01:36:37PM 15          I go up there and minister guys.  A lot of them

 16 guys didn't want to hear that, Judge.  They'd been up there --

 17 they had been in prison 35, 30 years.  So I had to find a way

 18 to break in and they didn't have no money, they can't buy

 19 commissary, they can't work.

01:36:50PM 20          So I take snacks up there to them.  For some reason

 21 they all like animal crackers and that was my opening, believe

 22 it or not, animal crackers.

 23          I just want you to know that I appreciate you.  I

 24 appreciate today.  I appreciate life.  Life means something.

01:37:06PM 25 I made some bad choices.  But I want you to know -- and I mean

1  this -- that I'll never reoffend because I appreciate my

2  freedom.  I would never disrespect you because I have enormous

3  amount of respect for you.

4           And with that I wish you a Merry Christmas.  You

01:37:22PM 5  too... you guys have always been kind to me and I appreciate

6  you.

7           **THE COURT:**  Thank you, Mr. Marks.  Two things.

8  Mr. Marks, I get a chance.  You know, you and I go back a long

9  way.  I presided at the trial.  I remember many of the facts

01:37:42PM 10  at the trial.  The Government has pointed many of them out in

11  their filings.

12           You did say you made bad judgments.  That would be

13  an understatement in terms of drug dealing and some violence

14  and threats.

01:37:55PM 15           The Government suggests that there's no guarantee

16  that you won't do that again if you're released.  Your lawyer

17  suggests that the Court can provide some protection by

18  imposing conditions in supervised release.

19            But I'd like to give you the opportunity to

01:38:20PM 20  address the Government's suggestion as to that -- that, you

21  know, a leopard can't change his skin.  You did certain things

22  in the past and there's no guarantee that you won't do them

23  again.

24           The second thing you might comment on, the

01:38:36PM 25  Government suggests that, either directly or inferentially,

1   that the courses and all the religious activities and others

2   that you engaged in is an effort to play the Court.  To --

3   that it's not really -- it's done for a purpose.

4           Any thoughts on either of those two --

01:39:08PM 5           THE DEFENDANT: Yeah.

6           THE COURT: -- points?

7           THE DEFENDANT: The first thing I want to say is

8   this: I know you've been around a long time, you know when

9   people come up here and lie to you.  I know that.  And I pray

01:39:16PM 10  that you see the sincerity in me.

11          As far as the programs goes, I didn't have to do

12  any of that stuff, Judge.  None of it.  I could have went to

13  prison, stayed in Big Sandy, the most violent prison in the

14  United States, hands down.  There ain't a state prison that

01:39:29PM 15  can hold a flame to it.  I could have took that road, but I

16  didn't.

17          Were there some problems?  There were some problems

18  100%.  And I don't know if I'm allowed to speak about the

19  factual basis, but -- as far as the fights go, if you --

01:39:44PM 20          THE COURT: No.

21          THE DEFENDANT: As far as reoffending, I mean this

22  from the bottom of my heart, I respect the rule of law and I

23  respect my freedom.  It's small things, Judge, driving here

24  and you see houses, you see dogs.

01:39:58PM 25          FMC Lexington we see -- it's this small.  You see

horses coming by the prison, you learn to appreciate them
things.  Those are the small things that you learn to
appreciate.

Will I reoffend?  People can stand here and say,
you know, hey, we never know.  But I can tell you this: If I
were released -- I told you before in a letter I think I
wrote -- I'm suffering.  I am.  I'm suffering.  And I know
what that suffering is like.

Reoffending for me, I mean, anyone can stand up
here and tell you this -- I'm telling you now from the bottom
of my heart, I know -- I know that I'm not gonna reoffend,
Judge, because I appreciate that freedom.

I know what it's like to lose your freedom.  I know
what it's like to go to bed at night hungry.  I know what's it
like -- and I get embarrassed real easy about family stuff,
but my mother's sick.  She's been sick.  By the grace of God
she's still here.  I do love my mother.  Two weeks ago my mom
was homeless.  So reoffending disappoints my mother.

Never gonna reoffend.  Never.  Did I do some bad
things?  100%.  And I didn't want to comment on this because I
thought you wanted Mr. Gleeson to stay away from it -- street
punk, I was worse than a street punk.  100% worse than a
street punk.  Thought I knew everything, thought I was smarter
than everybody.

