UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

                                    Plaintiff,

                                                              <u>DECISION AND ORDER</u>

                                                              03-CR-6033L

                v.

CHAD MARKS,

                                    Defendant.
_____

        In 2006, defendant Chad Marks was convicted after a jury trial on various charges

involving drug and firearms offenses.  He was sentenced principally to a forty-year term of

imprisonment.

        Since his conviction, Marks has filed several motions seeking either to overturn his

conviction or to reduce his sentence.  Principally, he has moved to reduce his sentence pursuant

to 18 U.S.C. § 3582(c)(1)(A)(I).  (Dkt. #498.)


                                **BACKGROUND**

**I. Procedural Background**

        This case began with the filing of a criminal complaint in February 2003.  Indictments

were later filed, and Marks was charged, along with three codefendants, with various drug and

firearms offenses.

        All of Marks's codefendants eventually entered into plea deals, and pleaded guilty to

some of the charges against them, in exchange for some benefit at sentencing.

Although Marks engaged in "protracted plea negotiations" with the Government, *United States v. Marks*, 561 Fed.Appx. 42, 43 (2d Cir. 2014), he and the Government never reached a plea agreement.  At one point, the Government offered Marks a deal with a 20-year sentence, which, though objectively lengthy, was well below the maximum sentence that Marks was facing.  That offer, and another alleged offer, became the subject of later litigation, mostly concerning the communication, or lack thereof, among Marks, his then-attorney, and the Government.[1]

But as stated, Marks and the Government never entered into a plea agreement.  Marks went to trial in 2006, and was convicted by a jury on seven counts.  (Dkt. #255).

The Court sentenced Marks principally to a term of forty years imprisonment.  The forty-year sentence was the minimum permitted under the sentencing statutes then in effect.  Much of that was due to the "stacking" of multiple mandatory sentences for violations of 18 U.S.C. § 924(c), relating to possession of a firearm in furtherance of a drug trafficking crime.  *See United States v. Rivera-Ruperto*, 852 F.3d 1, 25 (1ˢᵗ Cir. 2017) (explaining "stacking") (Torruella, C.J., dissenting).

In February 2019, Marks filed a *pro se* motion (Dkt. #491) to reduce his sentence, based largely on a decision from the Eastern District of New York, *United States v. Holloway*, 68 F.Supp.3d 310 (E.D.N.Y. 2014).  In *Holloway*, the district court granted relief to a defendant who had been sentenced in 1996 to a mandatory term of 57 years under § 924(c), for three separate carjackings over a two-day period.

---

[1] Marks has filed a *pro se* motion for relief under 28 U.S.C. § 2255, based largely on alleged ineffective assistance of counsel in connection with the plea negotiations.  That motion will be addressed in a separate decision.

In 1999, defendant Holloway brought a collateral attack against his sentence under 28 U.S.C. § 2255, which the district court denied.  In 2012, he filed a motion to reopen his § 2255 proceeding under Fed. R. Civ. P. 60(b).  "Recognizing that there were good reasons to revisit Holloway's excessive sentence [as described in detail by the court] but no legal avenues or bases for vacating it," then-District Judge John Gleeson[2] (who later retired from the bench and is now representing Marks) issued an order requesting that the United States Attorney "consider exercising her discretion to agree to an order vacating two or more of Holloway's 18 U.S.C. § 924(c) convictions."  *Id.* at 314.  In so doing, the court stated that "cases like Holloway's produce sentences that would be laughable if only there weren't real people on the receiving end of them."  *Id.* at 312.

The Government in *Holloway* ultimately agreed not to oppose the defendant's motion to vacate two of his convictions.  The court afterwards entered an amended judgment to that effect, and reduced the defendant's term to about 30 years from the original 57-year term.  *Id.* at 314-15; *United States v. Holloway*, No. 95 Crim. 78 (E.D.N.Y. Aug. 7, 2014) (Dkt. #259) (Amended Judgment).  In doing so, the court expressly "applaud[ed]" the prosecutor's exercise of her discretion, *id.* at 311, observing that while "[i]t is easy to be a tough prosecutor," in the sense that "[p]rosecutors are almost never criticized" for being *too* "tough," the prosecutor in *Holloway* had "the wisdom and courage" to help remedy an injustice.  *Id.* at 316.

In the case at bar, this Court issued an Order on March 14, 2019 (Dkt. #493), citing *Holloway* and requesting the United States Attorney for the Western District of New York to

---

[2] Judge Gleeson retired from the Eastern District of New York in 2016 and entered private practice with the New York City firm Debevoise & Plimpton.  He is now proceeding as co-counsel in this case involving Chad Marks, presumably in a *pro bono* capacity.

"carefully consider exercising his discretion to agree to an order vacating one of Marks' two

Section 924(c) convictions," so as to avoid "the mandatory 25-year term [on the second

conviction] that is now contrary to the present provisions of the statute," *i.e.*, § 924(c), as

amended by the First Step Act. *Id.* at 4.

The United States Attorney never formally responded to the Court's Order and

suggestion, but the Government's position is crystal clear from its filings and steadfast

opposition to Marks's motion. Given the Government's continued, unyielding characterization

of Marks as "a dangerous and violent man," (Dkt. #503 at 1), and "a liar, perjurer and an

obstructer of justice," *id.* at 2, who "remains a criminal," *id.*, and its position that Marks "is not

entitled to and does not deserve any more mercy," *id. at* 23, it is obvious that the Government

will never consent to vacating one of Marks's § 924(c) convictions, or to any other relief for

Marks. It seems highly unlikely that the Government ever took seriously this Court's request

that it "carefully consider" doing so.

Be that as it may, that avenue of relief is thus foreclosed in this case. Absent the

Government's consent (or some other independent ground), this Court has no authority to vacate

any of Marks's convictions. *See United States v. Barnett*, No. 90-cr-913, 2020 WL 137162, at

*4 (Jan. 13, 2020) (stating that "*Holloway* does not create an independent avenue for relief," and

that because "the Government does not consent to *Holloway* relief in this case, ... Barnett's claim

fails"), *appeal filed*, (2d Cir. Feb. 10, 2020); *United States v. Vallejo*, No. 02-CR-1188, 2019 WL

2717107, at *3 (E.D.N.Y. June 28, 2019) ("the Court does not have the discretion to vacate his

conviction or sentence pursuant to *Holloway* without the Government's consent"); *Acuna v.

United States*, No. 07-cr-00615, 2016 WL 3747531, at * 3 (D. Haw. July 8, 2016) ("The

Government's approval is an essential element in granting relief under the *Holloway* decision"). While the Court agrees with much of the reasoning underlying the *Holloway* decision, the Court's present decision does not rest upon *Holloway*.

But that does not necessarily mean that Marks is barred from all relief. In addition to his *pro se* motion to reduce his sentence, he has also filed a motion, through counsel, to reduce his sentence pursuant to 18 U.S.C. § 3582(c)(1)(A)(I). (Dkt. #498.) That motion is based in large part on the First Step Act of 2018, which is discussed below.

## DISCUSSION

### I. First Step Act

Since Marks's conviction, the legal landscape has changed in significant ways, as the result of Congressional action. Most notably, in December 2018, the President signed into law the First Step Act of 2018 ("FSA" or "Act"). That "act was the culmination of several years of congressional debate about what Congress might do to reduce the size of the federal prison population while also creating mechanisms to maintain public safety." Congressional Research Service, "The First Step Act of 2018: An Overview" (Mar. 4, 2019), *available at* https://crsreports.congress.gov.

The FSA effected a number of changes in several areas, including federal sentencing law. For one, the Act eliminated the so-called "stacking" provision of 18 U.S.C. § 924(c)(1)(C), under which a defendant convicted of multiple § 924(c) charges at the same time was subject to higher mandatory minimum penalties for each subsequent count, even if he had no prior § 924(c) convictions. Instead of automatically triggering a 25-year sentence for a second, but

concurrently imposed § 924(c) conviction, the FSA requires the existence of a prior § 924(c) conviction "that has become final," before "stacking" can occur. 18 U.S.C. § 924(c)(1)(C)(I); *United States v. Jackson*, Crim. No. 99-15, 2019 WL 6245759, at *5 (S.D.W.Va. Nov. 21, 2019).