But you know what, Judge? You grow up, you learn.

1   You learn that, hey, look, that's not who you want to be.  You

2   go look in that mirror.  Look in that mirror every day.

3          I pray every day.  On my knees every day.  Because

4   I do want to change my life.  Am I perfect?  No.  If I were

01:41:28PM 5   released, the first place I'd go today is Victory Baptist

6   Church in Henrietta, let them know I'm here, not even going to

7   go to my mother first.  I'm going to the church, let them know

8   who I am.

9          This is what I want to do.  Because I know that I

01:41:38PM 10   have to have that.  I have to be rooted there.  I have to be

11   rooted in that church.

12          The next thing I'd be doing is I'd immerse myself

13   in criminal justice reform.  I made a lot of relationships,

14   I'm sure the Court knows, with many attorneys.  Many.

01:41:51PM 15          Sean Hopwood, dear friend of mine, law professor,

16   former federal inmate.  Former federal inmate went on to

17   become -- won two cases in the Supreme Court as a jailhouse

18   lawyer.

19          I mean, those guys are making it.  Brandon Sample,

01:42:05PM 20   post-conviction attorney.  These guys were in federal prison.

21   They're making it.

22          I'm not gonna disappoint.  And you know something

23   else?  I'm not gonna disappoint Mr. Rodriguez.  I'm not.  I

24   want to prove -- I want an opportunity to prove to you.

01:42:20PM 25          And I can say this, and I'll close, I don't deserve

1   another day in there.  Maybe I should have went to prison

2   100%, there's no doubt about that.  But there's nothing left

3   to gain.  Wasting tax dollars.

4          I just -- I want you to know I mean what I say, say

01:42:39PM 5   what I mean.  Thank you.

6          **THE COURT:** Thank you.

7          Mr. Rodriguez, would you like to present?

8          **MR. RODRIGUEZ:** Thank you, Judge.

9          I'll start by pointing out the obvious, which is in

01:43:31PM 10   this case, in this proceeding the defendant bears the burden.

11          And I think unlike a trial where you would never

12   hold the defendant's silence against them, you would never

13   hold his reluctance or refusal to testify under oath against

14   him, in this case I think you should.

01:43:49PM 15          Because we talked about testimony, we talked about

16   him getting on the stand under oath, and he didn't do it.  He

17   stood up here and said things to you not under oath, not

18   subject to cross-examination.  So I think Your Honor can take

19   that into account in determining whether the defendant has

01:44:04PM 20   borne its burden.

21          Judge, there's a lot of -- we submitted a 24 page

22   legal memorandum arguing the law.  We stand by those

23   arguments.  I won't repeat them.  I think the Court has

24   reviewed them.

01:44:25PM 25          Simply to point out that we believe the First Step

1  Act is clear: If Congress had wanted to give the courts

2  discretion to allow inmates out early because of the double,

3  consecutive 924(c) sentences, it would not have specifically

4  ruled that the change in the law with respect to consecutive

5  924(c) sentences only applies to people who are sentenced

6  after December of 2018.

7  **THE COURT:** Well, Mr. Gleeson suggested that there's

8  no reference in 3582(c) to any statute or any other thing that

9  would prevent the Court from considering the seachange in the

10  law.

11  I mean, it's obviously an issue the Court has to

12  deal with because Congress did determine that the action be

13  retroactive, but I think Mr. Gleeson suggests, you know, that

14  might have resulted in many, many applications by those who

15  really didn't warrant relief.

16  In this case maybe it is something the Court could

17  consider.  I mean, I know your position is that the Court

18  shouldn't and can't, but all we have really is Congress

19  deciding to expand the scope of Section 3582 to some extent by

20  eliminating the gatekeeper requirement that the Bureau of

21  Prisons held.

22  One could view that as some liberalization of the

23  relief afforded there --

24  **MR. RODRIGUEZ:** Judge --

25  **THE COURT:** -- to the extent judges have discretion,

1   you know, woefully absent from many years when the guidelines

2   were mandatory.   Now we have much more than we used to have

3   thanks to Justice Breyer and others.

4          But maybe it just boils down to that, that under

01:46:26PM 5   Section 3582 the Court has a lot of discretion:   It may

6   consider quite a few factors in determining whether this

7   particular man warrants the extraordinary relief that he

8   seeks.