The FSA also made certain provisions of the Fair Sentencing Act of 2010 retroactive to the effective date of the latter act, *i.e.*, August 3, 2010, so that currently incarcerated offenders who received longer sentences for possession of crack cocaine than they would have received if sentenced for possession of the same amount of powder cocaine before the enactment of the Fair Sentencing Act can submit a petition in federal court to have their sentences reduced. *See* First Step Act § 404 (authorizing a defendant to file a motion in the sentencing court to "impose a reduced sentence as if sections 2 and 3 of the Fair Sentencing Act of 2010 were in effect at the time the covered offense was committed").

Otherwise, however, the First Step Act does not provide for retroactive relief. For all offenses other than those falling within the ambit of sections 2 and 3 of the Fair Sentencing Act, the sentencing reform provisions of the FSA benefit only individuals who were convicted following the effective date of the Act, *i.e.*, December 21, 2018. *See* First Step Act §§ 401(c), 402(b), 403(b); *United States v. Contreras*, 332 F.R.D. 712, 713 (D.N.Mex. 2019). Thus, the changes made regarding the "stacking" of § 924(c) offenses are not retroactive. *See Baugh v. United States*, No. 16-cv-2628, 2020 WL 409728, at *5 n.5 (M.D.Tenn. Jan. 24, 2020), *appeal filed*, No. 20-5313 (6th Cir. Apr. 20, 2020).

Another major change brought about by the First Step Act involves the availability of so-called "compassionate release." Prior to the enactment of the FSA, a court could revisit a previously-imposed sentence if the Bureau of Prisons ("BOP") filed a motion to reduce the

sentence, and if the court concluded, based on criteria established by the U.S. Sentencing

Commission, that "extraordinary and compelling reasons" warranted a sentence reduction. *See*

28 U.S.C. § 994(t), 18 U.S.C. § 3582(c)(1)(A).

One of the FSA's most significant changes concerning compassionate release is that

motions for reduction of sentence under § 3582 can now be brought by the defendant, if certain

conditions are met.[3]  Previously, defendants had to submit a petition to the BOP director, who

could decide whether to file a motion in district court. *See United States v. Brown*, 411

F.Supp.3d 446, 448 (S.D.Iowa 2019) (citing United States Sentencing Guidelines Manual

§ 1B1.13 cmt. n.4 (2018)).  If the director declined to do so, the defendant could not challenge

that decision in federal court. *See*, *e.g.*, *Orlansky v. FCI Miami Warden*, 754 Fed.Appx. 862,

866-67 (11th Cir. 2018) (stating that the BOP had "unreviewable discretion" in that regard)

(quoting *Turner v. United States Parole Comm'n*, 810 F.2d 612, 618 (7th Cir. 1987)).

Now, defendants themselves may bring a motion for reduction of their sentence.  As

amended by the First Step Act, 18 U.S.C. § 3582(c)(1)(A)(I) permits a court to consider such a

motion either when the motion is made by the BOP, as before, or "upon motion of the defendant

after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau

of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of

such a request by the warden of the defendant's facility, whichever is earlier." *Id.*

---

[3] Although relief under the statute is commonly referred to as "compassionate release," such relief is not limited to immediate release, but includes a reduction in sentence. *See United States v. Shmuckler*, No. 11-cr-344, 2019 WL 6257959, at *2 n.5 (E.D.Va. Nov. 22, 2019) ("The BOP uses the terms 'compassionate release' and 'reduction in sentence' interchangeably, and the Court will do the same") (citation omitted), *appeal filed*, No. 19-7786 (4th Cir. Dec. 5, 2019).

§ 3582(c)(1)(A).[4]  There is no dispute that Marks filed the appropriate request for compassionate

release with the warden of his facility, and the Government does not contend otherwise.

So it is clear that now, both the BOP and the defendant may file a motion for

compassionate release.  What is less so is whether and to what extent the FSA effected any

changes with respect to how courts can or should decide motions under § 3582(c)(1)(A)(I),

particularly whether courts are bound by the criteria established by the Sentencing Commission

for determining what constitutes "extraordinary and compelling reasons" for sentence reduction.

Section 3582(c)(1)(A) provides that "the court ... may reduce the term of imprisonment

(and may impose a term of probation or supervised release with or without conditions that does

not exceed the unserved portion of the original term of imprisonment), after considering the

factors set forth in section 3553(a) [concerning the factors to be considered in imposing a

sentence] to the extent that they are applicable, if it finds that ... extraordinary and compelling

 reasons warrant such a reduction ... ."

Congress never defined what constitutes "extraordinary and compelling" reasons.

Instead, Congress directed the Sentencing Commission to promulgate "the criteria to be applied

and a list of specific" examples.  28 U.S.C.  § 994(t).  The only specific instruction set forth by

---

[4] Section 3582(c)(1)(B) also provides that "the court may modify an imposed term of
imprisonment to the extent otherwise expressly permitted by statute ... ."  There is authority that
"[t]he First Step Act provides such an express authorization ... ."  *United States v. Butler*, __
Fed.Appx. __, 2020 WL 1074722, at *1 (6th Cir. 2020).

    Neither side here suggests that § 3582(c)(1)(B) controls this case, and since the First
Step Act's retroactivity provisions do not directly apply to Marks, I conclude that the relevant
provision is § 3582(c)(1)(A).  In any event, § 3582(c)(1)(B) simply provides a "vehicle for
sentence reductions sought under the First Step Act," *United States v. Lewis*, __ F.Supp.3d __,
2020 WL 128580, at *31 (D.N.M. 2020) (quotation omitted), and does not set forth independent,
substantive standards for granting relief.

Congress is that "[r]ehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason."  *Id.*

Pursuant to Congress's direction, and prior to the First Step Act, the Sentencing Commission established four categories of circumstances in which, in the Commission's view, "extraordinary and compelling reasons exist."  U.S. Sentencing Guidelines ("USSG") Manual § 1B1.13 cmt. n.1 (U.S.S.C. 2018).  Those relate generally to:  the defendant's medical condition; the defendant's age; the defendant's family circumstances; and any other reason that the BOP director determines to be extraordinary and compelling.  *Id.*  What circumstances might otherwise be deemed "extraordinary and compelling" under that last, catch-all provision, were not further clarified, but were left to the BOP director to determine.  *See United States v. Rodriguez*, No. 2:03-cr-271, 2020 WL 1627331, at 2 (E.D.Pa. Apr. 1, 2020).  Those categories under the USSG have not been updated since the FSA was enacted in 2018.

Courts have reached different conclusions about whether, in the wake of the FSA, courts considering a § 3582(c) motion for reduction of sentence are limited to the four sets of circumstances set forth by the Sentencing Commission.  Some courts have held that the FSA allows the court to grant such a motion only if the BOP director could have done so under the law as it existed prior to the enactment of the FSA.  In other words, those courts conclude that judges' discretion is constrained by the Sentencing Commission's previously established categories, and may not stray beyond the specific instances listed in the Commission's comment to § 1B1.13.  *See*, *e.g.*, *United States v. Willingham*, No. CR113-010, 2019 WL 6733028, at *2 (S.D.Ga. Dec. 10, 2019); *United States v. Lynn*, No. CR 89-72, 2019 WL 3805349, at *4 (S.D.Ala. Aug. 13, 2019), *appeal dismissed*, 2019 WL 6273393 (11th Cir. 2019).