9          **MR. RODRIGUEZ:** Judge, as we argued last time we

01:46:45PM 10   were in front of you, we don't -- we don't dispute that Your

11   Honor has enhanced discretion under the First Step Act.   We

12   don't.   I mean, the Congress intended to allow the courts more

13   discretion.

14          Our argument here is that if you read the statute,

01:47:02PM 15   Congress cannot be deemed to have intended for a judge to

16   exercise that discretion so as to reduce sentences that were

17   based on consecutive 924(c) sentences imposed prior to

18   December '18.   A fair reading of the law does not support that

19   interpretation.

01:47:19PM 20          And, Judge, even if you were to consider, and I

21   know it's -- the law is relatively new, cases have evolved,

22   but even if you were to consider the type of cases where this

23   discretion has been used, the defendants in those cases are

24   nothing like this defendant.

01:47:34PM 25          Even the case that Your Honor cited last week, I

1   forget the name of it, where the District Court indicated that

2   it had the discretion, but decided not to exercise it.  Even

3   if -- that case, as I recall, that defendant had no

4   disciplinary record while in prison.

01:47:53PM 5           To grant -- so our argument is both on a macro

6   level and a micro level.  On a macro level we've argued here

7   the law -- we believe that the law in this case warrants

8   denial.  We respectfully submit the law does not allow the

9   Court to grant early release in this case.

01:48:11PM 10          But if we look at who Mr. Marks is, I may be

11  mistaken, but I did not find any cases where a defendant was

12  allowed early release that in any way -- in any way resembled

13  Mr. Marks' circumstances.

14          The three or four cases cited by the defendants in

01:48:30PM 15  their first -- defendant in their first set of cases were

16  completely different defendants, inmates:  They were old, they

17  were elderly; one woman had breast cancer, one breast, and it

18  seemed to be spreading in the other; another man had very

19  serious illnesses.

01:48:47PM 20          **THE COURT:** That traditionally was the way Section

21  3582 was viewed, I grant you that.  It was called

22  "compassionate release" and , you know, it often was a vehicle

23  for very sick inmates to get some relief in their dying last

24  days.

01:49:04PM 25          I think Mr. Marks and his counsel would say, well,

1    the statute's been expanded somewhat now, Judge.  And you say

2    well, it has, but still Mr. Marks was not the person -- the

3    type of person, based on his record, et cetera, that should

4    get the benefit of that.

01:49:23PM  5            MR. RODRIGUEZ: That is correct.  And in this case

6    we argue -- we believe that he is not.

7            THE COURT: In your comments at some point you

8    might, you know, I've sentenced many, many people over the

9    last 32 plus years, and they all have an aspect of the

01:49:41PM 10   sentencing where there's supervised release.  Many conditions,

11   some onerous.

12           One might say the concerns you have about Mr. Marks

13   slipping back into drug activity or violence, I would ask you

14   why couldn't that be dealt with like we do every other inmate

01:50:03PM 15   with, in this case, a pretty extensive term of supervised

16   release?  We do it with everybody:  Robbers, rapists, child

17   porn people.  Why wouldn't it work here?

18           Let me say there's no guarantee where -- both of us

19   have been in the business too long to know very little can you

01:50:23PM 20   guarantee.  One might say, you know, you don't appreciate

21   things until you lose them:  You don't appreciate your health

22   until you lose it, you don't appreciate sometimes a spouse as

23   much as you should until you lose him or her.  And Mr. Marks

24   has suggested his freedom means too much to him to go down the

01:50:44PM 25   road that he was there before.

1          So that's a lengthy question, but I guess why not

2 supervised release if you're really concerned that he might --

3          **MR. RODRIGUEZ:** Because supervised release does

4 not -- I'm sorry, Judge.  I didn't mean to cut you off.

01:50:58PM 5          **THE COURT:** Happens all the time.

6          **MR. RODRIGUEZ:** I apologize for doing it all the

7 time.

8          First, because the law provided for a ten year

9 mandatory on the drugs, a 30 year mandatory minimum on the two

01:51:11PM 10 gun counts.  And under 3582(c) the Court cannot diminish that

11 without -- without appropriate reasons, and none exist here.