Other courts have taken a different view, concluding that courts are no longer bound by the specific categories identified by the Sentencing Commission prior to the enactment of the First Step Act. *See*, *e.g.*, *United States v. Schmitt*, No. CR12-4076, 2020 WL 96904, at \*3 (N.D.Iowa Jan. 8, 2020); *United States v. Beck*, No. 13-CR-186, 2019 WL 2716505, at \*6 (M.D.N.C. June 28, 2019).  Those courts appear to be part of a growing consensus. *See United States v. Young*, No. 00-cr-00002, 2020 WL 1047815, at \*6 (M.D.Tenn. Mar. 4, 2020) ("a majority of the district courts that have considered the issue have ... held, based on the First Step Act, that they have the authority to reduce a prisoner's sentence upon the court's independent finding of extraordinary or compelling reasons") (citing cases).  For the reasons that follow, I agree with those courts.

First, USSG § 1B1.13, which implements Congress's directive in 28 U.S.C. § 994(t), presupposes that the motion for reduction of sentence before the court was brought by the BOP director. *See id.* (stating that the court may reduce a term of imprisonment "[u]pon motion of the Director of the Bureau of Prisons ..."), and *id.* cmt. n.4 ("A reduction under this policy statement may be granted only upon motion by the Director of the Bureau of Prisons").  As stated, the fourth catch-all category set forth by the Sentencing Commission is that "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in [the other three categories]."

But now, the defendant himself may bring a motion for relief, regardless of whether the BOP director considers such relief appropriate.  To say that the court is restricted to the four sets of circumstances set out by the Sentencing Commission would essentially nullify the fourth

category as to motions brought by defendants, since the director's failure to bring a motion presumably means that the director does not believe that any extraordinary and compelling reason exists.

Such a result hardly seems consonant with Congress's intent in passing the First Step Act. Notably, the title of the Act is "Increasing the Use and Transparency of Compassionate Release." Simply by giving prisoners direct access to the courts, the Act went some way toward achieving that end. But given the procedural hurdle that defendants must clear–that the BOP first deny or fail to act on a request made to the BOP–limiting the fourth criterion to the BOP director's judgment as to whether a motion is warranted would hardly accomplish much. Courts have repeatedly noted that motions for compassionate release have rarely been filed by the BOP. *See United States v. Rivernider*, 2020 WL 597393, at *3 (D.Conn. Feb. 7, 2020); *Brown*, 411 F.Supp.3d at 450 (noting that the Act's title is "especially valuable" in evaluating Congress's intent in light of the BOP's long and criticized history of rarely granting compassionate-release petitions). It seems likely that the BOP's parsimony in that regard was one reason for Congress's decision to allow prisoners to file motions directly. The statute's caption emphasizes Congress's intent to increase the use of compassionate release, not decrease it by being cabined by the limited set of considerations that were relevant under prior law. It is manifest that Congress did not want the court's power to reduce a previously-imposed sentence to be so sparingly used as to render it practically ineffectual.

As far back as the passage of the Comprehensive Crime Control Act of 1984, Congress has sought to provide a means for courts to address "the unusual case in which the defendant's circumstances are so changed ... that it would be inequitable to continue the confinement of the

prisoner." S. Rep. 98-225, at 96 (Aug. 4, 1983). *See also id.* at 41 ("The Committee believes that there may be unusual cases in which an eventual reduction in the length of a term of imprisonment is justified by changed circumstances. These would include ... cases in which ... extraordinary and compelling circumstances justify a reduction of an unusually long sentence").

Before the passage of the First Step Act, the Sentencing Commission also "encourage[d] the Director of the Bureau of Prisons to file such a motion if the defendant [met] any of the circumstances set forth" by the Commission. In doing so, the Commission observed that "[t]he court is in a unique position to determine whether the circumstances warrant a reduction (and, if so, the amount of reduction), after considering the [relevant] factors ... ." USSG § 1B1.13 cmt. n. 4.

As stated, however, in practice the BOP rarely filed such motions. When it passed the FSA, Congress was presumably aware that what it had envisioned as a useful safety valve, *see* S. Rep. 98-225 at 121, was too often stuck in the "closed" position. That Congress sought to increase the use of compassionate release thus suggests that the Court should take a more expansive than restrictive approach toward its ability to grant relief under the Act. *See United States v. Maumau*, No. 08-cr-758, 2020 WL 806121, at *4 ("continuing to give the Bureau of Prisons Director a veto over such requests would defeat this goal"); *United States v. Rodriguez*, __ F.Supp.3d __, 2019 WL 6311388, at *7 (N.D.Cal. Nov. 25, 2019) ("Congress knew that the BOP rarely granted compassionate release petitions, and the purpose of the FSA was to allow defendants to file motions in district courts directly even after the BOP Director denies their petition"); *Brown*, 2019 WL 4942051, at *3 ("[T]he only way direct motions to district courts would increase the use of compassionate release is to allow district judges to consider the vast

variety of circumstances that may constitute 'extraordinary and compelling'") (internal citation and quotation marks omitted).  What constitutes an "extraordinary and compelling" reason for a reduction may vary widely, depending on the particular circumstances relating to the petitioning defendant.

It should also be noted that the Sentencing Commission's failure to update or revise the relevant criteria may not be the result of a deliberate decision by the Commission.  As several district courts have pointed out, the Commission currently has only two voting members, two shy of the four that it needs to amend the Guidelines.  *See United States v. Webster*, No. 91cr138, 2020 WL 618828, at *4 n.3 (E.D.Va. Feb. 10, 2020); *Brown*, 411 F.Supp.3d at 449 n.1.  While it seems likely that Congress intended that the Sentencing Commission issue updated criteria, as a practical matter that simply cannot happen right now.

For these reasons, I concur with those courts that have concluded that the court is not bound by the USSG's statements concerning release.  In particular, the fact that the BOP director has not found extraordinary and compelling reasons to exist does not constrain the court's ability to decide that question, independently.  That is particularly so given the now-advisory nature of the Sentencing Guidelines.  *See United States v. Gagne*, No. 3:18-cr-242, 2020 WL 1640152, at *3 (D.Conn. Apr. 2, 2020) (stating that "'extraordinary and compelling' circumstances may exist outside of those circumstances delineated by the U.S. Sentencing Commission, given the advisory nature of the guidelines, and their conflict with the statutory language of the First Step Act amendments") (citing *United States v. Booker*, 543 U.S. 220 (2005)), *appeal filed*, No. 20-1169 (2d Cir. Apr. 8, 2020).

In short, when a defendant brings a motion for sentence reduction based on extraordinary and compelling circumstances, the court effectively steps into the shoes of the BOP director, and makes its own determination.  *See Dinning v. United States*, No. 2:12-cr-84, 2020 WL 1889361, at *2 n.1 (E.D.Va. Apr. 16, 2020) ("this Court has the discretion to provide relief to petitioners who do not fall directly within the Sentencing Commission's current policy statement"); *Schmitt*, 2020 WL 96904, at *3 ("although the Guideline provides helpful guidance on what constitutes extraordinary and compelling reasons, it is not conclusive given the recent statutory changes"); *United States v. Gonzales*, No. 05-CR-561, 2019 WL 5102742, at *3 (W.D.Tex. Oct. 10, 2019) (stating that just as with "all sentencing decisions, a judge should consider the Guidelines" but is not bound by them, the court would consider U.S.S.G. § 1B1.13, but would not consider itself bound by that guideline); *Brown*, 2019 WL 4942051, at *4 (Sentencing Commission's prior interpretation of "extraordinary and compelling reasons" is informative, but not dispositive); *Beck*, 2019 WL 2716505, at *6 ("While the old policy statement provides helpful guidance, it does not constrain the Court's independent assessment of whether 'extraordinary and compelling reasons' warrant a sentence reduction under § 3582(c)(1)(A)(I)").  *See also United States v. Maumau*, No. 08-cr-758, 2020 WL 806121, at *4 n.5 (D.Utah. Feb. 18, 2020) (stating that even prior to the First Step Act, courts were not "a rubber stamp for compassionate release decisions made by the Bureau of Prisons," and that the Act does not represent "a new grant of discretion," but "merely an increased opportunity [for courts] to exercise that discretion").