12          **THE COURT:** The Government says you really don't get

13 to supervised release? You can't -- that's really irrelevant,

14 Judge, because you shouldn't be releasing him?

01:51:28PM 15          **MR. RODRIGUEZ:** Yes, that's our first argument,

16 Judge.  And we believe it's a strong argument.

17          Now, but even if Your Honor were to consider, well,

18 can't we protect against criminal activity by Chad Marks if we

19 release him?  Your Honor, releasing him under supervised

01:51:44PM 20 release in no way guarantees or no way even assures that he's

21 not going to commit criminal activity.

22          He was incarcerated under the most secure

23 circumstances around.  He wasn't just under supervision while

24 he was out; he was incarcerated and he violated conditions:

01:52:05PM 25 He beat up inmates.

1         And I'm not talking about just in BOP.  I'm also

2    talking about when he was at MCJ, Monroe County Jail; also

3    while he was being held in Batavia.  I know that was a long

4    time ago, Judge, but if you're trying to --

01:52:20PM 5         **THE COURT:** That's what the defense would say, that

6    it has been decades ago and --

7         **MR. RODRIGUEZ:** Judge, if you're trying to

8    determine --

9         **THE COURT:** The Government is suggesting, you know,

01:52:29PM 10   there's no ability for redemption.  Obviously, guarantee --

11   it's like a bail consideration.  The way I can guarantee that

12   someone's not going to flee or not going to engage in criminal

13   activity is to lock everybody up.  And, you know, you can't do

14   that.

01:52:46PM 15        There's always a risk.  And I guess one of the

16   factors that eliminates risk is terms of supervision.

17        **MR. RODRIGUEZ:** But, Judge, I would argue two

18   things.  One is again it is not our burden in this proceeding

19   to show that Mr. Marks will not -- will be a danger.  It is

01:53:07PM 20   their burden to convince you that he will not be a danger,

21   number one.

22        Number two, you have to look at his prior conduct.

23   Your Honor has said in court many times when Your Honor has

24   sentenced defendant s, when Your Honor has been back on

01:53:21PM 25   supervised release violations where you tell them, yes, a lot

1  of people come in here and they promise me this will be the

2  last time, and Your Honor knows better than I that oftentimes

3  it is not.

4           You look at the defendant's prior behavior to gauge

01:53:38PM 5  what his future behavior will be.  And with respect to this

6  defendant, unlike any other defendant that I've been able to

7  find who has been released early under this changed law, that

8  this defendant has engaged in criminal activity, has engaged

9  in violent activity while incarcerated.  Not just pretrial,

01:54:00PM 10  not just presentence, but post-sentence.

11           While in BOP he was, if I count correctly, he was

12  charged five times.  I'm not talking about the stuff that

13  happened recently in Lexington.  He was charged five times

14  with disciplinary violations.  As I recall, one was for trying

01:54:20PM 15  to bribe a guard.  I think that was the last one in 2013.

16           And then the other four related to violence.  He

17  was fighting in one of them.  I think at least one of them

18  involved an assault.

19           So this is not a defendant if Your Honor -- Your

01:54:33PM 20  Honor always does this -- Your Honor is trying to look into

21  the future, in some ways read your crystal ball and say what

22  can I expect this man to do if I release him?  You have to

23  consider what he's done in the past.  And what he's done in

24  the past is violate.

01:54:50PM 25           Now, Judge, Your Honor -- and I'm gonna talk about

1  this street punk notion because I think it's an important one.

2  I think the first time it was used, I think it was in Your

3  Honor's letter to the Clemency Unit.  Mr. Gleeson picked it up

4  in his papers, and Mr. Marks is running with it.

01:55:12PM 5         What's that mean?  Mr. Marks when he was engaging

6  in his criminal activity -- we need to go back and remember,

7  he wasn't just some street urchin who was on the street doing

8  the bare minimum to survive and stay alive.

9         You'll recall that this man had a roofing business,

01:55:33PM 10  it's in the presentence report, he had a roofing business, a

11  construction business, and he also had that pizza shop.

12         So the notion that Chad Marks had no options, that

13  he was completely out in the world and really had nothing --

14  no chance but to -- but to break the law is not him.

01:55:53PM 15         Now, if you say a street punk is simply somebody

16  who was young and should have known better, he's a bright guy.

17  Your Honor knows this as well as I do.  You have read his

18  letters.  We've seen the letters to counsel.