**II. Application to this Case**

**A. Preliminary Findings and Additional Background**

Marks has met the exhaustion requirement for bringing a motion for relief under § 3582.

Marks has submitted a copy of a July 9, 2019 response from the warden of his facility to Marks's

request for consideration for a reduction in sentence, stating that Marks "do[es] not meet the

criteria" for such relief.  (Dkt. #498-2.)  *See* 18 U.S.C. *§* 3582(c)(1)(A). The BOP has not filed a

motion on Marks's behalf.  The Government does not contend that Marks has failed to exhaust

his administrative remedies.  Thus, the Court may turn to the merits of Marks's motions.

As stated, the Court is not bound by the Sentencing Commission's views as to what

constitutes "extraordinary and compelling reasons" for sentence reduction.  There is no dispute

that Marks does not qualify for relief under the first three sets of circumstances, relating to his

medical condition, age, or family circumstances.  Marks was born in 1978, and there is no claim

that his health is poor or that he is needed to give care to his immediate family members.

Marks's motion is premised on the argument that apart from those categories, his

individual circumstances warrant a finding of extraordinary and compelling reasons to reduce his

sentence.  I agree.  There is growing authority from district courts throughout the country that

find extraordinary and compelling circumstances under circumstances very similar to Marks's.

First, Marks was subject to the "stacking" of offenses under 18 U.S.C. § 924(c)(1)(C).

As explained above, the First Step Act's elimination of stacking of such offenses is not

retroactive.  But it is worth noting that if Marks were sentenced today (or at any time after the

effective date of the FSA) for the same offenses, he would not be subject to the stacking

provisions of § 924(c)(1)(C).  That provides at least some indication of Congress's view of

whether such "stacking" generally produces just and desirable results.  Several courts have recently ruled that the *combination* of changes to the 'stacking' provisions of § 924(c), coupled with the defendant's rehabilitation, establish extraordinary and compelling conditions warranting a sentence reduction.  Marks deserves no less.  *See U.S.A. v. Defendants*, No. 99-CR-257, 2020 WL 1864906, at \*5-\*6 (C.D.Cal. Apr. 13, 2020) (concluding that the combination of factors raised by defendant's motion, including her rehabilitation and changes to the "stacking" provisions of § 924(c), established extraordinary and compelling conditions that qualified her for sentence reduction); *United States v. Decator*, Cr. No. 95-0202, 2020 WL 1676219, at \*3 (D.Md. Apr. 6, 2020) (concluding that defendant's post-sentencing rehabilitative conduct, "[c]ombined with the 'extraordinary and compelling' fact that most of Decator's lengthy sentence resulted from the now-eliminated practice of 'stacking' § 924(c) sentences," warranted relief under § 3582(c)(1)(A)(i)); *United States v. Chan*, No. 96-cr-00094, 2020 WL 1527895, at \*5 (N.D.Cal. Mar. 31, 2020) ("when the Court considers the record presented by Chan regarding his rehabilitation efforts in combination with the amendments to Section 924(c)'s stacking provisions, the Court concludes he has demonstrated extraordinary and compelling reasons to reduce his sentence"); *United States v. Redd*, No. 97-cr-00006, 2020 WL 1248493, at \*6 (E.D.Va. Mar. 16, 2020) (concluding that the "gross disparity between the sentence Mr. Redd received and the sentence he would have received after the First Step Act," due to Congress's elimination of "stacking" § 924(c) charges, were "extraordinary and compelling developments that constitute extraordinary and compelling reasons that warrant a reduction to Mr. Redd's sentence of incarceration").

Congress has also stated that "rehabilitation ... *alone*" may not be considered an extraordinary and compelling reason for reduction of sentence. While that clearly forecloses relief based solely on a defendant's efforts toward rehabilitation, it implies that rehabilitation *is* a factor that a court may consider, in conjunction with other relevant circumstances. *See*, *e.g.*, *Decator*, 2020 WL 1676219, at *4 (summarizing defendant's post-sentencing conduct, and stating that "[f]rom all accounts, Decator is a much different man today that he was when he participated in the armed bank robberies" of which he was convicted); *Redd*, 2020 WL 1248493, at *10 (granting motion to reduce sentence, and noting defendant's "demonstrated ... commitment to self-improvement," including "hundreds of hours [in] vocational programs, assisting others in their rehabilitative efforts, exhibiting solid work habits," and other accomplishments); *United States v. Perez*, No. 88-10084, 2020 WL 1180719, at *3 (D.Kan. Mar. 11, 2020) (granting a motion for reduction of sentence, and noting that defendant had a relatively clean disciplinary record in prison, had gained his GED and availed himself of various educational programs, and stating that although the defendant's rehabilitation alone was not a sufficient reason for release, "his conduct while in prison combined with the other facts and circumstances of his case shows that he poses no risk to public safety upon release").

On that score, this Court has already stated that "[i]n my more than 30 years as a district court judge, I have never known a prisoner to do more to make changes in his life while incarcerated." (Dkt. #493 at 3.) By all appearances, Marks has achieved "extraordinary accomplishments" at bettering himself. *Id.*

The Government takes a far different view. According to the Government, Marks "was and remains a dangerous and violent man," Gov. Mem. (Dkt. #503) at 1, who is "evil." (Dkt.

#523 at 46.). The Government portrays Marks's efforts at rehabilitation as little more than window dressing, aimed at currying undeserved favor from the Court.

In support of their respective positions, both sides have submitted evidence relating to Marks's history during his imprisonment. Marks has submitted proof that while in prison, he has successfully completed many courses of study, mentored other inmates, and been recognized for his achievements. *See* Dkt. #491. Marks has also submitted numerous letters from individuals with no obvious stake in the outcome of these proceedings, attesting to the good he has done for others during his imprisonment. *See* Dkt. #509, #510, #521, #524.

For its part, the Government relies first on evidence from Marks's trial. There is no question that the trial evidence showed that Marks engaged in serious criminal activities. At Marks's sentencing, the Court said as much, stating that Marks was "right at the heart" of a "large-scale drug conspiracy" that involved "weapons and violence at every step of the way ... ." Sentencing Tr. (Dkt. #368) at 40. The Court further found that a substantial sentence was warranted because of Marks's crimes. *Id.* at 41. None of that is in doubt or dispute.

The Government also contends that Marks's criminal behavior has continued during his imprisonment. In general, however, most of the incidents documented by the Government occurred many years ago. It appears that Marks was charged and disciplined in connection with fights involving him and other inmates in 2008, 2009 and 2010, and that in 2013 he was found guilty of bribing a staff member. *See* Dkt. #511-2. The Government states that the bribery charge is Marks's "most recent litigated violation ... ." Gov. Mem. (Dkt. #503) at 16. While the Court does not discount those matters, it cannot be ignored that Marks has had no violations since, and that his most recent violation involving violent behavior occurred about ten years ago.

-18-

Aside from those incidents, the Government contends that during his incarceration, Marks has been a member of the "Dirty White Boys," which the Government describes as a "prison gang that espouses racist views and opinions." *Id.* at 14. The Government also alleges that federal Special Investigative Section ("SIS") officers have learned that Marks recently possessed a SIM card for a cellular telephone, in violation of prison contraband rules, and that he has been involved in transporting the drug Suboxone to other inmates. *See* Dkt. #503 at 2.

To shed some light on these matters, the Court held a hearing on December 17, 2019. The Government called a single witness, Steven Wascher. Wascher has been a BOP employee since 2014. He is currently employed as an SIS technician at FMC (Federal Medical Center) Lexington (Kentucky). Prior to that, he was a BOP officer.