19         Remember when we did the hearing where we were

01:56:12PM 20  trying to determine whether he would take 20 years or not?

21  Ms. Harrington provided us the letters.  He would submit legal

22  arguments to Don Thompson.  He would argue with Don Thompson

23  about what his guideline ranges should be.

24         So, again, Judge, I respectfully challenge the

01:56:30PM 25  notion that he was a street punk if street punk means just

1  some violent little thug who didn't know any better.

2          This man knew better, and he knew better after he

3  was sentenced when he engaged in violence in the prison.

4          **THE COURT:**  I'm not sure my use of the term street

5  punk was -- I mean, he was engaged in many bad acts, he was a

6  punk.  I mean, whether we, you know, get stuck on semantics, I

7  accept your point.  He was --

8          **MR. RODRIGUEZ:**  And he beat up people, Judge.  I

9  mean, he beat up Dominic Malia.  He bragged about it.

10          **THE COURT:**  I remember.

11          **MR. RODRIGUEZ:**  And Dominic Malia had to go to the

12  hospital twice as a result of what Chad Marks did to him.

13          In his papers, the things in his letters he -- I'm

14  embarrassed, I'm embarrassed by some of the things I said.

15          Things he said?  How about the things he did?  It's

16  not just those horrible letters that he wrote to his wife

17  about what he was gonna do to those little girls and to his --

18  excuse me for the language, but it's his -- to his -- to her

19  nigger, Spic boyfriend when he got out.  It's not just the

20  words he used.  It's his actions to follow those words.

21          Now, I'll end here , Judge, and I need to be a

22  little careful because I in no way -- and I mean this -- I in

23  no way want to suggest that you're in any way gullible or that

24  you don't understand human nature.  I understand a lot better

25  than I ever will.

1          **THE COURT:** Go ahead and say whatever you want to

2   say.

3          **MR. RODRIGUEZ:** But it's important to point out from

4   the very earliest times that he was incarcerated this

01:58:16PM 5   defendant intended to play up religion because he knew you

6   were a religious man.

7          It's in his correspondence.  He wrote it.  He told

8   this inmate -- he wrote it in a letter to Don Thompson.  He

9   wrote it in a letter to Don Thompson where he pointed out that

01:58:34PM 10   he's gonna take religion classes in order to try to get a

11   reduced sentence.

12          **THE COURT:** I'm not really all that religious.

13          **MR. RODRIGUEZ:** What's that?

14          **THE COURT:** I'm not really all that religious.

01:58:45PM 15          **MR. RODRIGUEZ:** Well, he thinks you are, which is

16   obvious by his letters to the Court, which is obvious by the

17   first statement he made when he came up here.  He started

18   quoting Jesus Christ.  He starts his letters quoting the Lord

19   and ends his letters quoting the Lord.  He clearly is trying

01:58:59PM 20   to appeal to what he thinks Your Honor feels strongly about.

21          And the thing is, Judge, he has been doing this

22   from the very outset of this case.  Ms. Chartier attached

23   certificates of the classes that he took, it's part of the

24   record, I've got them somewhere here, the classes that he took

01:59:24PM 25   when he was incarcerated.  I think they're Exhibit G to maybe

1   the defendant's submissions.

2          I've got them here, the defendant's sentencing

3   submissions.  And back then Chad Marks attached a certificate

4   from Growing Kids God's Way January of 2004.

01:59:48PM  5          A certificate from Clean Ministry Addictive

6   Recovery Program, January 2004.

7          Certificate about anger management.

8          A certificate from Good News Jail and Prison

9   Ministry, Bible correspondence course.

02:00:05PM 10          And I would have asked him all this, by the way, on

11  cross-examination, but I didn't get a chance.

12          Another certificate from Good News Bible

13  correspondence course, this one was for the Gospel of John  --

14  first one was the Gospel of John - Unit I; the Gospel of John

02:00:19PM 15  - Unit II; Gospel of John - Unit IV; Philippians; the Epistle

16  of 1 John; Thessalonians; Romans - Unit I; Ephesians; and

17  Gospel of John - Unit III.

18          What's interesting about this is that at the same

19  time that he was taking these classes, Judge, at the same time

02:00:48PM 20  he was taking these classes he was assaulting fellow inmates

21  at BOP and at Batavia, and he was sending letters threatening

22  to rape his wife, to torture little girls and to cut off the

23  penis of his wife's boyfriend and shove it down the throat of

24  his daughter.