Wascher testified about several matters. First, he testified about a search of Marks's cell that occurred on February 21, 2019. Wascher testified that on that day, a cell search was conducted on the alley that included Marks's cell. He stated that Marks's "cell was one of those on that alley, and we had previous information that there may be contraband in his cell. So we searched it along with the other cells." Hearing Tr. (Dkt. #526) at 12.

Wascher testified that "random" cell searches occur frequently, and are "supposed to happen daily throughout the day." *Id.* But he also stated that the officers conducting the search on that day had received information that Marks had contraband in his cell, specifically a SIM card. Wascher stated that he had been informed that Marks was trying to obtain a cell phone and SIM card to help him coordinate his activities aimed at obtaining Suboxone. *Id.* at 13.

Wascher stated that the officers conducting the search in Marks's cell found an empty SIM card holder, *i.e.*, the clear plastic cover for a SIM card, inside a Bible. He testified that the

Bible was on top of the wall locker belonging to Marks's then-cellmate (identified as "Moore"). Wascher said that Moore was questioned about it, and stated that the Bible belonged to him.  An incident report (Government's Hearing Ex. 1) was filed, and Moore eventually spent some time in the Special Housing Unit as a result.  Tr. at 43.  Marks was never charged or disciplined in connection with this matter.  *Id.*  All the evidence points to Moore, who admitted the offense and was punished for it.  Nevertheless, in an obvious effort to scrape together damaging evidence against Marks, the Government persists in attempting to paint him as the guilty party, based on the sketchiest of "proof."

Wascher could not state with any degree of confidence where the SIM card holder came from or to whom it belonged.  He testified that "if [he] had to pick an inmate and guess who it belonged to, [he] would say Mr. Marks," based mostly on his assessments of the personalities of Marks and Moore.  *Id.* at 19.  Wascher said this despite his testimony that Moore had admitted that the Bible in which the SIM card holder was found belonged to him.  *Id.* at 17.

As stated, Wascher also testified that he had been informed that Marks was attempting to obtain Suboxone (a drug used to treat opiate addiction), for distribution to other inmates.  Tr. at 13.  Wascher said that he was told that Marks wanted to get a cell phone, which he could use to coordinate his activities directed toward that end.  *Id.*

Apart from that testimony, however, neither in the hearing nor in any other evidence submitted to the Court has there been any indication that Marks has been involved in obtaining or distributing Suboxone, or attempting to do so.  On cross-examination, Wascher stated that he had "[n]othing specific" about that matter, and that it was "just information."  Tr. at 83.  Wascher was asked further about the matter, and in short, there was no evidence presented to substantiate

any allegation that Marks was involved in obtaining or distributing Suboxone.  Wascher may indeed have been told as much, but there is no evidence before me that such information was accurate or reliable.

Wascher next was asked about Marks's alleged membership in the "Dirty White Boys." He testified that in August 2019, he was contacted by the FMC Lexington legal department, and asked to look into a tattoo that federal prosecutors had noticed on a photograph of Marks that Marks had posted on social media.  In that photograph, the word "PRIDE" is visible on Marks's upper left arm, just under the sleeve of his t-shirt.

Wascher was directed to take a picture of the tattoo and to attempt to find out what it signified, or why Marks got it.  Pursuant to that request, Marks was summoned to an office, where he was interviewed by Wascher.  Wascher took photographs of Marks's upper body.  He then engaged in a "casual conversation" with Marks.

During that conversation, Marks "mentioned that he had ran [sic] with the Dirty White Boys" while Marks was housed at a different facility.  *Id.* at 22.  According to Wascher, Marks stated that he eventually decided that he no longer wanted to be involved in the group, and tried to distance himself from it.  Marks allegedly stated that the group had asked him to assault other inmates, because they were "minorities or homosexual," *id.*, but notably Marks did not say that he had ever done so, at least according to Wascher's initial testimony at the hearing.

The Government's attorney then showed Wascher an affidavit that he had previously signed.  (Dkt. #512-1.)  In that affidavit, Wascher stated that during this interview, Marks told him that "he had been a member of the 'Dirty White Boys'" and that "as a member of the Dirty White Boys gang he beat up other inmates at the direction of gang leaders."  *Id.* ¶ 7.  After

-21-

seeing the affidavit, Wascher said that it refreshed his recollection, and that Marks had said those

things.  Tr. at 28-29.

On cross-examination, Wascher described the Dirty White Boys as a "mid to low level"

gang that is classified as a "serious threat group," a lower level than "disruptive" groups, which

Wascher described as "extremely violent .. ."  *Id.* at 91.  He added that the Dirty White Boys are

"not like the Aryan Brotherhood or the Bloods or the Crips."  *Id.* at 69.  When asked if the Dirty

White Boys were "a significant problem," Wascher replied, "I wouldn't classify it as significant

... ."  *Id.* at 76.

During the hearing, little was said during direct examination about Marks's tattoo, which

was the ostensible reason why Marks was summoned to meet with Wascher in the first place.

More information was developed on cross-examination.

Wascher testified that he had been told simply to take photographs of Marks's tattoos.

The Government has submitted the photos that were taken by Wascher.  They show that Marks

has tattoos over much of his body, especially his back.

As it turned out, the full tattoo on Marks's arm was hardly the damning evidence that the

Government was probably hoping for.  The tattoo bears the words "Irish Pride," and an image of

a leprechaun dancing between those two words.  This appears to be yet another example of

Government prosecutors seeking to obtain as much "dirt" against Marks as possible.

Wascher was also asked about his investigation into certain monies that have been

transferred into Marks's prisoner account.  In October 2019, the Government filed a sworn

declaration of Wascher in which he referenced this matter.  (Dkt. #512-1.)

The gist of Wascher's statements in his declaration and his hearing testimony is that it appears that Marks has been running a business, in violation of prison rules, with assistance from an outside individual, who was apparently working for an organization seeking to gain clemency for non-violent drug offenders.  According to Wascher, Marks has done legal work (such as drafting court briefs and motions) for inmates, and those inmates have sent payments to that person, who has remitted money back to Marks.  Wascher Decl. ¶ 8; Tr. at 26-27.  On cross-examination, Wascher testified that he did not know whether Marks had ever informed any staff members that he was receiving money for providing legal assistance to other inmates, and that Wascher has never spoken to Marks about the matter.  Tr. at 88-89.  There is no evidence or allegation that Marks has ever been charged or disciplined for such activity.

**B. Findings**

Addressing the subjects of Wascher's testimony, which track the Government's assertions about Marks's activities in prison, the Court begins with the search of Marks's cell, which turned up the empty SIM card holder.  The Government would have the Court find that the SIM card holder belonged to Marks, and that his possession of the SIM card holder is evidence that he obtained or tried to obtain a SIM card and a cell phone, to facilitate his unlawful activities inside the prison.

That might raise concerns about Marks's claim that he has turned his life around and followed the straight and narrow path in recent years, if there were credible, convincing evidence to support it.  But there is not.

-23-

Wascher's testimony was somewhat confused about what occasioned the search of Marks's cell.  At some points in his testimony, he seemed to say that the search was purely routine, but at others he indicated that it was based on information that Marks had been attempting to obtain a SIM card.

It may be that the officers were conducting a routine, random spot-check of cells and decided to specifically target Marks's cell, but Wascher's testimony was unclear and not entirely consistent in that regard.  Although the circumstances leading up to the search are not in themselves of great importance, these inconsistencies do enhance Wascher's credibility.

Regardless of what led to the search, the search produced an empty SIM card holder in a Bible, on top of Moore's locker.  Moore claimed ownership of the Bible (it does not appear that he or anyone else admitted ownership of the SIM card holder itself).  Moore was charged with a violation, found guilty, and punished; Marks was not.