02:01:06PM 25          So he can sit here and cite hundreds of hours of

1 classes that he's taken while in prison.  Mr. Wascher pointed

2 out that that in no way suggests that a person is not

3 dangerous or won't be.

4 But he's been playing this game from the very

02:01:27PM 5 outset and I respectfully submit that he is continuing to play

6 it, and that if you release him none of -- none of these

7 classes will in any way be determinative of how he will behave

8 when he gets out.

9 The last point, and I'm gonna rest on the papers,

02:01:46PM 10 Judge, that I submitted with my briefs both in my initial memo

11 and in my reply memo, this is his motion, but when Your Honor

12 decides it I would ask Your Honor to also think about some of

13 the other remarks, which is the community in which he will be

14 put and the people who he threatened to kill and to torture

02:02:11PM 15 and rape.  He wrote these threats.  They are in his

16 handwriting.

17 And those people are out there and they will be

18 literally at his mercy when he comes out.  And no ankle

19 bracelet, no home confinement, nothing short of keeping him in

02:02:34PM 20 will ensure that they are not hurt while he gets out.

21 This man does not deserve early release, not under

22 the law, nor does he deserve early release as a result of who

23 he is.  He is a dangerous person who knows how to play the

24 game and he should remain inside, incarcerated for the 40

02:02:56PM 25 years that Your Honor correctly sentenced him to in 2011, I

1  believe.  Thank you, Judge.

2            **MR. GLEESON:** Judge, can I be heard briefly?

3            **THE COURT:** Just two minutes.

4            **MR. GLEESON:** Two minutes, okay.

02:03:10PM 5            **THE COURT:** Maybe four.

6            **MR. GLEESON:** I'll do it.  If nothing short of

7  keeping him in would protect those people, then Mr. Rodriguez

8  wouldn't have offered a 20 year deal because all those threats

9  existed back when that deal was offered.

02:03:24PM 10            Second, Judge, please don't regard the relief we're

11  asking for as extraordinary.  It just seems that way because

12  judges can be judges again.

13            And I don't want to quibble with the Court, 3582(c)

14  wasn't expanded.  It was used as a vehicle for release for --

02:03:47PM 15  for people of advanced age with infirmities only because those

16  were the only circumstances in which BOP opened the door.  It

17  has always been a safety valve.  It just was never used that

18  way.

19            Of course, if a guarantee that people would not

02:04:05PM 20  recidivate were a condition precedent for them leaving prison,

21  no one would ever leave prison.

22            Second, the one thing I'll mention that hasn't been

23  mentioned, you know, you can rely on social science about

24  violent crimes and recidivation and how age -- people age out

02:04:21PM 25  of violent crime.

1            And if you look at the social science, and I'm

2  happy to brief this if the Court finds it helpful, Chad Marks

3  has aged out of violent crime.

4            This whole thing about the game, it's just -- it's

02:04:38PM 5  so much more cynicism -- and let me just use Mr. Rodriguez's

6  argument myself.  In 2004 there was programming and at the

7  same time he was taking -- he was engaging in violent conduct.

8            From 2013 forward, really the last bit of violence

9  in his record is July of 2010.  From 2010 forward he's

02:05:06PM 10  engaging in programming, but there's no violence, there's no

11  hints of the sort that this -- that this argument suggests.

12            I'll suggest to you that take the same rubric that

13  Mr. Rodriguez has placed before the Court and it shows that

14  Mr. Chad Marks has, in fact, changed.

02:05:27PM 15            Last thing I'll do, I don't know how far into my

16  four minutes I am, I'm going to suggest to the Court that the

17  one thing that crystallizes the Government's approach to this

18  case is what Mr. Rodriguez said when he stood up.  This is a

19  criminal case.  This is a federal criminal case in a federal

02:05:48PM 20  courtroom and you've been asked by the Government to hold Chad

21  Marks' silence against him.

22            That is just jaw dropping.  It is so fundamentally

23  wrong, so fundamentally revealing of how far -- how invested

24  the Government has become in this case.