None of this information concerning Moore's acceptance of responsibility and punishment was contained in the Government's first submission on the motion pending before the Court.  Wascher admitted that he "initially" told the Government's prosecutor that the SIM card was found in Marks's Bible, but that such statement was incorrect.  He also admitted then that the statement in the Government's brief that the SIM card was found in Marks's Bible was likewise incorrect.  Wascher ultimately testified that he had no factual reason to doubt that the Bible in which the SIM card holder was found belonged to Moore, as Moore himself stated.  Those frank and remarkable concessions by Wascher on cross-examination render his direct testimony lacking in credibility.

Despite all this, Wascher opined that he believed that the SIM card holder belonged to Marks, and that Moore falsely claimed ownership of it because Marks coerced him to do so. Wascher Decl. ¶¶ 4, 5; Tr. at 19.  He testified that he based this belief on "[t]he previous information we had, the intelligence stating that [Marks] was in possession of [the SIM card holder], he was trying to gain access to a cell phone, the interactions with Mr. Marks versus the interaction with Inmate Moore.  Two completely different personalities."  Tr. at 18.  He added, "based on my experience, if I had to pick an inmate and guess who [the SIM card holder] belonged to, I would say Mr. Marks."  Tr. at 19.

While the Court does not discount the value of Wascher's experience, by his own frank admission his belief that the SIM card holder belonged to Marks amounts to nothing more than a guess.  A guess, even one based on experience, is still a guess.  *See Ruggiero v. Yamaha Motor Corp., U.S.A.*, 778 Fed.Appx. 88, 93 (3d Cir. 2019) (affirming district court's order excluding expert witness's opinion testimony which was "at best, an educated guess") (citation omitted).  Wascher's assessment of Marks's and Moore's personalities notwithstanding, his belief that Marks likely coerced Moore into taking the fall for him is based on nothing more than surmise.

In spite of all of Wascher's conjectures and speculation, he admitted on cross-examination that he was the one who wrote the incident report that led to Moore being charged and punished for having the SIM card holder.  Tr. at 43.  If Wascher truly thought that Marks was involved, there is no apparent reason why he could not have written the report to implicate Marks.  He did not do so.  This suggests, once again, an orchestrated effort to manufacture adverse information against Marks, no matter how speculative and conjectural.

Wascher also testified that there had been some suspicion or information that the reason why Marks was attempting to obtain a cell phone and SIM card was to facilitate his attempts to obtain and distribute the drug Suboxone.  If there is a paucity of evidence indicating that Marks possessed a SIM card, there is even less evidence concerning this.

When asked on cross-examination if he knew of any specific information connecting Marks with Suboxone, Wascher replied, "Nothing specific.  It was just information."  Tr. at 83. He did not identify the source of that information.  Wascher also testified that Marks was never charged in connection with Suboxone at FMC Lexington, and that as far as he knew, Marks had never been so charged at any other institution.  Tr. at 87.  All he could state was that Marks "had been under investigation for Suboxone."  *Id.*  Without at least some evidence indicating that there was a factual basis for such an investigation, or what the result of the investigation was, this is entitled to no weight whatsoever.

As to Marks's association with the Dirty White Boys, again Wascher's testimony was inconsistent.  In his declaration, Wascher stated that Marks "told [Wascher] that as a member of the Dirty White Boys gang he beat up other inmates at the direction of gang leaders."  Wascher Decl. ¶ 7.  At the hearing, Wascher testified on direct examination that Marks told him that Marks had "run with the Dirty White Boys" for some time during his incarceration at Coleman federal penitentiary, but eventually stopped associating with them "because he had matured and realized how stupid it was; and *they wanted him to assault – or asked him to assault* minorities and homosexuals ... ."  Tr. at 28 (emphasis added).  After being shown his declaration, to refresh his recollection, Wascher stated that Marks "told [Wascher] he was a member of the Dirty White Boys and he beat up other inmates at the direction of gang leaders."  Tr. at 29.

On cross-examination, Marks was asked, "You say that Marks told you that he participated in beatings at the behest of the leaders of the Dirty White Boys; is that correct?"  He responded, "I believe I said that Marks informed me that he was instructed to beat up homosexuals and minorities at their direction."  Tr. at 75.[5]          It is unclear from Wascher's own testimony, then, whether or not Marks told him that he ever actually assaulted anyone at the direction of Dirty White Boys leaders.

I also find it difficult to believe that Marks, knowing that his petition for a reduced sentence was pending, would volunteer, for no apparent reason, that he had beaten up inmates at the direction of gang leaders.  It seems far more plausible that if Marks did mention his past association with the Dirty White Boys, he did so to impress upon Wascher that his connection with that group was brief and that he had cut his ties to the Dirty White Boys, in part because they *wanted* him to assault other inmates.  If the Government is correct in its assertion that "Marks is certainly an intelligent man who knows how to manipulate the system," Gov't Mem. (Dkt. #503) at 19, it would be highly unlikely for him to freely admit that he had assaulted inmates at the direction of gang leaders.

Concerning Marks's tattoos, it is unsurprising that the Government has said little about them, since there is so little to say.  Wascher testified that he did not know why the Government wanted him to photograph Marks's tattoos, Tr. at 71, but the most likely explanation may be that someone from the Government saw the photograph of Marks, in which the word "PRIDE" is

---

[5] Wascher also testified on cross that there is no record of Marks having engaged in violence while he was at Coleman, although on redirect he opined that "[p]robably nine out of ten fights or assaults [that] happen in prison [prison staff] have no idea [that] they happen[ed]." Tr. at 75, 94.  Whether or not that estimate is accurate, the Court will not assume that Marks committed assaults for which he was never charged.

visible under his shirt sleeve, and wondered if the entire tattoo might have been gang related, racist, or otherwise incriminatory (*e.g.*, if it said "white pride").  It is not.

As to the payments into Marks's prisoner account, it appears that Marks may have been engaged in performing legal services for other inmates, or that he was facilitating others in providing such services.  It is also not clear whether he had permission from prison authorities to do so, though it does not appear that he was ever charged with any violations in that regard.

In any event, Marks' activities involving performing legal work are of relatively little significance in the context of this proceeding.  Even if Marks's activities amounted to "running a business" in contravention of prison regulations, there is no indication that the "business" was unlawful, violent or dangerous.  If Marks's alleged business activities were of concern to prison authorities, there is no apparent reason why they could not pursue disciplinary charges, but for the purposes of the pending motion for sentence reduction, this matter is relatively insignificant.

## C. Whether Marks Has Established Grounds for Relief

As a threshold matter, I note that even if a court finds extraordinary and compelling reasons to grant for sentence reduction, the court should also consider whether the defendant, if released, would pose "a danger to the safety of any other person or to the community."  *See*

-28-

U.S.S.G. § 1B1.13(2); 18 U.S.C. §§ 3142(g), 3582(c)(1)(A)(ii).[6]  *See, e.g., United States v. Mondaca*, No. 89-CR-655, 2020 WL 1029024, at *3 (S.D.Cal. Mar. 3, 2020).

I do not believe that Marks, if released, would pose such a danger.  But since the Court's reasons for reaching that conclusion are largely tied to my reasons for finding that Marks has demonstrated "extraordinary and compelling reasons" for relief, the Court will discuss those matters in conjunction with each other.

As the Court has previously stated, "I have never known a prisoner to do more to make changes in his life while incarcerated."  (Dkt. #493 at 3.)  The record that has been developed since then only serves to reinforce that conclusion.

As developed at the hearing, the Government's evidence of Marks's supposedly bad behavior during his incarceration has proven to be ephemeral and unconvincing.  If anything, the hearing testimony did little more than to undercut the credibility of the Government's broad assertions about Marks's irredeemably bad character.