02:06:09PM 25            I urge the judge to exercise -- I urge the Court to

1  exercise the discretion that's been afforded you.  It's not

2  extraordinary.  This is exactly the sort of safety valve

3  Congress originally had in mind and has finally allowed direct

4  access to the courts for you to invoke.  Thank you.

02:06:28PM 5             **THE COURT:** Thank you.

6             **MR. RODRIGUEZ:** One last thing.

7             **THE COURT:** Everybody wants the last word.

8             **MR. RODRIGUEZ:** It will be ten seconds long.

9             **THE COURT:** What?

02:06:35PM 10            **MR. RODRIGUEZ:** Ten seconds long.

11            He was not silent.  He has never been silent.  He

12  got up here and spoke.  What he did not do was swear and allow

13  himself to be cross-examined.  So the notion that somehow

14  we're questioning his right to remain silent, he didn't

02:06:50PM 15  exercise that right.  He got up and spoke.

16            He sent Your Honor countless letters.  I wanted a

17  chance to cross-examine him, and they chose not to do it under

18  oath.

19            **THE COURT:** All right, thank you all.  As I think I

02:07:06PM 20  indicated before, the Court's not prepared to rule today.

21  There are many factual and legal issues the Court has to

22  decide.  I will reserve.  This has been pending for some time.

23  I know all have an interest in its prompt resolution, and I

24  will tend to it promptly.

02:07:25PM 25            Two things.  Rules of evidence in these proceedings

1    don't appear to apply and I would think -- both sides had two

2    exhibits.  They weren't formally moved, but I think they

3    should all be just part of the record.

4              **MR. RODRIGUEZ:** I don't have a problem with that

02:07:48PM 5    Judge.  I think --

6              **THE COURT:** 1 and 2 and Exhibit A and B.

7              **MR. GLEESON:** Agreed.

8              **MR. RODRIGUEZ:** No objection.

9              **THE COURT:** All right. I think I have --

02:07:58PM 10            **MR. GLEESON:** Yeah.

11             **THE COURT:** Well, Exhibit A I have because that was

12   part of the Government's filing.  Exhibit B I have a copy

13   here.  And Exhibit 1.

14             **MR. RODRIGUEZ:** 1 and 2, Judge.  I've got -- I've

02:08:18PM 15   got copies.  Can I hand them up?

16             **THE COURT:** Okay.  I don't think -- was Exhibit 1

17   attached to your papers at any point?

18             **MR. GLEESON:** Is 1 the incident report?

19             **MR. RODRIGUEZ:** Yes.

02:08:30PM 20            **MR. GLEESON:** That was attached to our reply brief,

21   Judge.

22             **THE COURT:** Exhibit 2, the affidavit of Wascher, was

23   attached.

24             **MR. RODRIGUEZ:** It was attached to my papers.

02:08:38PM 25            **THE COURT:** So I guess I have those.

1          **MR. GLEESON:** Judge, could you do whatever you can,

2    please, to have him sent back to the --

3          **THE COURT:** That's the second thing I was going to

4    talk about.  I don't see any reason for Mr. Marks to be in

02:08:53PM 5    Youngstown.  He could be removed to FMC Lexington or wherever

6    the Bureau of Prisons believes he should be incarcerated.

7          **MR. GLEESON:** That's our request.

8          **THE DEFENDANT:** Thank you, Your Honor.

9          **MR. GLEESON:** Thank you.

02:09:08PM 10          **THE COURT:** All right, Mr. Marks, the Court will --

11    I promise you that I will examine all the issues in this case

12    carefully.  It's obviously most important to you, but it's

13    important to counsel and the Court as well.

14          Thank you.  Have a nice holiday everyone.  Have

02:09:29PM 15    safe travels.

16          **MR. GLEESON:** Thank you, Judge.

17          **MS. HARRINGTON:** Thank you, Your Honor.

18          (**WHEREUPON**, proceedings adjourned at 2:09 p.m.)

19                    *    *    *

20

21

22

23

24

25

1        **CERTIFICATE OF REPORTER**

2

3            In accordance with 28, U.S.C., 753(b), I certify

4   that these original notes are a true and correct record of

5   proceedings in the United States District Court for the

6   Western District of New York before the Honorable David G.

7   Larimer on December 17th, 2019.

8

9   S/ Christi A. Macri

10  Christi A. Macri, FAPR-CRR
    Official Court Reporter
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25