But there *is* ample evidence that Marks has made a positive turnaround in his life.  That includes the abovementioned letters to the Court from various individuals, attesting to his accomplishments and good character, and the beneficial influence he has had on other inmates, as well as documents showing that he has completed numerous programs and educational courses.  I will not list them all individually, but they include:  Marks's obtaining an Associate of

_____

[6] On its face, § 3582 seems to provide that the "not a danger" factor only applies to prisoners over 70 years of age, who seek relief under § 3582(c)(1)(A)(ii).  Section 1B1.13 of the Guidelines tracks the statute in that regard.  *See United States v. Karr*, No. 17-CR-25, 2020 WL 774363, at *6 (E.D.Ky. Feb. 20, 2020) (describing the U.S.S.G.'s policy statement as an "odd construction" that both links and separates the questions of "extraordinary and compelling circumstances" and "danger" posed by the defendant).  But since the question is self-evidently a good one, the Court will address it, regardless.

Ministry degree from Vision International University, after completing 33 courses comprising 540 hours; an Individualized Reentry Plan prepared by the BOP, noting Marks's hundreds of hours of programming work and "good work reports" as an orderly; certificates showing his successful completion of various adult education programs, including the "Suicide Companion Program" and the "Alternatives to Violence Project"; letters and memos from BOP officers attesting to his good behavior and achievements in prison; and many letters from fellow inmates, likewise attesting to the positive influence that he has had on their lives during their incarceration. *See, e.g.*, Dkt. #469-1 at 16 (memorandum from Education Specialist T. Breeyear stating that Marks "has spent numerous hours" helping create a re-entry program for prison inmates); *id.* at 40-41 (letter from inmate describing Marks as "an inspiration to us all"); *id.* at 43 (letter from inmate stating that Marks is "selfless" and "willing to help anybody at anytime" who "motivates us to be better people"); *id.* at 49 (letter from the Human Rights Defense Center describing Marks as "a pleasure to work with" who is "passionate, conscientious, and hardworking"); *id.* at 76 (memo from BOP lieutenant stating that as an orderly, Marks "has an outstanding overall job proficiency"); *id.* at 78 (letter from a non-profit organization that works with prisoners, stating that the organization is "committed to hiring" Marks upon his release from prison).[7]  It is hard to imagine how Marks could have done much more in prison to demonstrate his efforts at rehabilitation.

---

[7] All the letters and documents documenting Marks's achievements and good character have been filed in this case under Docket numbers 496-1, 509, 521, and 524.  There are about 20 letters from various persons attesting to Marks's good character and the help he has provided to fellow inmates, as well as a number of internal memos from BOP staff, which also reflect Marks's consistently good behavior in job assignments and the like.

The Government discounts much of this as Marks's insincere, if not cynical, attempt to curry favor with the Court.  At oral argument, the Government's attorney asserted that Marks "intended to play up religion" from "the very earliest times" of this case.  Tr. at 138.  The record contains a letter from Marks to his then-lawyer in February 2004, stating in part that he had certificates for having completed drug programs, pre-college courses, and Bible correspondence courses, "which [he] hope[d would] help" him concerning the severity of the sentence he was facing.  (Dkt. #527-1 at 15.)  The Government has also submitted a letter from a former cellmate of Marks dated July 29, 2004 (before Marks's trial) stating that Marks, after admitting to many misdeeds, told him that he, Marks, was "going to start doing Biblical Studies [in an attempt] to sway [this Court's] decision" in his case.  (Dkt. #503-1 at 30.)

Several observations come to mind.  First, the fact that Marks's rehabilitative and educational efforts date back to before his conviction does not in itself tilt the scales one way or the other.  I have little doubt that if Marks had waited until after the passage of the First Step Act to begin those efforts, the Government would attempt to use that as evidence of his insincerity.

That puts Marks in a "Catch-22" situation.  If he had spent his free time in prison doing little but visiting the weight room, or sitting in his cell reading comic books, the Government would likely point to that as evidence of his incorrigibility or indolence.  Yet having taken consistent, years-long efforts to better his life and the lives of those around him, Marks finds himself accused of a cynical attempt to play on the Court's sympathies.  The Government is apparently unwilling even to consider the possibility that Marks's efforts have been sincere.  In the Government's view, there is no place for redemption.  I do not share that view.

In that regard, it is worth noting that though Marks has long been seeking legal relief, his rehabilitative efforts began years before the enactment of the First Step Act.  It would have taken remarkable prescience for Marks to anticipate, many years ago, the changes that lay ahead with respect to federal sentencing laws, and to devote himself to building up a resumé that he could use in support of an application for judicial relief, at some then-unknown time in the future.  Most lawyers and legislators could not have anticipated such remarkable changes in the law.

Furthermore, the mere fact that some self-interest may have been involved is hardly remarkable, and is not a reason to disregard Marks's accomplishments since then.  Whatever motives may have *initially* prompted Marks to undertake rehabilitative efforts, the fact is that he has followed that path for many years, by all appearances to the benefit of himself and others.  If actions speak louder than words, then Marks's actions have spoken volumes.  To ignore those efforts would only serve to discourage prisoners from making any efforts at rehabilitation, which is presumably not what Congress had in mind when it gave prisoners the ability to seek direct relief from the courts.

The Court also recognizes that Congress's grant of authority to courts to entertain prisoner-filed motions for reduction of sentence was not intended to give courts free rein to modify previously-imposed sentences.  *See United States v. Goodwyn*, 596 F.3d 233, 235 (4th Cir. 2010) ("The law closely guards the finality of criminal sentences against judicial 'change of heart'").  The general principle still holds that courts may not alter previously-imposed sentences, absent an express grant of authority.  *Freeman v. United States*, 564 U.S. 522, 526 (2011).

-32-

Although the First Step Act does confer such authority, *see United States v. Hemphill*, No. 08-CR-008, 2020 WL 60237, at *1 (E.D.Tenn. Jan. 6, 2020), and though Congress clearly sought to increase the availability of compassionate release, Congress did not mean to open the floodgates in that regard.  The court must still find "extraordinary and compelling reasons" for relief.  *See United States v. Rivernider*, 10-cr-222, 2020 WL 597393, at *2 (D.Conn. Feb. 7, 2020) ("In eliminating the requirement of a BOP motion, Congress did not modify the substantive standard governing eligibility for compassionate release"); *United States v. Ebbers*, No. 02-CR-1144, 2020 WL 91399, at *4 (S.D.N.Y. Jan. 8, 2020) (same).

As another district judge has put it, releasing defendants from incarceration is always "a delicate business" not to be done cavalierly, *Brown*, 411 F.Supp.3d at 451, but Congress has set up safeguards to ensure that courts may not "release *any* prisoner through compassionate release ... ." *Id.* (emphasis added).  Sympathy alone is not enough, but, "if the FSA is to increase the use of compassionate release, the most natural reading of the amended § 3582(c) and § 994(t) is that the district court assumes the same discretion as the BOP Director when it considers a compassionate release motion properly before it." *Id.*  The same standards remain in place; all that has changed is that the BOP director is no longer the sole gatekeeper who decides whether courts may consider a motion for compassionate release.  The court decides what warrants release or reduction of sentence.

As mentioned, the Court should also consider whether, upon release, the defendant would pose "a danger to the safety of any other person or to the community."  In that regard, this Court is not faced with a stark choice between simply turning Marks loose, or continuing his

-33-

incarceration.  The Court has the option of reducing Marks's period of incarceration, followed by a term of supervised release.

Supervised release, which is laid out at 18 U.S.C. § 3583, was created by Congress as "a form of postconfinement monitoring overseen by the sentencing court."  *Johnson v. United States*, 529 U.S. 694, 696-97 (2000).  As the Supreme Court has explained, "Congress intended supervised release to assist individuals in their transition to community life.  Supervised release fulfills rehabilitative ends," providing "individuals with postconfinement assistance" through the supervision of the court.  *United States v. Johnson*, 529 U.S. 53, 59 (2000).  "The court can provide such assistance because, '[w]hile on supervised release, the offender [is] required to abide by certain conditions,' *Johnson v. United States*, 529 U.S. at 697, such as regularly reporting to a probation officer, pursuing schooling or work, and refraining from further criminal activity, *see* U.S.S.G. § 5D1.3(c); 18 U.S.C. § 3583(d)."  *United States v. Island*, 916 F.3d 249, 253 (3d Cir. 2019).  Congress has also authorized supervising courts to revoke supervised release and order re-imprisonment when defendants fail to meet their release conditions.  *See* 18 U.S.C. § 3583(e); *Johnson v. United States*, 529 U.S. at 697.

Supervised release is routinely imposed as a component of sentencing, including sentences for crimes far more serious than those of which Marks has been convicted.  Supervised release affords the court an array of conditions which it can impose, the defendant's compliance with which will be monitored by a probation officer.  New conditions can be added as necessary.  Beyond the low risk that Marks now presents, whatever risk there is can be further mitigated by supervised release.  *See United States v. Williams*, No. 04cr95, 2020 WL 1751545, at *3 (N.D.Fla. Apr. 1, 2020) (although court could not conclude that defendant posed no risk at all to

public safety, "the risk of him engaging in further criminal conduct is minimal and can be managed through home confinement and the terms of his supervised release").

It is undisputed that at one point in this case, during plea negotiations, the Government floated the idea of a straight 20-year plea.  Rodriguez Aff. (Dkt. #295) at 15-16.  According to the prosecutor, Marks's then-attorney rejected the offer as "too much time" and because he did not think that Marks would be amenable to the offer.  *Id.* at 16.

Clearly, then, at one time the Government was open to the idea of Marks being released from prison after twenty years.  As explained above, I see no reason why Marks is more dangerous now than he was then.  The evidence before the Court indicates quite the contrary.

The Court is not suggesting that a defendant can refuse a plea offer, and then years later, having received a stiffer sentence than what he was offered, retroactively "accept" the offer.  The point is that the Government's prior willingness to consider a 20-year plea deal undercuts its present argument that Marks is too dangerous to be released before the end of his current 40-year sentence.  The Government has strenuously argued that Marks's behavior in prison has made him even less of a candidate for early release, but for the reasons given, I am not persuaded by that argument.

After considering all the relevant factors, including all the sentencing factors under § 3553(a), I find that Marks has established grounds for relief under § 3581(c)(1)(A)(i).  The reasons for my conclusion have been amply laid out above, but it would be useful to recapitulate the most salient points.

Marks has met the procedural requirements for bringing a motion under 18 U.S.C. § 3582(c)(1)(A)(i).  He filed an administrative request for a motion for reduction of sentence, and none has been forthcoming from the BOP.

Second, this Court may decide whether Marks has demonstrated "extraordinary and compelling reasons" for relief, irrespective of the BOP's views (or silence) on the matter.

Third, although the First Step Act's retroactivity provisions with respect to the Fair Sentencing Act do not directly apply to Marks (since he was convicted prior to the effective date of the Fair Sentencing Act) the First Step Act is instructive, inasmuch as it evidences Congress's intent to mitigate the harsh and sometimes unjust effects of the sentencing laws.  That includes the mandatory "stacking" of § 924(c) counts, which drastically increased Marks's sentence above what it would otherwise have been.  Congress has deemed such stacking unfair and excessive, and decided that it no longer controls new cases.

Fourth, a prisoner's rehabilitation alone cannot be grounds for relief, but the Court may still consider it as a relevant factor.  It could be error for the Court to ignore it.  The record amply demonstrates that Marks has taken extraordinary steps in that direction, and that he began doing so at a time when he could not have foreseen the forthcoming changes in the law.  Combined with the changes in the sentencing laws, Marks's efforts toward rehabilitation lead me to conclude that he has established extraordinary and compelling reasons for a reduction of his sentence.

Fifth, I find that if released, Marks would not pose a danger to the safety of any other person or to the community.  The Court has no crystal ball with which to foresee the future, but that is not what is required.  If it were, few if any defendants would ever be granted relief, and

that is clearly not Congress' intent.  Considering all the evidence, the Court must make an

independent determination, and in this case, given Marks's clean disciplinary record for many

years past, and his demonstrably successful efforts at rehabilitation, I conclude that upon release,

he will not pose a danger to the community.

I short, the record reflects that Marks has done virtually everything in his power to

rehabilitate himself.  The one thing that is not in his power is his release from prison and his

return to society.  That power lies with the Court.

I recognize that the Court does not sit as a super parole board.  The Court has no inherent

power to grant clemency to previously sentenced defendants, whether based on their good

conduct in prison or for any other reasons, no matter how compelling those reasons might seem.

The operative word there, though, is "inherent."  In other words, the Court may not, as a

matter of course, alter a defendant's sentence for reasons of mercy or sympathy.

But that does not mean that the Court is powerless to act.  Congress has expanded courts'

powers to modify defendants' sentences, as set forth above.  Pursuant to that authority, and for

the reasons stated above,  I conclude that Marks is entitled to relief, as set forth below.


**D. What Relief is Appropriate in this Case**

The final question is what relief to grant.  Again, the Court need not choose between

immediate, unconditional release or no relief at all.

Having weighed the relevant circumstances, in light of the evidence and the law, I

conclude that the appropriate relief here is to reduce Marks's sentence to an aggregate term of

twenty years' imprisonment, followed by an eight-year term of supervised release. The term of supervised release shall be governed by the terms set forth in the original Judgment (Dkt. #328).[8]

In reaching this conclusion, the Court notes that even twenty years is more than that imposed on Marks's codefendants, who received sentences of 13 years (Richard Ross, Dkt. #142), 15 years and one month (Nathan Brown, Dkt. #256), and 12 years and seven months (Tommy Hardy, Dkt. #276). None of those codefendants were minor participants in the offense. I recognize that those defendants pleaded guilty, while Marks elected to proceed to trial. The point is that his sentence remains a hefty one, and for all the reasons stated above, in my discretion, I find that it is appropriate here.

## CONCLUSION

Defendant's motion for reduction of sentence pursuant to *United States v. Holloway* (Dkt. #491) is denied.

---

[8] On October 18, 2019, the Court directed the Probation Office to prepare a "supplement" to the original Presentence Report, "addressing the proper sentence if defendant were to be sentenced today, taking into account intervening changes" in the law, including the First Step Act. (Dkt. #514.)

Probation submitted a report on November 4, 2019, which calculated an aggregate recommended sentence of 60 to 190 years, based on a series of Guidelines calculations.

At oral argument on Marks's motions, I stated that "my first reaction [upon reading that] is to laugh ... ." (Dkt. #523 at 39.) I stated then, as I do now, that this serves only to demonstrate how little deference this Court owes to the Guidelines. Far worse criminals are sentenced to far lighter sentences, often with the Government's consent. While the Guidelines often warrant some consideration from the Court, in this instance the Guidelines are so extreme and outrageous that they deserve no consideration whatsoever in determining what sentence is appropriate.

-38-

Defendant's motion for reduction of sentence pursuant to 18 U.S.C. § 3582(c)(1)(A)(I) (Dkt. #498) is granted.  Defendant's sentence is reduced to an aggregate total of twenty (20) years' imprisonment, to be followed by a five-year term of supervised release, as set forth here.

Defendant is committed to the custody of the Bureau of Prisons for a term of ten (10) years concurrent on Counts 1, 7, 9, 11, 13 and 15; five (5) years' imprisonment on Count 8, to run consecutive to the ten-year term on Counts 1, 7, 9, 11, 13 and 15; and five (5) years on Count 10, consecutive to all other sentences, for a total aggregate sentence of twenty (20) years' imprisonment.

The Court imposes a five (5) year term of supervised release, to run concurrently, on all counts of conviction.

All other terms and conditions of supervised release, fines and special assessments imposed in the original Judgment filed May 12, 2008 remain in full force and effect.

I direct the Clerk of the Court to promptly prepare an amended judgment accordingly.

IT IS SO ORDERED.

_____
            DAVID G. LARIMER
         United States District Judge

Dated: Rochester, New York
            April 20, 2020.

-39-